HERRICK, FEINSTEIN LLP
Stephen B. Selbst
Janice Goldberg
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
sselbst@herrick.com
jgoldberg@herrick.com

*Attorneys for the Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                                                          :
In re                                                     :    Chapter 11
                                                          :
WYTHE BERRY FEE OWNER LLC,                                :    Case No. 22-11340 (MG)
                                                          :
                              Debtor.                     :
-------------------------------------------------------- x
                                                          :
WYTHE BERRY FEE OWNER LLC,                                :    Adv. Proc. No. ____(MG)
                                                          :
                              Plaintiff,                  :
                                                          :
        v.                                                :
                                                          :
NEW YORK STATE DEPARTMENT OF                              :
TAXATION AND FINANCE,                                     :
                                                          :
                                                          :
                                                          :
                              Defendant.                  :
-------------------------------------------------------- X

## ADVERSARY COMPLAINT

Wythe Berry Fee Owner LLC, as debtor and debtor-in-possession (the "**Debtor**"), by its

counsel, Herrick, Feinstein LLP, as and for its complaint against defendant New York State

Department of Taxation and Finance ("**NYS Finance**"), alleges as follows:

## NATURE OF THE ACTION

1.      The Debtor, as landlord, entered into a lease dated February 28, 2017 (the "**Lease**") with Wythe Berry LLC ("**Lessee**"), pursuant to which the Debtor leased The William Vale Hotel, office, retail, and parking located at 55 Wythe Avenue, Brooklyn, New York (together, the "**WV Complex**"), a copy of which is attached as **Exhibit A**. The Debtor brings this action pursuant to section 505(a) of the Bankruptcy Code seeking a declaration that it has no sales tax liability (the "**Sales Tax Liability**") owed to NYS Finance in respect of the personal property included in the Lease because the Lease was a sale of such personal property for tax purposes.

2.      If the Court determines, however, that the transaction was a lease of personal property for tax purposes, the Debtor seeks a determination of such Sales Tax Liability for the period from October 6, 2022, through October 31, 2023 (the "**Tax Period**"), the date that Lessee vacated the WV Complex.

3.       Because the amount of the Debtor's Sales Tax Liability, if any, would constitute an administrative expense under section 507(a)(8) of the Bankruptcy Code, the Debtor has an urgent need to determine whether it has any Sales Tax Liability, and if so, the amount thereof, so that the funds necessary to pay the Sales Tax Liability can be segregated and deducted from funds otherwise payable to creditors under the Debtor's plan of reorganization.

## PARTIES

4.      The Debtor is a Delaware limited liability company with its principal place of business at 55 Wythe Avenue, Brooklyn, New York 11249.

5.      Defendant New York State Department of Taxation and Finance is the taxation agency of the government of the State of New York and maintains an office at Harriman Campus Road, Albany, New York 12227.

## JURISDICTION

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).

7.      Venue is appropriate under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.      The Lease Includes Personal Property**

8.      Section 1.1.2 of the Lease provides that the Leased Premises (as defined in the Lease) includes: "All Equipment, furniture, inventory, and other personal property in "AS IS and WHERE IS" condition…to which Lessor has lawful title[.]" (the **"Leased Personal Property"**). Ex. A at §1.1.2.

9.      Section 2.1 of the Lease provides for an annual rental of $15,000,000, payable in two installments of $7,500,000. The Lease does not allocate any portion of the rent payable to the Leased Personal Property.

**B.      The State Court Action**

10.      The Debtor terminated the Lease effective May 20, 2021, based upon Lessee's failure to pay rent and other defaults, yet Lessee held over at the premises until October 31, 2023.

11.      On June 11, 2021, the Debtor commenced an action styled *Wythe Berry Fee Owner LLC v. Wythe Berry LLC*, Index No. 514152/2021 (Kings Cnty. Sup. Ct.) (the "**State Court Action**"). The complaint alleged breaches of the Lease based on Lessee's failure to pay rent and other defaults and sought a judgment, *inter alia,* that the Lease had been terminated.

12.      In December 2021, the Court in the State Court Action entered an Order (the "**December 2021 Order**") requiring Lessee to pay $15 million annually (in two semi-annual installments of $7.5 million each) in use and occupancy to the Debtor, commencing February 1, 2022, as a condition of Lessee's continued occupancy at the WV Complex. Lessee paid $7.5

million on February 1, 2022, but withheld the payment due on August 1, 2022, until January 26, 2023. Lessee made additional payments of $7.5 million, on February 1, 2023, and August 1, 2023.

**C.      The Involuntary Chapter 11 Filing and Removal of the State Court Action**

13.      On October 6, 2022 (the "**Petition Date**"), Mishmeret Trust Company Ltd., in its capacity as Trustee (the "**Trustee**") of the Series C Bonds issued by All Year Holdings Ltd. and certain holders of the Series C Bonds, filed an involuntary petition seeking entry of an Order for Relief against the Debtor [ECF No. 1, 2]. On January 18, 2023, this Court entered an Order for Relief against the Debtor [ECF No. 56].

14.      On February 14, 2023, the State Court Action was removed to this Court, and is now proceeding as Case No. 23-10112 (MG) (the "**Adversary Proceeding**").

15.      On August 23, 2023, the Debtor filed a motion for partial summary judgment in the Adversary Proceeding, seeking a declaration that the Lease had been terminated as of May 20, 2021 [Adversary Proceeding, ECF Nos. 30-31]. On October 5, 2023, the Court granted partial summary judgment to the Debtor, finding that, *inter alia*, the Lease was cancelled and terminated on May 20, 2021 [Adversary Proceeding, ECF No. 45].

**D.      Sale Process; Plan of Reorganization**

16.      On February 6, 2024, the Debtor filed its plan of reorganization (the "**Plan**") [ECF No. 242], which contemplates that the WV Complex will be sold, with the proceeds from the sale of the WV Complex used to fund payments of claims and administrative expenses.

17.      In order to confirm the Plan, section 1129(a) of the Bankruptcy Code requires*, inter alia*, that all administrative claims and expenses be paid.

18.      If the Debtor has any Sales Tax Liability, such liability would constitute an administrative expense, the amount of which is unknown to the Debtor because it has not filed sales tax returns with NYS Finance for the Sales Tax Period. Thus, the Debtor has an urgent need

for a determination: (A) that it has no Sales Tax Liability, or (B) if it is so liable, of the amount of the Sales Tax Liability in order to confirm the Plan.

**E.    Sales Tax Liability**

19.    When New York state and local sales tax (the "Sales Tax") is due on a stream of periodic payments depends upon whether the underlying taxable transaction is an installment sale or a lease (on personal property subject to sales tax).[1]  Where, as here, the underlying transaction involved both real property and personal property, the Sales Tax Liability, if any, only applies to the personal property in the transaction.

20.    If the underlying transaction is an installment sale, the Sales Tax is calculated on the full sale price of such personal property and is due at the inception of the installment sale.  In contrast, if the underlying transaction is a lease (other than a lease for motor vehicles), the Sales Tax is calculated on each lease payment and is due when and as each lease payment is due.

21.    Whether an underlying transaction is treated as an installment sale or lease depends upon the transaction's economic terms, not upon the nomenclature or documentation used by parties. In general, a transaction denominated as a lease will be treated as an installment sale for Sales Tax purposes if the lease payments are "substantially equivalent to the value" of the leased property and the lessee eventually becomes or has the option to become the owner of the property. For federal income tax purposes, a "lease" will be treated as a sale if the lease terms transfer economic ownership to the "lessee."

22.    Courts have held that a lease should be treated as an installment sale if "the terms of the contract are such that the lessee's only sensible course, at the end of the contract term, is to

---

[1] See, Tax Law § 1107(a); NYC Admin. Code § 11-2001(a); NYS Finance Publication 718. The current New York City sales tax rate is 4.5% plus a Metropolitan Commuter Transportation District surcharge of 0.375%. The current New York State sales tax rate is 4%; thus, the combined sales tax rate is 8.875%.

become the owner of the goods." *In re Herold Radio Electronics Corp.,* 218 F. Supp. 284 (S.D.N.Y. 1961), *aff'd* 327 F.2d 564 (2d Cir. 1964).

23.    In determining whether a transaction styled as a lease is a sale for tax purposes, courts look at the aggregate amount of rent to be paid by the lessee and compare it to the purchase price or fair market value of the equipment at the inception of the lease. Courts also look at the residual value, if any, of the equipment, at the end of the lease term, and whether the lessee has a bargain purchase price or discounted purchase price to acquire at the maturity of the lease.

**F.    The Stout Report**

24.    While preparing for a sale of the WV Complex, the Debtor began to analyze the potential sales tax consequences to the Debtor of the sale. In connection with its analysis, it learned that the Debtor had never filed sales tax returns with respect to any payments received under the Lease. After learning of its potential Sales Tax Liability, the Debtor engaged Kyle TenHuisen of Stout Risius Ross LLP ("**Stout**"), whose report is annexed hereto as **Exhibit B** (the "**Stout Report**") to assist the Debtor in analyzing the Sales Tax Liability. Stout is a global advisory firm specializing in corporate finance, accounting and transaction advisory, valuation, financial disputes, claims, and investigations. www.stout.com.

25.    To enable the Debtor to determine the Sales Tax Liability, Stout conducted a retrospective appraisal of the Fair Rental Value ("**FRV**") of the Leased Personal Property as of February 28, 2017, the date of the Lease. In its report, Stout explained that:

> In principle, the concept of Fair Rental Value is to determine what a fair and equitable rental payment would be for the use of an asset (or group of assets) for a given period of time to enable the lessor to recover a reasonable return on their investment and provide a reasonable payment structure for the lessee.

Ex B. at 15.

26.     The Stout Report explains that a calculation of FRV requires a determination of the lease term or rental term, a current value of the asset(s) at the beginning of the defined term, the projected residual value of the asset(s) at the end of the defined term, and the required rate of return. A generally accepted financial payment function is then used to calculate the FRV. *Id.*

27.     To determine the FRV, Stout first conducted an investigation of the Lessee's books and records, and physically inspected the WV Complex to assess the categories and condition of the Leased Personal Property. Ex. B. at 8-11. Stout determined that there were ten major categories of personal property that constituted the Leased Personal Property. Ex. B at 11.

28.     To determine the appropriate term of the lease of the Leased Personal Property, Stout reviewed hotel renovation and refurbishment cycles, hotel soft goods replacement cycles, hotel FF&E (i.e., fixtures, furnishing and equipment) useful lives, and had discussions with market participants. On average these indicated an expected life of seven to ten years. Here, a majority of the Leased Personal Property was still in service as of the date of Stout's physical inspection (nearly seven years from the Valuation Date). Based on that investigation, Stout determined that eight years was a reasonable defined term for the Leased Personal Property in the context of the FRV analysis. Ex. B at 18.

29.     The next two factors Stout considered were the current value and residual value of the Leased Personal Property, which represent the present value and future value concepts, respectively, in its FRV analysis. The current value is the value of the Leased Personal Property at the beginning of the Lease term, while the residual value represents the anticipated future value of the Leased Personal Property at the end of the term. Stout found that within the leasing industry the residual value typically represents the amount that can be recovered by selling the asset(s) at the end of the lease term. Ex. B at 19.

30.     Stout determined that the fair market value of the Leased Personal Property at the WV Complex on February 28, 2017, was $6,640,000 and that residual value of the Leased Personal Property was $329,000. Ex. B at 19.

31.     The final factor that Stout analyzed was the appropriate rate of return for a lease of the Leased Personal Property with a lease term of eight years. As set forth in the Stout Report, Stout considered a variety of information sources, and concluded that the appropriate rate of return was 10%. Ex. B at 21.

**G.     The Stout Report Establishes that the Lease was an Installment Sale of the Leased Personal Property**

32.     In determining whether a transaction styled as a lease of personal property should be treated as a sale for Sales Tax purposes, courts consider, *inter alia,* the value of the personal property at the inception of the lease, the total payments to be made by the lessee during the duration of the lease, and the residual value, if any at the end of the lease. A review of these factors establishes that the Lease was an installment sale of the Leased Personal Property for tax purposes, including Sales Tax.

33.     According to the Stout Report, the Lease term far exceeded the useful life of the Leased Personal Property. As a result, the portion of the Lease payments allocable to the Leased Property, by definition, must be substantially equivalent to the value of the Leased Personal Property. Furthermore, the Lease did not require the Lessee to replace or repair any Leased Personal Property. Upon the termination of the Lease, the Lessee merely  had to return to the Debtor any remaining Leased Personal Property in an "as is, where is" condition, without any obligation to repair, replace, restore, or restock.

34.     Thus, although the Lease did not formally transfer title of the Leased Personal Property to the Lessee or provide a purchase option to the Lessee, the only sensible economic

option for both the Debtor and the Lessee was for the Lessee to retain possession of any remaining Leased Personal Property at the expiration of the Lease. Therefore, under the principles outlined above, the Lease should be treated as an installment sale for Sales Tax purposes.

35.    Because the Lease should be treated as an installment sale of the Leased Personal Property for Sales Tax purposes, the Sales Tax on the Leased Personal Property was due and should have been paid at the commencement of the Lease in 2017. Accordingly, the Debtor seeks a determination that the Lease was an installment sale of the Leased Personal Property, and that it has no Sales Tax Liability arising from that transaction.

**H.    Alternatively, the Court should determine the Debtor's Sales Tax Liability**

36.    Based on the data and values described in paragraphs 24-35 above, Stout determined that the *monthly* FRV of the Leased Personal Property was $98,000, which equates to an *annual* rate of $1,176,000. Applying the applicable tax rate of 8.875% to the Tax Period, the Debtor determines its Sales Tax Liability as follows:

| Period | Tax Liability |
|---|---|
| October 6, 2022-October 31, 2022 | $7,294 |
| November 1, 2022-October 31, 2023 | $104,370 |
| Total | $111,663 |

**RELIEF REQUESTED**

37.    By this Complaint, the Debtor seeks a determination by this Court that: 1) that the Debtor has no post-petition Sales Tax Liability because the Lease constituted an installment sale of the Leased Equipment for purposes of Sales Tax Liabilty, or alternative, (2) if the Court does ot determine that that the Lease constituted an installment sale of the Leased Equipment for purposes of Sales Tax Liability, then (A) its Sales Tax Liability for the period from October 6, 2022-October

31, 2022 is $7,294, and B) that its Sales Tax Liability for the period from November 1, 2022-October 31, 2023 is $104,370.

**I.      Section 505 of the Bankruptcy Code Authorizes this Court to Determine the Debtor's Liability for Unpaid Sales Tax**

38.     Section 505 of the Bankruptcy Code grants this Court broad authority to determine the amount or legality of "any tax … whether or not paid." 11 U.S.C. §§ 505(a)(1), (a)(2)(B). This broad authority includes the power to determine sales taxes of the kind addressed by this motion.

39.     Section 505 contains only three exceptions to the Court's authority to determine tax liabilities, none of which apply here. The first exception prohibits bankruptcy courts from determining "the amount or legality of a tax ... if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title." 11 U.S.C. § 505(a)(2)(A). Section 505(a)(2)(A) is akin to a *res judicata* or collateral estoppel provision, which bars a bankruptcy court from hearing disputes if the tax liability at issue has been contested and determined on the merits pursuant to an adversarial hearing. This exception is not relevant because the Debtor has not even filed – let alone adjudicated – returns for the sales taxes at issue here.

40.     The second exception, contained in section 505(a)(2)(B), prohibits a determination as to a debtor's entitlement to a tax refund before the earlier of: (a) 120 days after the debtor's proper request of such refund from the governmental unit from which such refund is claimed; or (b) a determination by such governmental unit of such request. 11 U.S.C. § 505(a)(2)(B). Here, the Debtor has made no claim for a tax refund, so this section is similarly inapplicable.

41.     The third exception, section 505(a)(2)(C), prevents the Court from determining the amount of any *ad valorem* tax if the applicable periods for contesting or redetermining such

amount under nonbankruptcy law have expired. 11 U.S.C. § 505(a)(2)(C). Because the taxes at issue here are not *ad valorem* taxes, this section is similarly inapplicable.

42.    Accordingly, the Court has the authority to make the Debtor's requested determination of the Sales Tax Liability. The Court should exercise that authority here. Section 505 exists to facilitate the administration of the bankruptcy estate by allowing debtors to determine, in an efficient fashion, their tax liabilities.

43.    Without the relief the Debtor is seeking, the Debtor has no certainty as to whether it has any Sales Tax Liability for the Tax Period. Even if the Debtor filed returns for the Tax Period, it has no assurance as to when NYS Finance would review them, a process that could take years to conclude. The Debtor is proceeding to confirmation of its Plan and needs a determination of the Sales Tax Liability, if any, so that if it has any Sales Tax Liability, it can properly withhold amounts payable from funds otherwise distributable to creditors. Streamlining the process in this Court would considerably aid the speed and effort required to determine the Debtor's Sale Tax Liability, if any, and would thus benefit both the Debtor's estate and creditors.

## CAUSE OF ACTION

**(Declaratory Judgment)**

44.    The Debtor repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 44 above as if fully set forth herein.

45.    There is a real and justiciable controversy between the parties as to their rights and obligations with respect to (a) whether the Lease should be treated as an installment sale of the Leased Personal Property, in which event the Debtor has no Sales Tax Liability, or (B), if the Lease is not treated as an installment sale, the amount of the Debtor's Sales Tax Liability for the period from the Petition Date through October 31, 2023.

11

46.     The Debtor is thus entitled to a declaratory judgment pursuant to Section 505 of the Bankruptcy Code as to the amount of its Sales Tax Liability, if any.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Debtor respectfully requests that the Court:

1)  Enter judgment according to the declaratory relief sought;

2)  Enter such other further relief to which the Debtor may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

Dated: March 27, 2024                              **HERRICK, FEINSTEIN LLP**

                                                    */s/ Stephen B. Selbst*
                                                    Stephen B. Selbst
                                                    Janice Goldberg
                                                    2 Park Avenue
                                                    New York, NY 10016
                                                    Telephone: (212) 592-1400
                                                    Facsimile: (212) 592-1500
                                                    E-mail: sselbst@herrick.com
                                                              jgoldberg@herrick.com

                                                    *Attorneys for the Plaintiff*

Exhibit A

# LEASE AGREEMENT

THIS **LEASE AGREEMENT** (this "**Lease**"), dated as of February 28, 2017 (the "**Effective Date**"), by and between **WYTHE BERRY FEE OWNER LLC** ("**Lessor**") and **WYTHE BERRY LLC** ("**Lessee**").

## WITNESSETH

**WHEREAS**, Lessor owns a complex consisting of a luxury hotel containing 183 rooms (the "**Hotel**"), as well as office, retail and parking, located at 55 Wythe Avenue, Brooklyn, New York (collectively, the "**Complex**");

**WHEREAS**, Lessee currently operates the Complex and is aware of any and all existing conditions thereat; and

**WHEREAS**, Lessor desires to lease to Lessee, and Lessee desires to lease from Lessor, the Complex and the other real and personal property, equipment and interests described in this Lease on the terms and conditions described below.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and agreements contained in this Lease, and other good valuable consideration, the receipt and sufficiency of which are acknowledged and confessed, the parties, intending to be legally bound, agree as follows:

## ARTICLE I
## LEASE

1.1     **Leased Premises.** Lessor hereby leases, rents and lets unto Lessee, and Lessee hereby leases, rents and hires from Lessor, for the Lease Term (as hereinafter defined) and subject to all the covenants and conditions hereinafter stated, all rights, title and interest of Lessor in and to the following (collectively, the "**Leased Premises**"):

1.1.1   All of the land and the real property upon which the Complex is located (the "**Real Property**"), including without limitation the building and fixtures (the "**Buildings**") located thereon, together with all tenements, hereditaments, rights, privileges, interests, easements and appurtenances now or hereafter belonging or in any way pertaining to the Real Property, Buildings and/or the Complex and subject to each and every matter affecting title to the Leased Premises, including, without limitation, all easements, rights of way, covenants, conditions and restrictions, liens, encumbrances, encroachments, licenses, changes, zoning laws, ordinances, regulations, building codes and other applicable laws. The Real Property is more particularly described on Exhibit A attached hereto.

1.1.2   All equipment, furniture, inventory, and other personal property in "AS IS and WHERE IS" condition without representations or warranties (to which Lessor has lawful title, specifically including, but not limited to, office supplies, other

supplies and foodstuffs (hereinafter the "**Inventory**"), appliances, tools, instruments, and other tangible personal property owned by Lessor as of the date of this Lease, and located on the Real Property (the "**Personal Property**"). In the event that any Lessor's Personal Property requires replacement, maintenance or upgrading, for any reason whatsoever, and without notice or demand of Lessor, Lessee is obligated to provide for the same at its own cost and expense and Lessor shall have no obligation therefore and such replacement shall immediately become Lessor's Personal Property.

     1.2    **Lease Term**. The term of this Lease shall commence as of February 1, 2017 (the "**Commencement Date**"), and terminate January 31, 2032 (the "**Expiration Date**"), unless sooner terminated as hereinafter provided (the "**Lease Term**"). Lessee hereby acknowledges that it is currently in possession of and operates the Complex, and assumes all of the obligations with respect to the existing conditions thereat. Notwithstanding anything herein to the contrary, Lessee agrees to and does hereby indemnify and hold the Lessor, its officers, directors, agents, employees and lenders harmless from and against any claims, demands, causes of action, liability, loss, damage, deficiency, cost or expense (including, without limitation, reasonable attorney's fees and associated costs and expenses) resulting from (i) any of the existing conditions at the Complex or (ii) any violations shown on the Title Proforma (as hereinafter described).

     1.3    **Renewal**. Upon the expiration of the Lease Term, the Lease shall be automatically renewed for a period of seven (7) years (as reflected in Section 17.3 hereof), unless terminated by the Lessor or Lessee at least thirty (30) days prior to the expiration of the Lease Term. Notwithstanding anything herein to the contrary, Lessee shall pay all transfer taxes, including New York State Real Estate Tax and New York City Real Property Transfer Tax imposed in connection with any additional extension of the Lease Term.

     1.4    **End of Term**. On the Expiration Date or such earlier date that this Lease terminates or expires, the Lessee shall peaceably and quietly surrender the Leased Premises to the Lessor vacant (except for those sublessees occupying under leases with the Lessor, if any), broom clean, in good order, condition and repair excepting reasonable wear and tear and damage that is not the Lessee's obligation to repair, free and clear of all subleases and Liens (as hereinafter defined) (except for subleases and Liens caused or expressly consented to by the Lessor), and with all Personal Property acquired (or leased) by the Lessee (other than such Personal Property which is being used in connection with the operation of the Hotel) and all personal property of sublessees (except for the property of sublessees occupying under leases with the Lessor) removed.

## ARTICLE II
## LEASE PAYMENTS AND OTHER FINANCIAL CONSIDERATIONS

     2.1    **Rent**. During the first year of the Lease Term, Lessee covenants and agrees to pay, as lease payments hereunder Fifteen Million Dollars ($15,000,000.00) per year (the "**Rent**") for each year of the Lease Term. The Rent shall be due and payable on or before the first day of each six month period beginning February 1, 2017. In the event

that the Complex shall have gross annual income in excess of Fifty Million Dollars ($50,000,000.00) in a calendar year, the Rent shall be increased by an amount equal to one and a half (1.5%) percent of the amount of Complex gross annual income.

This is an absolutely net lease. Accordingly, Lessor shall receive a net return from the Leased Premises equal to the Rent, without deduction for any expense or charge for the Leased Premises (except as otherwise expressly provided in this Lease). Lessee shall pay as "**Additional Rent**" all expenses, of every kind and nature, relating to or arising from the Leased Premises, including Impositions (as hereinafter defined) and expenses arising from the leasing, insurance, management, operation, maintenance, repair, use, or occupancy of the Leased Premises and all construction relating to the Leased Premises. Notwithstanding the foregoing, so long as no Event of Default of Lessee (as hereinafter defined) has occurred, Lessor shall pay all of the following expenses: (a) any expenses expressly agreed to be paid by Lessor pursuant to this Lease, (b) debt service and other payments with respect to any Lessor mortgagee, (c) expenses incurred by Lessor to monitor and administer this Lease, unless otherwise expressly provided in this Lease, (d) intentionally omitted, and (e) other expenses that are personal to the Lessor, including Lessor's income taxes.

Lessor's delay in rendering, or failure to render, any statement or bill for Additional Rent for any period shall not waive Lessor's right to render a statement or collect such Additional Rent for that or any subsequent period. If Lessor delivers to Lessee an incorrect statement with respect to any Rent, Lessor shall have the right to give Lessee a corrected statement for the period covered by the incorrect statement and to collect the correct amount of the Rent.

If at any time during the Lease Term the Rent is not fully collectible by reason of any Law (as hereinafter defined), Lessee shall enter into such agreements and take such other action as Lessor reasonably requests and which is not prohibited by any Law, to permit Lessor to collect the maximum permissible Rent (but not in excess of the Rent). On the termination of that Law prior to the Expiration Date (a) the Rent shall be paid in accordance with this Lease, and (b) Lessee shall pay to Lessor, if not prohibited by any Law, the Rent which would have been paid but for that Law, less the Rent paid by Lessee to Lessor during the period of that Law.

For purposes of this Lease, "**Impositions**" shall mean, collectively, (a) all real estate taxes, all special assessments and all other property assessments, including all assessments for public improvements or betterments, whether or not commenced or completed within the term of this Lease and for New York City all Business Improvement District ("**BID**") charges and assessments, (b) all ad valorem, sales and use taxes, (c) all rent and occupancy taxes and all similar taxes, (d) all personal property and other taxes on the Personal Property, (e) all water, sewer, and other utility charges imposed by any governmental authority, (f) all fines, fees, charges, penalties, and interest imposed by any governmental authority or utility, and (g) all other governmental charges and taxes, in each case of any kind or nature whatsoever, general or special, foreseen or unforeseen, ordinary or extraordinary, which are at any time during or with respect to the Lease Term assessed, levied, charged, confirmed or imposed with respect to the Leased

3

Premises, the Personal Property or the use, leasing, ownership or operation thereof, or become payable out of or become a lien upon the Leased Premises, the sidewalks or streets adjoining the Leased Premises, or the Personal Property or the rents or income therefrom. Notwithstanding the foregoing, Impositions shall not include (i) any tax imposed on Lessor's income or receipts (whether net or gross); (ii) any mortgage recording tax imposed with respect to any Lessor mortgage, as to which Lessee shall pay any mortgage tax), (iii) any tax imposed with respect to the sale, exchange or other disposition by Lessor of the Leased Premises, including any lease by Lessor of all or part of the Leased Premises; or (iv) franchise taxes, excess profits taxes, capital gains taxes, and taxes on doing business that are imposed on Lessor. If at any time during the Lease Term the present method of real estate taxation or assessment is changed so that there is substituted for the type of Impositions presently being assessed or imposed on real estate, or in lieu of any increase in such Impositions, a tax described in clauses (i) or (iv) that is imposed solely on owners of real estate, such substitute taxes shall be deemed to be included within the term "**Impositions**".

Throughout the Lease Term, Lessee will pay, or cause to be paid, all Impositions as and when the same shall become due and payable, provided that if any Imposition may by Law be paid in installments, Lessee may pay such Imposition in installments as permitted by Law.

Lessee's failure to pay such amounts when due, and all damages, costs and expenses which Lessor may incur by reason of any default of Lessee or failure on Lessee's part to comply with the terms of this Lease, all of which Lessee hereby agrees to pay within ten (10) days after written demand or as is otherwise provided herein. Upon any failure by Lessee to pay any of the Rent or other amounts due hereunder, such Rent and other amounts shall accrue interest at the greater of (i) five hundred (500) basis points above the Prime lending rate or (ii) four hundred (400) basis points above the thirty day LIBOR Rate and Lessor shall have all legal, equitable and contractual rights, powers and remedies provided either in this Lease or by statute, at law, in equity or otherwise in the case of nonpayment of Rent.

It is understood and agreed that Lessor shall be obligated to make any mortgage payments relating to the Leased Premises as said payments become due. In the event that Lessor fails to make such mortgage payments, Lessee may make the mortgage payments and Lessee shall be entitled to deduct from the Rent the amount of such mortgage payments actually paid by Lessee.

### ARTICLE III
### USE OF LEASED PREMISES/COMPLIANCE WITH LAW

3.1    **Use of Premises**. Lessee expressly agrees to use the Leased Premises, subject to the provisions of this Lease, for hotel use with food and beverage services and any other lawful uses permitted pursuant to the certificate of occupancy in existence on the date hereof (the "**Permitted Use**") and cannot, in any way and under any circumstances, alter the Permitted Use. Lessee shall operate the Leased Premises in accordance with industry standards and shall at all times operate the Leased Premises in a

manner consistent with the current operations, the zoning laws then in effect and the certificate of occupancy. Notwithstanding the foregoing, Lessee shall not at any time use or occupy the Leased Premises, or suffer or permit anyone else to use or occupy the Leased Premises, (a) in any manner that violates the provisions of this Lease or the certificate of occupancy, if any, for the Leased Premises, (b) so as to cause waste, (c) so as to violate any insurance policy then issued in respect of the Leased Premises, or (d) so as to create a nuisance. All employees of the Leased Premises shall be employees of Lessee and Lessor shall have no responsibility for any employees or staff at the Leased Premises.

Notwithstanding anything herein to the contrary, Lessee acknowledges that it shall have no rights with respect to the use, transfer or construction within air rights or unutilized development rights; the rights and benefits to which belong to the Lessor.

3.2  **Compliance with the Law**. Lessee shall maintain and conduct Lessee's business on the Leased Premises in a lawful manner and shall timely and fully comply in all material respects at all times, with any and all federal, state and local laws, statutes and ordinances and all regulations, orders and directives of appropriate governmental and accrediting agencies, as such laws, statutes, ordinances, regulations, orders and directives now existing or that may hereafter be enacted ("**Law**") applicable to the Leased Premises. Without limiting the foregoing, Lessee shall promptly cure all violations of Law as to which a notice of violation has been issued or as to which a directive or order has been issued by any public officer or other person having authority, promptly discharge of record any such notice of violation, promptly comply with any such order or directive, and pay all fines, penalties, interest and other costs imposed by any governmental authority in connection with any violation or requirement of Law. At Lessee's sole cost and expense, Lessee shall be required to make any unforeseen and structural alterations, repairs, changes or modifications in or to the Leased Premises to be in compliance with all Laws. It shall be the obligation of Lessee to execute and satisfy the legal and administrative procedures enforceable to cause the Hotel to operate in compliance with all applicable Laws (now or hereafter enacted).

3.4  **Permits and Licenses**. It shall be the sole obligation of Lessee to obtain and maintain throughout the Lease Term all permits and licenses necessary for the Permitted Use of the Leased Premises (the "**Permits and Licenses**"), as provided for in Section 3.1 above. Lessor agrees to reasonably cooperate with Lessee to the extent reasonably required to obtain and maintain the Permits and Licenses. If the competent governmental authority, having jurisdiction over the Leased Premises, refuses, suspends, revokes or delays the issuance of any of the Permits and Licenses, and if such refusal, suspension, revocation or delay is not due to the breach of the terms hereof by Lessor, the Lessee waives any claim against the Lessor and this Lease shall continue in full force and effect with no abatement of the Rent.

3.5  **Waste; Nuisance**. Lessee shall not perform or fail to perform any acts or carry on or permit to exist any practices that may injure or damage the Leased Premises in any respect or that may constitute a public or private nuisance or menace to the owners

or occupants of adjacent property, or that may violate the provisions of any required insurance on the Leased Premises or that may diminish the coverage under such insurance or render such insurance void. Lessee shall not commit or suffer to exist any waste upon the Leased Premises or permit any conduct which exposes Lessor to liability as a result of its conduct.

3.6    **Liens.**    Lessee shall not permit any liens, charges or encumbrances ("**Liens**") upon the Leased Premises.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF LESSOR

Lessor hereby warrants and represents to Lessee, as of the date of this Lease, that:

4.1    **Authority**.    Lessor has full power and authority to execute and to deliver this Lease and all related documents, and to carry out the transaction contemplated herein. This Lease is valid, binding and enforceable against Lessor in accordance with its terms.    The execution of this Lease and the consummation of the transaction contemplated herein do not result in a breach of the terms and conditions of, nor constitute a default under, nor violation of any law, regulation, court order, mortgage, note, bond, indenture, agreement, license or other instrument or obligation to which Lessor is now a party or by which Lessor or any of the assets of Lessor may be bound or affected.

4.2    **Title**.    Lessor has good and insurable fee simple title to the real property identified and described in the title proforma, a copy of which is attached hereto on Exhibit B (the "**Title Proforma**"), subject only to the easements, reservations and encumbrances of record, those which an accurate survey would disclose or which are identified in the Title Proforma or schedule thereto ("**Permitted Exceptions**"), and has good and insurable title to the personal property to be leased to Lessee under the term of this Lease. Lessor warrants that so long as Lessee is not in default hereunder, Lessee shall have quiet enjoyment of the Leased Premises.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF Lessee

Lessee hereby warrants and represents to Lessor, as of the date of this Lease and continuing up to and throughout the Lease Term, that:

5.1    **Status of Lessee**. Lessee is a limited liability company duly organized and validly existing under the laws of the State of New York, and is qualified to do business in the State of York.

5.2    **Authority**. Lessee has full power and authority to execute and to deliver this Lease and all related documents, and to carry out the transactions contemplated

herein. This Lease is valid, binding and enforceable as against Lessee in accordance with its terms. The execution of this Lease and the consummation of the transaction contemplated herein do not result in a breach of the terms and conditions nor constitute default under or violate Lessee's Articles of Organization or any law, regulations, Court order, mortgage, note, bond, indenture, agreement, license or other instrument or obligation to which Lessee is a party or by which Lessee or any of the assets of Lessee may be bound or affected.

5.3 **Litigation**. To the best of Lessee's knowledge there is no litigation, investigation or other proceeding pending or threatened against or in relation to Lessee, its properties or business which is material to this Lease, nor does Lessee know or have reasonable grounds to know of any business for any such action.

5.4 **Necessary Action**. Lessee has taken all action necessary to enter into this Lease and to carry out the terms of this Lease.

5.5 **Taxes**. Lessee has filed all tax returns (federal, state and local) required to be filed and paid all taxes shown thereon to be due, including interest and penalties, other than such taxes that Lessee is contesting in good faith by appropriate legal proceedings and proper reserves have been established on the books of the Lessee.

5.6 **Liens**. There are no Liens upon or with respect to any of the properties of Lessee or right to receive revenues of Lessee other than Permitted Liens.

5.7 **Conflicts**. Lessee is not a party to any indenture, loan or credit agreement or any lease or other agreement or instrument (including company charters or other organizational documents) which is likely to have a material adverse effect on the ability of Lessee to perform its obligations under the Lease or which would restrict or otherwise limit the incurring of the debt arising under this Lease.

5.8 **Reserved**.

5.9 **Solvency.** Lessee has capital sufficient to carry on its business and transactions and all businesses and transactions in which it is about to engage and is solvent and able to pay its debts as they mature. No transfer of property is being made and no debt is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Lessee.

5.10 **Reserved**.

5.11 **Accuracy of Information**. To the best of Lessee's knowledge after a due and diligent investigation, all factual information heretofore or contemporaneously furnished by or on behalf of Lessee to Lessor for the purposes of satisfying the provisions of or in connection with this Agreement or any transaction contemplated hereby is, and all other factual information (taken as a whole) hereafter furnished by or on behalf of Lessee to Lessor will be, to the best of Lessee's knowledge after a due and diligent

investigation, true and accurate in every material respect on the date as of which such information is dated or certified, and Lessee has not omitted and will not omit any material fact necessary to prevent such information from being false or misleading. Lessee has disclosed to Lessor, in writing, all facts which Lessee has knowledge of and which Lessee believes is more likely than not to materially and adversely affect the business, credit, operations or financial condition of Lessee or which Lessee believes is more likely than not to materially and adversely affect any material portion of Lessee's property, or Lessee's ability to perform its obligations under the Lease.

5.12    Lessee does not have any employees engaged in work at the Leased Premises that are subject to a union contract or collective bargaining agreement, and Lessee is not subject to any unfunded pension liabilities with respect to any employees engaged in work at the Leased Premises.

### ARTICLE VI
### MAINTENANCE AND REPAIR

6.1    **Maintenance and Repair**. Except as otherwise expressly provided in this Lease, throughout the Lease Term, Lessee: (a) at Lessee's sole cost and expense, shall have full responsibility for the condition, alteration, maintenance, management, repair and replacement of the Leased Premises and all parts thereof, and to keep and maintain the Complex in good working order and condition, ordinary wear and tear excepted, including but not limited to, the maintenance, repair and replacement, if necessary, of the roof, foundation, all structural components, the heating, ventilation and air conditioning system of the Complex and all plumbing, electrical and equipment systems of the Complex and the grounds, driveways, walkways, paving and parking lots of the Leased Premises, and (b) acknowledges that Lessor shall have no obligations whatsoever to perform any work or make any repairs with respect to the Leased Premises, to furnish any services with respect to the Leased Premises, or to incur any expenses with respect to the Leased Premises.

Lessee expressly acknowledges and agrees that Lessor has not made and is not making, and Lessee, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease. Lessee shall at all times (i) maintain the Leased Premises in an orderly and safe condition, in a good state of repair, and in a manner consistent with the standards of operation and maintenance of hotels in the same Hotel Category, and (ii) make such repairs, replacements and Alterations (as hereinafter defined) to the Leased Premises as are necessary to keep it in the condition required by the preceding clause (i). Notwithstanding, Lessor shall have the obligation to make repairs to the Leased Premises as specified in this Lease.

Lessee shall, within a reasonable period of time after learning of such condition, send Notice to the Lessor of any repairs that may be necessary throughout the Term of this Lease, and of any incidents or deterioration occurring in the Property, even when no apparent damage can be deduced from that, provided that the Lessee is aware of such condition. These expenses will be borne directly by Lessee. If Lessee has not carried out

24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
Pg 22 of 133

such repairs itself when they are necessary, Lessor can carry them out itself, immediately passing on the corresponding expenses to Lessee.

6.2    **Alterations**.  Lessee may, at its sole option and in accordance with the applicable Annual Operating Budget and as otherwise required by the terms of this Lease, make any additions, replacements, changes, alterations, installations, repairs or improvements to the Leased Premises (the "**Alterations**") that Lessee, in its sole discretion, deems necessary or appropriate; except that Lessee shall not, without Lessor's consent, which shall not be unreasonably withheld, conditioned or delayed, make any Material Alterations (as hereinafter defined) to the Leased Premises.  For purposes of this Lease, a "**Material Alteration**" shall mean any Alteration to the Leased Premises that (i) costs in excess of Five Hundred Thousand Dollars ($500,000.00) (as such amount shall be increased during the Lease Term by increases in the CPI) or (ii) which materially affects the structure of the Leased Premises. Lessee shall not commence any Material Alterations until Lessee has met all of the following conditions:

a) the proposed Material Alterations are in accordance with a project drawn up by a competent technician, to the extent required by applicable Law;

b) Lessee has obtained all permits, approvals, and authorizations required by the Building Department of the City of New York (the "**Building Department**") and all other applicable governmental authorities for the Material Alterations;

c) the Material Alterations will be performed by Lessee from funds in the Hotel Reserve or otherwise with funds that Lessee makes available for that purpose as may be required by the terms of this Lease;

d) the Material Alterations will comply with all applicable laws and statutory regulations and the Building Department code;

e) Lessee has caused its general contractors, construction managers, architects, engineers, and subcontractors to obtain insurance reasonably satisfactory to Lessor and with such additional coverages as may be reasonably required by Lessor, and (ii) Lessee has delivered to Lessor certificates (in form reasonably acceptable to Lessor) evidencing such required insurance; and

f) Lessor has reasonably consented to the final plans and specifications for the proposed Material Alterations and the source and use of funds required therefor.

**ARTICLE VII**
**EQUIPMENT**

7.1    **Lessor's Equipment**. All equipment, furniture and furnishings on hand as of the Commencement Date and which are not tagged or marked by Lessee as Lessee's

equipment shall constitute a part of the Leased Premises and shall be and remain the personal property of Lessor ("**Lessor's Equipment**").

      7.2    **Lessee's Equipment**. All equipment, fixtures, and furnishings acquired by Lessee and not constituting Lessor's Equipment and not necessary for the operation of a hotel shall be and remain the personal property of Lessee ("Lessee's Equipment") and shall be tagged or marked by Lessee as such and all other property shall become that of Lessor's when purchased and left at the Leased Premises at Lease termination.

      7.3    **Disposition of Obsolete Equipment**. Lessor and Lessee recognize that portions of Lessor's Equipment may become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary in the operation of the Leased Premises. In any instance in which Lessee in its sole discretion determines that any items of Lessor's Equipment has become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary in the operation of the Leased Premises, Lessee may remove such items of Lessor's Equipment from the Leased Premises, and on behalf of Lessor sell, trade-in, exchange or otherwise dispose of same without any responsibility or accountability to Lessor thereof; provided, however, that Lessee shall substitute and install in the Leased Premises other equipment having equal or greater utility (but not necessarily the same function) in the operation of the Leased Premises, and provided further that such removal and substitution shall not impair the operations of the Leased Premises. All such substitute equipment shall constitute Lessor's Equipment and shall be held by Lessee on the same terms and conditions as items originally comprising Lessor's Equipment. Lessee shall execute and deliver to the Lessor such documents as may from time to time be requested to confirm the title of the Lessor to any items of Lessor's Equipment. Lessee will not remove or permit the removal of any Lessor's Equipment from the Leased Premises except in accordance with the provisions in this Section.

**ARTICLE VIII**
**TAXES AND UTILITIES**

      8.1    **Taxes**. From and after the Commencement Date, Lessee shall be responsible for and shall pay prior to delinquency any and all taxes, assessments, charges, and all other amounts demanded from any governmental and/or quasi-governmental agency for or relating to the Leased Premises including, but not limited to, ad valorem taxes assessed against the Leased Premises, and any and all federal, state or local taxes incurred or assessed in connection with Lessee's operation of the Leased Premises, including, without limitation, federal and state income taxes, franchise taxes, FICA, FUTA and other unemployment taxes. It shall not be a defense that such tax, assessment or charge was not in existence or contemplated at the time of the execution of this Agreement. Lessee shall not be obligated to pay any franchise, excise, corporate, estate, inheritance, succession or capital levy or tax of Lessor or any income, profits or revenue tax upon the income of Lessor.

      8.2    **Utilities**. Lessee shall be solely responsible for and shall pay all charges for utilities, leases, and impositions in respect of the Leased Premises, including, without

10

limitation, charges for water, gas, electricity, sewer service, refuse disposal, telephone service and similar services incurred in connection with the operation of the Leased Premises during the Lease Term and for all other cost or expenses associated with its business or the usage of the Leased Premises during the Lease Term.

## ARTICLE IX
## INSURANCE

9.1    **General Requirements**. Lessee, at Lessee's sole cost and expense, shall take out, and maintain at all times throughout the Lease Term (except as otherwise specifically provided below), and after the Lease Term for so long as Lessee, or any person or entity holding through or under Lessee, remains in possession of the Leased Premises, insurance with the coverages and deductibles described below. All policies required by this Article IX shall be issued by insurance companies licensed to do business in the State of New York. All such insurers shall have a claims paying ability rating of no less than "A-" and a financial class category rating of at least "VIII" by A.M. Best Company (or any successor rating agency or entity reasonably selected by Lessor if A.M. Best Company discontinues publishing ratings of insurance companies or if the rating system is changed). If it is commercially impracticable to obtain insurance from an insurer with an "A-" rating and a financial size category of at least "VIII" because of changes in the insurance industry or conditions in the Competitive Set, the Lessee's insurers shall have a policy holder's rating that is at least equal to the Customarily (as hereinafter defined) required rating.

All insurance policies required by this Article IX shall (i) contain endorsements that such insurance may not be canceled or amended, except upon not less than thirty (30) days' prior written notice to Lessor, and (ii) be written as primary policies not contributing to or in excess of any policies carried by Lessor, and (iii) each contain a Waiver of Subrogation endorsement, in form and substance reasonably satisfactory to Lessor, in favor of Lessor.

If Lessee fails to maintain the insurance required by the foregoing provisions of this Article IX or to timely furnish to Lessor the required evidence of such insurance and payment of the insurance premiums, Lessee shall be liable for all expenses incurred by Lessor with respect to such default, together with any costs, expenses, losses and/or liabilities that would have been covered by the insurance Lessee is required to maintain. If Lessee fails to maintain any of the insurance required by this Article IX, Lessor may, at its option, in addition to exercising any other remedies available to it under this Lease or at law, obtain the insurance described in this Article IX, in which event Lessee shall reimburse Lessor, as Additional Rent, within ten (10) days of being billed therefor, for the costs incurred by Lessor to obtain such insurance.

Lessee, at Lessee's expense, shall comply, and shall cause permitted sublessees, if any, and contractors, to comply, in all material respects at all times, with all insurance requirements set forth hereunder. Anything to the contrary notwithstanding, coverages existing at the Commencement Date shall be not less than the following:

11

a) *Property Insurance*. a commercial property policy covering Building, Contents and Business Income interruption in a form satisfactory to Lessor (the "**Property Policy**"). Such policy shall name Lessor as loss payee as its interest may appear and shall expressly provide that any losses thereunder shall be adjusted with Lessor, the Lessee and any Lessor's Lender or other applicable superior interest holder; and (b) such policies shall include a standard New York mortgagee endorsement with respect to each Lessor's Lender; and (c) all proceeds paid under such policies shall be applied in accordance with the requirements of this Lease.

b) *Liability Insurance*. Lessee shall maintain a policy of commercial general liability insurance in Customary (as hereinafter defined) form (the "**Liability Policy**") protecting Lessee against claims of third parties for bodily injury, death, personal injury, and property damage (including personal injury liability covering libel, liquor liability, slander, false arrest and malicious prosecution, and fire and water damage legal liability) occurring in, upon, or about the Leased Premises and any appurtenances thereto. Such policy shall include contractual liability coverage covering Lessee's indemnification obligations under this Lease with respect to covered claims, together with fire damage legal liability coverage. Subject to Lessor's right (as set forth below) to require Lessee to increase coverage limits and to the other provisions of this Article IX, such policy shall have a per occurrence combined single limit of at least Two Million Dollars ($2,000,000) annually and per location. Such coverages and amounts may be modified by Lessor as required from time to time by Lessor's lender or any applicable superior interest holders. The policy shall name the Lessee as insured and shall include as additional insureds Lessor and Lessor's lender and any other superior interest holders, if any.

c) *Workers Compensation*. Lessee shall maintain workers compensation insurance as required by Law and which shall include employer's liability insurance for all employees of Lessee, in accordance with the statutory limits required by Law.

d) *Boiler Insurance*. Lessee shall maintain insurance covering losses from explosion caused by steam, boilers, pressure vessels and similar equipment, if any, in an amount to be determined by the Lessor (in its commercially reasonable discretion) (the "**Boiler Policy**"). The Boiler Policy shall name Lessor as loss payee as its interest may appear and shall expressly provide that any losses thereunder shall be adjusted with Lessor, the Lessee and any Lessor's Lender or other applicable superior interest holder; and (b) such policies shall include a standard New York mortgagee endorsement with respect to each Lessor's Lender; and (c) all proceeds paid under such policies shall be applied in accordance with the requirements of this Lease.

e) *Automobile Insurance*. Lessee shall maintain a policy of Automobile Liability insurance on owned, non-owned and hired motor vehicles used in connection

12

with the operation of the Hotel with a combined single limit for bodily injury and property damage of not less than One Million Dollars ($1,000,000).

f) *Insurance Required by Lenders and by Laws for Hotel-Related Operations.* To the extent any Lessor mortgagee or Law for hotel related operations, including but not limited to insurance required for taverns and the serving of liquor, may require Lessee to obtain any insurance coverage not required by this Lease, or require additional insurance coverage, or require a different or more highly rated insurance company to issue the insurance, or impose any requirement relating to Lessee's insurance that is more stringent that the requirements of this Lease, Lessee shall comply with such insurance requirements.

Notwithstanding anything herein to the contrary, any and all insurance policies maintained by both Lessor and Lessee in connection with this Lease must contain an endorsement thereto naming the other (and other parties in interest) as an "additional insured", and that each party waives the respective insurance company's rights of subrogation as against the other, and any hotel or property manager operating or managing the Leased Premises.

As used in this Lease and in all amendments to this Lease (unless otherwise specified or unless the context otherwise requires), a **"Customary"** form of policy or amount of coverage or endorsement or other aspect of insurance is that form of policy, amount of coverage, endorsement or other aspect that is then customarily required by prudent Institutional Lenders for the hotels in the Competitive Set.

9.2    **Cancellation/Certification**.    Certificates of insurance evidencing such coverage shall be delivered to Lessor prior to the Commencement Date and annually thereafter prior to expiration of the then-current policy terms.

9.3    **Fee Mortgagee**.    Supplementing the foregoing, Lessee shall satisfy any and all insurance requirement of any mortgagee of Lessor and provide such mortgagee with certificates and other evidence of insurance as set forth in the document and instruments governing and securing any and all credit facilities of such mortgagee to Lessor.

### ARTICLE X
### DAMAGE, DESTRUCTION AND CONDEMNATION

10.1    **Damage or Destruction**. Should the building upon the Leased Premises be totally or partially destroyed by fire or other cause, the damage shall be repaired and the building restored with the proceeds of the insurance provided for in Article IX of the Lease. Should the building be damaged by any cause whatsoever, so that rebuilding or repairs are not completed within six (6) months of the occurrence of such damage, this Lease may be terminated at the option of the Lessee. Lessee shall be allowed an equitable

abatement of the rent during such time as it is unable to enjoy the use of the whole or part of the Leased Premises.

      10.2   **Condemnation**. In the event that all or any part of the Leased Premises shall be taken or damaged by the exercise of the power of eminent domain, then (whether or not this Lease shall terminate by operation of law upon such exercise of the power of eminent domain) the respective interest of the Lessor and Lessee in and to the Leased Premises by reason of such exercise of power and eminent domain shall be separately determined and computed by the Court having jurisdiction and separate awards and judgments with respect of such damage to the Lessor and Lessee, respectively, and to each of such respective interest, shall be made and entered. The Lessor shall receive and retain the full amount of such damages to be determined whether or not such amount is in its favor or in favor of the Lessee.  In the event the Leased Premises is so substantially and permanently taken by the power of eminent domain as to make the Leased Premises in the reasonable and good faith opinion of the Lessee unsuitable for continuing the operation of the Complex, then this Lease may be terminated by the Lessee, as of the effective date of the taking, by notice given by Lessee to Lessor. Any such termination shall be without prejudice to any claim of Lessee against the condemning authority for damages resulting to Lessee from such condemnation. In the event the Leased Premises shall be partially and permanently taken by the power of eminent domain but in the reasonable and good faith opinion of Lessee, Lessor and any of its lenders, if such consent is required by any loan documents then in effect, the uncondemned portion of the Leased Premises is suitable for continuing the operation of the Complex, then this Lease shall not terminate and Lessor shall repair the Leased Premises, with an equitable abatement of the monthly rent commensurate with a proportionate percentage reduction in income to Lessee as a result of the taking.

**ARTICLE XI**
**SURRENDER OF POSSESSION**

      11.1   **Surrender**. Upon the expiration or termination of the Lease Term, howsoever effected, Lessee shall forthwith surrender the Leased Premises to Lessor, free and clear of all claims, liens, security interests and other encumbrances (except Permitted Encumbrances and other encumbrances approved in writing by Lessor during the Lease Term) and in as good working order and condition as on the Commencement Date, ordinary wear and tear excepted. Lessor's Equipment and all inventory acquired by Lessee during the Lease Term and on hand as of the date of expiration or termination shall also be surrendered to Lessor and all equipment and inventory surrendered shall have an aggregate functional capability at least equal to the aggregate functional capability of the equipment and inventory existing at the Complex as of the Commencement Date, Lessee may remove Lessee's Equipment from the Leased Premises upon the expiration or termination of the Lease Term; provided, however, that Lessee shall be responsible for and shall immediately repair any damage to the Leased Premises caused by the removal of Lessee's Equipment.

**ARTICLE XII**

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
NYSCEF DOC. NO. 3

INDEX NO. 514152/2021
RECEIVED NYSCEF: 06/11/2021

24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
Pg 28 of 133

## DEFAULT AND LEASE TERMINATION

12.1     **Events of Default of Lessee**. Each of the following acts, omissions or occurrences shall constitute an "**Event of Default of Lessee**" hereunder:

A.     Failure by Lessee to pay or cause to be paid, within thirty (30) days of the date required, rent specified to be paid under Section 2.1 hereof or any other monetary amount due to Lessor;

B.     The vacating of the Leased Premises by Lessee;

C.     Failure of Lessee to observe and perform any covenant, condition or agreement of Lessee under this Lease, other than a breach addressed in Section 12.1(A) above, within ten (10) days after the date Lessee receives written notice of such failure of performance, or, with respect to failures of performance not susceptible of cure within ten (10) days upon approval in writing by the Lessor, the failure of Lessee to thereafter diligently prosecute same to completion and/or cure the same within sixty (60) days;

D.     Lessee shall make a transfer in fraud to creditors or shall make an assignment for the benefit of creditors not approved by Lessor;

E.     Lessee shall file a petition under any section or chapter of the United States Bankruptcy Code, as amended, or under any similar law or statue of the United States or any state thereof, or Lessee shall be adjudged bankrupt or insolvent in proceeding filed against Lessee thereunder;

F.     The filing or execution or occurrence (or contemplation thereof) of any of following: (i) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets or of Lessee's leasehold estate in the Leased Premises; or (ii) the judicial seizure of substantially all of Lessee's assets or Lessee's leasehold estate in the Leased Premises;

G.     If (1) a final judgment, including any judgment or other final determination of any contest, is entered against Lessee in an amount in excess of the monthly Rent (to the extent not covered by independent third party insurance as to which insurer does not dispute coverage), or (2) execution or other final process issues thereon with respect to the Lessee's property, and (3) Lessee does not discharge the same or provide for its discharge in accordance with its terms, or procure a stay of execution thereon, in any event within sixty (60) days from entry, or shall not, within such period or such longer period during which execution on such

15

judgment shall have been stayed, appeal therefrom or from the order, decree or process upon or pursuant to which such judgment shall have been entered, and cause its execution to be stayed during such appeal, or if on appeal such order, decree or process shall be affirmed and Lessee shall not discharge such judgment or provide for its discharge in accordance with its terms within sixty (60) days after the entry of such order or decree or affirmance, or if any stay of execution on appeal is released or otherwise discharged.

H.   Any representation or warranty of Lessee is breached or is false or misleading in any material respect when made or which becomes false during the pendency of this Lease.

I.   The reduction of the number of rooms at the Hotel by more than five (5%) percent, without the prior written consent of Lessor, to be given or withheld in Lessor's sole discretion and the failure by Lessee to remedy such action within thirty (30) days of receipt of Notice from Lessor of such failure.

J.   A failure by Lessee, whether by action or inaction, to meet any of the other material terms, covenants or conditions of this Lease, including, but not limited to, Alterations that are not in compliance with the provisions of this Lease, or subletting that is not in accordance with the provisions of this Lease, and the failure by Lessee to remedy such failure within thirty (30) days following receipt of Notice thereof from Lessor.

K.   Lessee's failure to discharge any mechanic's or other Lien that is its obligation to discharge under the terms of this Lease within the applicable time period provided in this Lease.

12.2   **Remedies of Lessor**. Upon the occurrence and continuance, beyond any applicable cure period, of any Events of Default of Lessee specified in the foregoing Section 12.1, Lessor shall have the option to pursue any one or a combination of the following remedies without any notice to or demand upon Lessee whatsoever:

A.   Terminate this Lease, in which event Lessee shall immediately surrender the Leased Premises to Lessor and cooperate in any requested operation transfer as required by this Agreement, and if Lessee fails to surrender the Leased Premises and otherwise cooperate, Lessor may, without prejudice to any other remedy which Lessor may have, expel or remove Lessee and any other person who may be occupying the Leased Premises, or any part thereof, at Lessee's expense. In such event Lessor may, in addition to the foregoing, seek such other damages and remedies as are available at law or in equity for Lessee's breach of this Lease.

16

B.      Enter upon and take possession of the Leased Premises and expel or remove Lessee and any other person who may be occupying Leased Premises, at Lessee's expense, or any part thereof, at Lessee's expense, without terminating this Lease, and exercise reasonable efforts to re-let the Leased Premises, as Lessee's agent, at the highest rent then obtainable and receive the rent therefor; and Lessee covenants and agrees to pay Lessor on demand any cost or expense incurred by Lessor in connection with re-letting the Leased Premises and any deficiency in Rent that may arise by reason of such re-letting. In no event shall Lessee be entitled to any profit made from any re-let or be relieved of any obligation to make rent payments in the event the party re-letting fails to do so.

C.      Enter upon the Leased Premises and, at Lessee's expense, take such actions as may be required of Lessee to cure the complained of default; and Lessee covenants and agrees to reimburse Lessor on demand for any expense, direct or indirect, which Lessor may incur in thus effecting compliance with Lessee's obligations under this Lease.

D.      Pursuit of any of the foregoing remedies shall not preclude pursuit of any other foregoing remedies or of the other remedies herein provided or any other remedies provided at law or in equity, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any Rent or other amounts due to Lessor hereunder or of any damages accruing to Lessor by reason of the violation of any of the terms, provisions or covenants herein contained. No waiver by Lessor of any violation or breach of any of the terms, provisions or covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions or covenants herein contained. Forbearance by Lessor to enforce one or more of the remedies herein provided upon an Event of Default of Lessee shall not be deemed or construed to constitute a waiver of such default.

E.      To the extent any amounts due to Lessor under the terms of this Lease, whether as a result of an Event of Default or otherwise, are not timely paid, such amounts shall bear interest at the rate of eighteen percent (18%) per annum from the date such amounts were due until paid to Lessor.

12.3    **Events of Default of Lessor**. Each of the following acts, omissions or occurrences shall constitute an "**Event of Default of Lessor**" hereunder:

A.    Failure of Lessor to observe and perform any material covenant, condition or agreement of Lessor under this Lease within ten days (10) after the date Lessor receives written notice of such failure of performance, or, with respect to failure of performance not susceptible of cure within ten (10) days upon approval in writing by the Lessee, the failure of Lessor to commence a cure within said ten (10) day period and to thereafter diligently prosecute same to completion;

B.    Lessor shall make a transfer in fraud to creditors or shall make an assignment for the benefit of creditors;

C.    Lessor shall file a petition under any section or chapter of the United States Bankruptcy Code, as amended, or under any similar law or statute of the United States or any state thereof or Lessor shall be adjudged bankrupt or insolvent in proceedings filed against Lessor hereunder; or

D.    The filing or execution or occurrence (or contemplation thereof) of any of the following: (i) the appointment of a trustee or receiver to take possession of substantially all of Lessor's assets or of Lessor's leasehold estate in the Leased Premises; or (ii) the judicial seizure of substantially all of Lessor's assets or of Lessor's leasehold estate in the Leased Premises.

12.4    **Remedies of Lessee.** Upon the occurrence and continuance of any of the Events of Default of Lessor specified in the foregoing Section 12.3, Lessee shall have the option to pursue any one or combination of the following remedies without any notice to or demand upon Lessor whatsoever:

A.    Terminate this Lease, in which event Lessee shall surrender the Leased Premises to Lessor upon notice to Lessor without further remedy.

B.    Take such actions as may be required of Lessor from time to time to cure the complained of default; and Lessor covenants and agrees to reimburse Lessee on demand for any expenses, direct or indirect, which Lessee may incur in thus effecting compliance with Lessor's obligations under this Lease.  Lessee may not deduct amounts due hereunder from payments due to Lessor.

Pursuit of any foregoing remedies shall not preclude pursuit of any of the other foregoing remedies or of the other remedies herein provided or any other remedies provided at law or in equity.  No waiver by Lessee of any violation or breach of any of the terms, provisions or covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions or

covenants herein contained. Forbearance by Lessee to enforce one or more of the remedies herein provided upon an Event of Default of Lessor shall not be deemed or construed to constitute a waiver of such default. To the extent any amounts due to Lessee under the terms of this Lease, whether as a result of an Event of Default of Lessor or otherwise, are not timely paid, such amounts shall bear interest at the rate of seven percent (7%) per annum from the date such amounts were due until paid to Lessee.

## ARTICLE XIII
## PROHIBITION AGAINST LIENS

13.1    **Prohibition Against Liens.**  Lessee shall keep the Leased Premises and this Lease free from any Liens filed or recorded in favor of any mechanic, materialman, architect or engineer performing services by or through Lessee and free from any Lien with respect to work, material or services alleged to have been performed for Lessee. If any such Lien is filed or recorded, Lessee shall discharge any such Lien by bond or otherwise within thirty (30) days after Lessee receives notice of such Lien. If Lessee fails to discharge such Lien within such thirty (30) day period, Lessor may pay the amount reflected on such Lien (or any portion thereof) and any costs, interest, and/or penalties imposed in connection therewith or take such other action as Lessor deems necessary or desirable to remove such Lien, without being responsible for investigating the validity thereof and without regard to any objection by Lessee. The amount so paid and costs incurred by Lessor shall be deemed Additional Rent under this Lease payable within thirty (30) days after Lessee is billed therefor. Nothing in this Lease shall be deemed in any way to: (a) constitute the Lessor's consent or request, express or implied, that any contractor, subcontractor, laborer or materialman provide any labor or materials for any alteration, addition, improvement or repair of the Leased Premises; or (b) evidence Lessor's agreement to subject the Leased Premises to any such Lien.

Nothing contained in this Lease shall be deemed or construed to mean that Lessor has granted Lessee any right, power or permission to do any act or to make any agreement which may create, give rise to, or be the foundation for, any right, title, interest, easement or Lien upon the estate of Lessor in the Leased Premises.

13.2    **Permitted Liens**.  Notwithstanding any provision of this Lease to the contrary but without limiting Lessee's obligation to timely pay Rent and other amounts due and payable by Lessee hereunder, Lessee may create or permit to be created the following liens or encumbrances with respect to Lessee's leasehold interest in the Leased Premises ("**Permitted Liens**"):

A.    Liens granted in connection with any improvements, expansion, extension, additions or modifications of the Complex or any real property adjacent thereto.

B.    Any liens, charges, encumbrances and restrictions which may be created or exist by reason of this Lease or loan from Lessor.

      C.      Liens, charges and encumbrances for taxes or assessments or other government charges or levies not then delinquent.

Notwithstanding anything herein to the contrary, Lessee shall not do any of the following (each, a "**Transfer**"): mortgage, pledge, encumber, alienate, grant a lien on, grant and option with respect to or grant any other interest in the Complex or the Leased Premises, any part thereof or any interest therein (including any legal, beneficial or economic interest in Lessee), directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record the Complex or the Leased Premises without the prior written consent of the Lessor (and mortgagee and collateral mortgagee thereof).

## ARTICLE XIV
## LIABILITIES AND INDEMNIFICATION

14.1    **Reserved**.

14.2    **Indemnification**. Lessee agrees to and does hereby indemnify and hold the Lessor, its officers, directors, agents, employees and lenders harmless from and against any claims, demands, causes of action, liability, loss, damage, deficiency, cost or expense (including, without limitation, reasonable attorney's fees and associated costs and expenses) resulting from (i) the acts or omissions of Lessee and Lessee's employees, agents, independent contractors, guests, invitees or any other persons or thing in respect of the Complex or caused in whole or in part by breach of this Agreement, (ii) any misrepresentation, breach of warranty or non-fulfillment of any agreement, representation, warranty or condition by or on the part of Lessee under this Lease, or (iii) any liability asserted against Lessor, its officers, directors, agents, employees and Lenders in any way relating to the Lessee or to the Complex except those liabilities specifically assumed herein by Lessor.

## ARTICLE XV
## INSPECTION

15.1    **Inspections**.    Lessor and Lessor's agents, insurers, lenders and/or representatives shall have the right to enter and inspect the Leased Premises during normal business hours.

## ARTICLE XVI
## ACCESS TO RECORDS AND
## REPORTING REQUIREMENTS OF LESSEE

16.1    **Access**. The Lessor shall have access to records of the Lessee, which are determined by mutual agreement of the parties to be reasonably necessary for the Lessor to be able to ensure that the Lessee is complying with the terms and conditions set forth herein. Notwithstanding anything provided herein to the contrary, Lessor shall not have access to review patient medical records in possession of the Lessee without the specific

consent of such patients and/or without complying strictly with all local, State, and Federal laws, rules, and regulations relating to the protection of confidential patient records.

16.2    **Reporting Requirements of Lessee.** Lessee shall keep true books of record and account in which full, true and correct entries in accordance with GAAP (consistently applied and in accordance with the International Financial Reporting Standards (IFRS)) (the "**Reporting Standards**") will be made of all dealings or transactions in relation to its business and activities, and an authorized member of Lessee shall furnish to Lessor:

(i)      as soon as possible and in any event within ten (10) days after the occurrence of an Event of Default or any event which, with the giving of notice, lapse of time, or both, would constitute an Event of Default, and if requested by Lessor, a statement of an authorized member of Lessee setting forth details of such Event of Default or event and the action which Lessee has taken or proposes to take to cure the same;

(ii)     as soon as reasonably available and in any event within seventy-five (75) days after the end of each calendar quarter, internally-prepared financial statements of Lessee, including a Balance Sheet and the related Income Statement as of the end of such quarter and for the portion of the fiscal year ended at the end of such quarter, setting forth in each case in comparative form the figures for the corresponding quarter and the corresponding portion of the previous fiscal year, all in reasonable detail and certified (subject to normal year-end adjustments) as to fairness of presentation, in accordance with the Reporting Standards, by Lessee's managing member;

(iii)    as soon as reasonably available and in any event within one hundred twenty (120) days after the close of each fiscal year, a combined and combining Balance Sheet and the related Income Statement as of the end of such fiscal year, fairly and accurately presenting the financial condition of Lessee at such date and the results of operations of Lessee for such fiscal year and setting forth in each case in comparative form the corresponding figures for the corresponding period of the preceding fiscal year, all in reasonable detail, prepared in accordance with the Reporting Standards consistently applied, compiled and reviewed, in each case, by an independent certified public accountant acceptable to Lessor and Lessee. Lessor may, but is not required to, hire an independent certified public accountant of its choosing, at Lessee's own expense to verify the foregoing;

(iv)     at Lessor's request, a schedule showing the accounts receivable agings delivered to Lessor within thirty (30) days after the end of each month;

(v)      promptly upon receipt and, in any event, within thirty (30) days after receipt thereof, copies of all interim and supplemental financial reports submitted to Lessee by independent certified public accountants in connection with any interim review of the books and records of Lessee made by such accountants;

(vi)    **Reserved**;

(vii)   **Reserved**;

(viii)  immediately after notice to Lessee of the commencement thereof, notice, in writing, of any action, suit, arbitration or other proceeding instituted, commenced or threatened against or affecting the Lessee with an amount in controversy in excess of $100,000;

(ix)    as soon as available and in any event within fifteen days of filing, Lessee's federal, state and local tax returns, if and as applicable, as soon as said returns are completed in the form said returns will be filed with the Internal Revenue Service and any state or local department of revenue or taxing authority; and

(x)     such other information respecting the condition or operations, financial or otherwise, of Lessee as Lessor may from time to time reasonably request, or as is required to be furnished by Lessor to any and all lenders pursuant to the terms of any and all loan agreements and/or mortgages to which Lessor and/or the Leased Premises are currently or may hereafter be bound, including, without limitation, annual public aid rate updates, monthly accounts receivable aging reports, cost reports, annual survey reports and budget and cash flow projections.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

17.1    **Additional Assurances.**  The provisions of this Lease shall be self-operative and shall not require further agreement by the parties except as may be provided herein to the contrary; provided, however, at the request of either party, the other party shall execute such additional instruments and take such additional acts as may reasonably be necessary to effectuate this Lease,

17.2    **Legal Fees and Costs.**  In the event either Lessor or Lessee institute any proceedings to enforce or interpret any provision of this Lease, the prevailing party will be entitled to recover its legal expenses, including, without limitation, reasonable attorney's fees, costs, and necessary disbursements, in addition to any other relief to which such party shall be entitled.

17.3    **Assignment and Subletting**. Lessee shall not assign this Lease or any interest herein, whether by operation of law or otherwise, without the prior written consent of the Lessor (and mortgagee and collateral mortgagee thereof). Notwithstanding the foregoing, the option to extend this Lease for an additional seven (7) year term (as set forth in Section 1.2 hereof) is specific to Lessee and shall not be included in any assignment or be transferable to any other party in any other manner.  Lessor may freely assign this Lease with notice to Lessee.

22

Lessee shall not assign this Lease without the prior consent of the Lessor, which may be given or withheld in the Lessor's sole and absolute discretion. Any unauthorized assignment shall be deemed a Lessee Event of Default.

Any change in control taking place in the ownership or control of the Lessee as a result of its merger, demerger or transformation or of the global assignment of assets and liabilities, or change in control of Lessee by transfer of interests in Lessee in a single or multiple transfers shall be considered an assignment of the Lease by Lessee and will require the consent of the Lessor, failing which shall be deemed a Lessee Event of Default. Notwithstanding anything to the contrary contained herein, but in any event subject to any and all restrictions set forth in the documents and instruments evidencing, governing and securing any credit or other loan facilities to Lessor or encumbering the Lease Premises, upon prior written notice to Lessor and provided the management of and the controlling interest in Lessee does not change, Lessor hereby consents to transfers of interest in and among the existing members/partners/shareholders of Lessee (or to entities or forms of ownership in which such persons hold the equity interests) and transfers of interest to their immediate family members or to other entities owned solely by said immediate family members or to trusts for the benefit of same. "Immediate family members" shall be defined as mother, father, son, daughter, brother, sister, grandchildren, son-in-law, daughter-in-law and spouse. In addition, transfers of interest of Lessee made by bequest, demise or operation of law shall not be deemed a Default or an Event of Default hereunder.

Notwithstanding anything herein to the contrary, Lessee may sublease all or part of the Leased Premises for any Permitted Use.

17.4    **Subordination and SNDA**. This Lease is subject and subordinate to all ground, building or underlying leases and to all mortgages which may now or hereafter affect such leases or the Real Property of which the Leased Premises are a part, and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessor or by any mortgagee, affecting any lease or the Real Property of which the Leased Premises are a part. In confirmation of such subordination, Lessee shall from time to time execute promptly any certificate that Lessor (or Lessor's mortgagee or collateral mortgage thereof) may request.

Lessor shall use commercially reasonable efforts to procure a Subordiantion and Non-Disturbance Agreement ("**SNDA**") from any lender, but in any events subject to any and all restrictions set forth in the documents and instruments evidencing, governing and securing any credit or other loan facilities to Lessor or encumbering the Lease Premises.

17.5    **Notice**. Any notice, demand or communication ("**Notice**") required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered, delivered by prepaid certified mail, return receipt requested or

delivered by a nationally recognized overnight delivery service (e.g. Federal Express or Airborne), addressed as follows:

To Lessor:     Wythe Berry Fee Owner LLC
               199 Lee Avenue, #693
               Brooklyn, New York 11211

To Lessee:     Wythe Berry LLC
               199 Lee Avenue, #693
               Brooklyn, New York 11211

Or, to such other address, and to the attention of such other person or officer as any party may designate, with copies thereof to the respective counsel thereof as notified by such party.

17.6   **Waiver/Remedies Cumulative**. Any failure or delay by Lessor to exercise any right or remedy under this Lease shall not be deemed a waiver of such right or remedy, and no right or remedy of Lessor shall be deemed to be waived unless expressly waived in writing by Lessor. The waiver of any right or remedy by Lessor hereunder shall not constitute or operate as a waiver of any future similar right or remedy. All rights, powers, options, elections and remedies of Lessor herein contained shall be construed as cumulative and no one of them as exclusive of any other or exclusive of any rights or remedies as are or shall be allowed Lessor at law or in equity.

17.7   **Severability**. In the event any provision of this Lease is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Lease, which shall be and remain in full force and effect, enforceable in accordance with its terms.

17.8   **Post-Commencement Date access to Information**. Lessee acknowledges that subsequent to the Commencement Date Lessor may need access to information or documents in the control or possession of Lessee for legitimate purposes. Accordingly, Lessee agrees that subsequent to the Commencement Date Lessee will make available to Lessor's agents, independent auditors and/or governmental agencies such documents and information in respect of the Leased Premises to the extent necessary to facilitate audits, compliance with governmental requirements and regulations and the prosecution or defense of claims or for other legitimate purposes.

17.9   **Relationship of Parties**. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership or joint venture or of any association between Lessor and Lessee, and no provision contained in this Lease or any acts of the parties hereto shall be deemed to create any relationship between Lessor and Lessee other than the relationship of Lessor and Lessee. In addition, notwithstanding anything herein to the contrary, nothing herein is intended for the benefit of any third parties and no person or entity other

than Lessor or Lessee or their successors or assigns shall have any rights of anything contained herein. No person or entity shall have a right by virtue of this Lease Agreement to join Lessor as a party or otherwise bring the Lessor into a suit asking for damages from Lessee. The Lessor has no obligation or duty for: governmental compliance; patient care; to protect the health, safety and welfare of any employee or third party; or to anyone for anything whatsoever relating to the operation of the business or condition of the Leased Premises such lease being triple net and all obligations relating to the foregoing belonging solely to the Lessee.

17.10  **Revenues**. During the Lease Term, all revenues and income derived from the operation of the Complex shall be the property of Lessee.

17.11  **Choice of Law and Venue**. The parties agree that this Lease shall be governed by and construed in accordance with the laws of the State of New York, and that the courts of such state shall be the exclusive courts of jurisdiction and venue for any litigation, special proceeding or other proceeding as between the parties that may be brought, or arise out of, in connection with or by reason of this lease.

17.12  **Gender, Number**. Whenever the context of this Lease requires, the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural.

17.13  **Amendment**. No changes in or amendments to this Lease shall be recognized unless and until made in writing and signed by all parties hereto or them respective successors and assigns. This Lease may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. This Lease amends and supersedes any and all prior leases between Lessor and Lessee.

17.14  **Binding Effect**. The terms of this Lease shall be binding upon, and shall inure to the benefit of and be enforceable by and against, the heirs, successors and assigns of the parties hereto.

17.15  **Time of the Essence**. Time is of the essence of this Lease, and each and every covenant, term, condition and provision hereof.

17.16  **Divisions and Headings**. The divisions of this Lease and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Lease.

17.17  **Liquor Licensing**. Lessor shall have the right to require Lessee to reasonably endeavor to endorse upon the existing manager's liquor license or to make an application for a temporary or permanent liquor license. Lessee shall be obligated, at its sole cost and expense, to maintain the liquor license in accordance with applicable Law. Lessee's failure to comply with this Section 17.17 shall be deemed a Lessee Event of Default under this Lease.

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
INDEX NO. 514152/2021
NYSCEF DOC. NO. 3
24-01334-mg   Doc 1   Filed 03/27/24   Entered 03/27/24 17:08:21   Main Document
RECEIVED NYSCEF: 06/11/2021
Pg 39 of 133

17.18 **Estoppels**. Lessor and Lessee shall, at any time and from time to time, within ten (10) business days following receipt of written request from the other party, execute, acknowledge and deliver a written statement certifying: that this Lease is in full force and effect and unmodified (or, if modified, stating the nature and date of such modification(s)); the Commencement Date; the then Expiration Date; whether the Lease has been extended; the dates to which the Rent reserved hereunder has been paid and the amount of such Rent; whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Lease (and, if so, specifying each such default of which the signer shall have knowledge); if the signer is the Lessee, that Lessee is not in default of any of its obligations under this Lease; and as to such other matters regarding this Lease as may reasonably be requested. Failure to deliver such statement within said ten (10) business days' period shall be conclusive as to the facts stated in the requested certification and binding upon the party who failed to deliver such certification.

17.19 **Memorandum of Lease**. Except as provided in this Section 17.19, neither this Lease nor any memorandum thereof may be recorded by any party hereto without the prior written consent of the other party hereto. Concurrently herewith, the parties have executed and delivered a memorandum of this Lease (the "**Memorandum**") in the form attached hereto as **Exhibit C**, which the parties agree to record in the appropriate New York City land records with respect to the Property promptly following the date hereof. Any cost or expense in connection with the recordation of the Memorandum shall be shared equally between Lessor and Lessee.

## ARTICLE XVIII
## GUARANTY

18.1 **Guaranty**. In order to induce Lessor to enter into this Lease, Yoel Goldman and Zelig Weiss, as guarantor (each, a "**Guarantor**", and collectively, the "**Guarantors**") hereby make the following guaranty and agreement with and in favor of Lessor and its respective legal representatives and assigns:

Guarantors guarantee to Lessor, its successors and assigns, that Guarantors shall pay to Lessor, the shortfall between the Rent owed under this Lease and the amount of gross income actually earned by the Lessee (the "**Guaranty**"). This Guaranty shall remain in effect until such time that Lessee has shown gross annual income of Sixteen Million Dollars ($16,000,000.00).

## ARTICLE XIX
## COVENANTS

19.1 **Covenants**. Lessee hereby covenants to Lessor as follows:

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
NYSCEF DOC. NO. 3
24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
Pg 40 of 133
INDEX NO. 514152/2021
RECEIVED NYSCEF: 06/11/2021

A.    Lessee's financial debt (other than for its Rent and regularly occurring operations obligations contemplated under this Lease which Lessee covenants to pay on time and keep current) will not exceed Five Million Dollars ($5,000,000) (in the aggregate) at any time during the Lease Term.

B.    Lessee shall not accept payments of Rent in advance from tenants of the Leased Premises for a period exceeding one (1) year.

C.    Lessee shall not grant any guarantee that is not in the ordinary course of business of the Leased Premises.

D.    Every quarter Lessee will deliver to the Lessor an officers' certificate confirming the compliance with the foregoing covenants set forth in this Article XIX.

E.    Lessee shall not Transfer the Complex or the Leased Premises without the prior written consent of Lessor (and mortgagee and collateral mortgagee thereof).

**[REMAINDER OF PAGE INTENTIONALLY BLANK; SIGNATURE PAGE FOLLOWS]**

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
NYSCEF DOC. NO. 3

INDEX NO. 514152/2021

RECEIVED NYSCEF: 06/11/2021

24-01334-mg   Doc 1   Filed 03/27/24   Entered 03/27/24 17:08:21   Main Document
Pg 41 of 133

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease as of the Effective Date.

**LESSOR**:

**WYTHE BERRY FEE OWNER LLC,**
a Delaware limited liability company

By: _____
Name: Yoel Goldman
Title: Authorized Signatory

**LESSEE**:

**WYTHE BERRY LLC,**
a Delaware limited liability company

By: _____
Name: Yoel Goldman
Title:   Authorized Signatory

**GUARANTORS (AS TO ARTICLE XVIII ONLY):**

_____
Name: Zelig Weiss

_____
Name: Yoel Goldman

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
NYSCEF DOC. NO. 3
24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
Pg 42 of 133
INDEX NO. 514152/2021
RECEIVED NYSCEF: 06/11/2021

## EXHIBIT A

### Legal Description

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, State of New York bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Wythe Avenue, with the southwesterly side of North 13th Street;

RUNNING THENCE southeasterly along the southwesterly side of North 13th Street, 250 feet;

THENCE southwesterly and at right angles to the last mentioned course, 200 feet, to the northeasterly side of North 12th Street;

THENCE northwesterly along the northeasterly side of North 12th Street, 250 feet to the southeasterly side of Wythe Avenue;

THENCE northeasterly along the southeasterly side of Wythe Avenue, 200 feet, more or less, to the point or place of BEGINNING.

24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
Pg 43 of 133

## EXHIBIT B

## Copy of Title Proforma

ALTA LOAN POLICY                                           Last amended:  February 27, 2017

### First American Title Insurance Company

SCHEDULE A

Title No.: MTANY-117524                           Policy No.: 5011336-0204941e

Date of Policy: February 28, 2017                 County: Kings

Amount of Insurance: $166,320,000.00

1.   **Name of Insured:**

     All Year Holdings Limited, a British Virgin Islands company, its successors and/or assigns as their
     interests may appear, as mortgagee, and Mishmeret Trust Company Ltd., an Israeli company, its
     successors and/or assigns as their interests may appear, as collateral assignee of All Year
     Holdings Limited

2.   **The Estate or interest in the land which is encumbered by the insured mortgage is:**

     Fee Simple

3.   **Title to the estate or interest in the land is vested in:**

     Wythe Berry Fee Owner LLC, a DE LLC

4.   **The insured mortgage and assignments thereof, if any, are described as follows:**

     See Mortgage Schedule attached hereto.

5.   **The Land referred to in this policy is described as follows:**

     **SEE LEGAL DESCRIPTION ATTACHED HERETO**

Property Address:  55 Wythe Avenue, Brooklyn, NY 11249; Block(s) 2283, Lot(s) 1
                      (for information only - not insured hereunder)

                                                          117524/109

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
INDEX NO. 514152/2021
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 06/11/2021

24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
Pg 44 of 133

## First American Title Insurance Company

### SCHEDULE A
(Continued)

Title No.: MTANY-117524                                          Policy No.:

#### LEGAL DESCRIPTION

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, State of New York bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Wythe Avenue, with the southwesterly side of North 13th Street;

RUNNING THENCE southeasterly along the southwesterly side of North 13th Street, 250 feet;

THENCE southwesterly and at right angles to the last mentioned course, 200 feet, to the northeasterly side of North 12th Street;

THENCE northwesterly along the northeasterly side of North 12th Street, 250 feet to the southeasterly side of Wythe Avenue;

THENCE northeasterly along the southeasterly side of Wythe Avenue, 200 feet, more or less, to the point or place of BEGINNING.

NOTE:  Being Block(s) 2283, Lot(s) 1, Tax Map of the Borough of Brooklyn, County of Kings, having an address of 55 Wythe Avenue, Brooklyn, New York.

NOTE:  Lot and Block shown for informational purposes only.

117524/109

Exhibit B to Lease – 55 Wythe Avenue

ALTA LOAN POLICY                                            Policy No.: 5011336-0204941e

**Title No.** MTANY-117524

## First American Title Insurance Company

### SCHEDULE B

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.    Rights of tenants or persons in possession, if any, as shown on Exhibit A annexed hereto, with no option to purchase or right of first refusal.

2.    Covenants, Conditions, Restrictions, Easements, Agreements, etc. of record:

   1. Sewer Easement in Liber 3043, Page 367
   2. Waiver of Legal Grade in Liber 323, Page 1493

   FOR MORTGAGE POLICY ONLY: The Policy insures the Insured that there is no condition or right of re-entry or any other provision for forfeiture or reversion of title set forth therein under which the Insured could be cut-off, subordinated, foreclosed or otherwise disturbed.

3.    Survey made by Leonard J. Strandberg and Associates Consulting Engineers and Land Surveyors, P.C., as Job number 13-35567E dated August 20, 2013, and last updated September 20, 2016, shows a 1 story high concrete and glass building with a 22 story extension, a 3 story high concrete and concrete block building with a 22 story extension and 5 – 22 story overhang, numerous ramps, and also shows:

   1.    Stone steps extend up to 2.1 feet onto North 13th Street, north 12th Street and Wythe Avenue.
   2.    Walls on or near portions of southeasterly record line of title.

   FOR MORTGAGE POLICY ONLY: The Policy insures the Insured against loss or damage sustained by reason of any final court order or judgment (a) requiring the removal of said encroachment and (b) providing for monetary damages or divestment of title arising as a result of said encroachment.

   FOR MORTGAGE POLICY ONLY: The Policy insures the Insured against loss or damage sustained by reason of (a) said encroachment of existing improvements located on the land onto adjoining land and (b) any final court order or judgment requiring the removal from any land adjoining the land of said encroachment.

4.    This Policy will be issued contemporaneously with policy number LX-11654514 of Old Republic National Title Insurance Company and M-8912-001263822 of Stewart Title Insurance Company . At the time liability for any loss shall have been fixed pursuant to the conditions of this policy, this Company shall not be liable to the insured for a greater portion of the loss than the amount that this policy bears to the whole amount of insurance held by the insured as aforesaid.

### First American Title Insurance Company

117524/147

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
INDEX NO. 514152/2021
NYSCEF DOC. NO. 3
24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
Pg 46 of 133
RECEIVED NYSCEF: 06/11/2021

**SCHEDULE B**
(Continued)

**Policy No.:** 5011336-0204941e

Unless a Schedule B Part II is attached, there are no subordinate matters that affect the title to the estate or interest referred to in Schedule A

**First American Title Insurance Company**

117524/147

Exhibit B to Lease – 55 Wythe Avenue

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
INDEX NO. 514152/2021
NYSCEF DOC. NO. 3
24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
RECEIVED NYSCEF: 06/11/2021
Pg 47 of 133

## MORTGAGE SCHEDULE

1.  Mortgage
    Mortgagor: Wythe Berry LLC
    Mortgagee: Wythe Berry Debt Holdings LLC
    Amount: $8,500,000.00
    Dated: 04/29/2014
    Recorded: 05/14/2014
    CRFN 2014000165946
    Tax Paid: $238,000.00

    Originally covered old Lot 10.

    Assignment of Mortgage
    Assignor: Wythe Berry Debt Holdings LLC
    Assignee: SDF93 Wythe Avenue 1 LLC
    Dated: 06/06/2014
    Recorded: 06/19/2014
    CRFN 2014000210612

2.  Mortgage
    Mortgagor: Wythe Berry LLC
    Mortgagee: SDF93 Wythe Avenue 1 LLC
    Amount: $8,050,000.00
    Dated: 06/06/2014
    Recorded: 06/19/2014
    CRFN# 2014000210613
    Tax Paid: $225,400.00

    Consolidation, Modification and Extension Agreement
    Mortgagor: Wythe Berry LLC
    Mortgagee: SDF93 Wythe Avenue 1 LLC
    Dated: 06/06/2014
    Recorded: 06/19/2014
    CRFN# 2014000210614

    Consolidates Mortgages 1 and 2 to form a single lien of $16,550,000.00.

3.  Gap Mortgage
    Mortgagor: Wythe Berry LLC
    Mortgagee: SDF93 Wythe Avenue 1 LLC
    Amount: $17,236,000.00
    Dated: 12/04/2014
    Recorded: 01/14/2015
    CRFN: 201500016216
    Tax Paid: $482,608.00

    Consolidation, Modification and Extension Agreement
    Mortgagor: Wythe Berry LLC
    Mortgagee: SDF93 Wythe Avenue 1 LLC
    Dated: 12/04/2014
    Recorded: 01/14/2015
    CRFN: 201500016217

117524/57

Consolidates Mortgages 1, 2 and 3 to form a single lien in the amount of $33,786,000.00.

Collateral Assignment of Mortgage
Assignor: SDF93 Wythe Avenue 1 LLC
Assignee: Emigrant Realty Finance, LLC
Dated: 12/17/2014
Recorded: 01/14/2015
CRFN: 2015000016220

Modification Agreement
Mortgagor: Wythe Berry LLC
Mortgagee: SDF93 Wythe Avenue 1 LLC
Dated: 07/01/2016
Recorded: 10/28/2016
CRFN: 2016000380648

Re-Assignment of Collateral Assignment of Mortgage
Assignor: Emigrant Realty Finance, LLC
Assignee: SDF93 Wythe Avenue 1 LLC
Dated: 11/02/2016
Recorded: 01/04/2017
CRFN: 2017000003991

Which Mortgage is currently held by SDF93 Wythe Avenue 1 LLC and is assigned to the insured in the unpaid principal balance of $33,786,000.00.

4.    Mortgage
      Mortgagor: Wythe Berry LLC
      Mortgagee: SDF93 Wythe Avenue 2 LLC
      Amount: $1,800,000.00
      Dated: 06/06/2014
      Recorded: 06/19/2014
      CRFN: 2014000210617
      Tax Paid: $50,400.00

5.    Gap Mortgage
      Mortgagor: Wythe Berry LLC
      Mortgagee: SDF93 Wythe Avenue 2 LLC
      Amount: $1,934,000.00
      Dated: 12/04/2014
      Recorded: 01/14/2015
      CRFN: 2015000016222
      Tax Paid: $54,152.00

      Consolidation, Modification and Extension Agreement
      Mortgagor: Wythe Berry LLC
      Mortgagee: SDF93 Wythe Avenue 2 LLC
      Dated: 12/04/2014
      Recorded: 01/14/2015
      CRFN: 2015000016223

117524/57

Exhibit B to Lease – 55 Wythe Avenue

Consolidates Mortgages 4 and 5 to form a single lien in the amount of $3,734,000.00.

Collateral Assignment of Mortgage
Assignor: SDF93 Wythe Avenue 2 LLC
Assignee: Emigrant Realty Finance, LLC
Dated: 12/17/2014
Recorded: 01/14/2015
CRFN: 2015000016226

Modification Agreement
Mortgagor: Wythe Berry LLC
Mortgagee: SDF93 Wythe Avenue 2 LLC
Dated: 07/01/2016
Recorded: 10/28/2016
CRFN: 2016000380649

Re-Assignment of Collateral Assignment of Mortgage
Assignor: Emigrant Realty Finance, LLC
Assignee: SDF93 Wythe Avenue 2 LLC
Dated: 11/02/2016
Recorded: 01/04/2017
CRFN: 2017000003990

Which Mortgage is currently held by SDF93 Wythe Avenue 2 LLC and is assigned to the insured in the
unpaid principal balance of $3,734,000.00.

6.    Project Loan Mortgage
Mortgagor: Wythe Berry LLC
Mortgagee: SDF93 Wythe Avenue 1 LLC
Amount: $4,936,184.00
Dated: 12/04/2014
Recorded: 01/14/2015
CRFN: 2015000016228
Tax Paid: $138,213.60

Collateral Assignment of Mortgage
Assignor: SDF93 Wythe Avenue 1 LLC
Assignee: Emigrant Realty Finance, LLC
Dated: 12/17/2014
Recorded: 01/14/2015
CRFN: 2015000016231

Modification Agreement
Mortgagor: Wythe Berry LLC
Mortgagee: SDF93 Wythe Avenue 1 LLC
Dated: 07/01/2016
Recorded: 10/28/2016
CRFN: 2016000380650

Re-Assignment of Collateral Assignment of Mortgage
Assignor: Emigrant Realty Finance, LLC
Assignee: SDF93 Wythe Avenue 1 LLC
Dated: 11/02/2016

117524/57

Recorded: 01/04/2017
CRFN: 2017000003993

Which Mortgage is currently held by SDF93 Wythe Avenue 1 LLC and is assigned to the insured in the unpaid principal balance of $4,936,184.00.

7.     Building Loan Mortgage
       Mortgagor: Wythe Berry LLC
       Mortgagee: SDF93 Wythe Avenue 1 LLC
       Amount: $38,543,816.00
       Dated: 12/04/2014
       Recorded: 01/14/2015
       CRFN: 2015000016233
       Tax Paid: $1,079,226.40

       Collateral Assignment of Mortgage
       Assignor: SDF93 Wythe Avenue 1 LLC
       Assignee: Emigrant Realty Finance, LLC
       Dated: 12/17/2014
       Recorded: 01/14/2015
       CRFN: 2015000016236

       Modification Agreement
       Mortgagor: Wythe Berry LLC
       Mortgagee: SDF93 Wythe Avenue 1 LLC
       Dated: 07/01/2016
       Recorded: 10/28/2016
       CRFN: 2016000380651

       Re-Assignment of Collateral Assignment of Mortgage
       Assignor: Emigrant Realty Finance, LLC
       Assignee: SDF93 Wythe Avenue 1 LLC
       Dated: 11/02/2016
       Recorded: 01/04/2017
       CRFN: 2017000003992

       Which Mortgage is currently held by SDF93 Wythe Avenue 1 LLC and is assigned to the insured in the unpaid principal balance of $38,543,816.00.

8.     Project Loan Mortgage
       Mortgagor: Wythe Berry LLC
       Mortgagee: SDF93 Wythe Avenue 1 LLC
       Amount: $5,195,254.00
       Dated: 09/08/2016
       Recorded: 10/28/2016
       CRFN: 2016000380655
       Tax Paid: $145.468.41

117524/57

Which Mortgage is currently held by SDF93 Wythe Avenue 1 LLC and is assigned to the insured in the unpaid principal balance of $5,195,254.00.

9. Building Loan Mortgage
Mortgagor: Wythe Berry LLC
Mortgagee: SDF93 Wythe Avenue 1 LLC
Amount: $9,804,746.00
Dated: 09/08/2016
Recorded: 10/28/2016
CRFN: 2016000380652
Tax Paid: $274,531.61

Which Mortgage is currently held by SDF93 Wythe Avenue 1 LLC and is assigned to the insured in the unpaid principal balance of $9,804,746.00.

Gap Mortgage made by Wythe Berry Fee Owner LLC, a DE LLC, to All Year Holdings Limited, a British Virgin Islands Company dated February 28, 2017 in the amount of $70,320,000.00 and recorded in the Kings County Clerk/Register's Office on _____, 2017 as CRFN_____. Which Mortgage is consolidated with mortgages listed above to form a single lien of $166,320,000.00 by Agreement of Modification of Mortgage, Security Agreement, Assignment of Rents, and Fixture Filing dated February 28, 2017 and recorded in the Kings County Clerk/Register's Office on _____, 2017 as CRFN_____.

Collateral Assignment of Agreement of Mortgage, Security Agreement, Assignment of Rents, and Fixture Filing
Assignor: All Year Holdings Limited, a British Virgin Islands Company
Assignee: Mishmeret Trust Company Ltd., an Israeli Company
Dated: February 28, 2017 and recorded in the Kings County Clerk/Register's Office on _____, 2017 as CRFN_____.

117524/57

Exhibit B to Lease – 55 Wythe Avenue

**FIRST AMERICAN TITLE INSURANCE COMPANY**

**NY ENDORSEMENT (EPL 8.1 - NYC)**
**(NEW YORK CITY ONLY)**

Attached to Policy No. 5011336-0204941e

The Policy insures the Insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

    (a)    any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B, or

    (b)    any environmental protection lien provided for by any state statute, New York City Code and/or Ordinance in effect at Date of Policy, except environmental protection liens provided for by the following statutes:

        (1)    Administrative Code, City of New York, Title 17 (Health) Section 17-151.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the amount of insurance.

**DATED: February 28, 2017**


Countersigned by:


*[signature]*
Elliot S. Zaks                                    **FIRST AMERICAN TITLE INSURANCE COMPANY**
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701


TIRSA Endorsement 8.1 EPL (New York City Only) (2/11/02)                                    117524


Exhibit B to Lease – 55 Wythe Avenue

**FIRST AMERICAN TITLE INSURANCE COMPANY**

**NY ENDORSEMENT (WAIVER OF ARBITRATION)**
**(OWNER'S OR LOAN POLICY)**

Attached to Policy No. 5011336-0204941e

The policy is amended by deleting therefrom:

(A)    If this endorsement is attached to an ALTA Loan Policy: Condition and Stipulation Section 13.

(B)    If this endorsement is attached to an ALTA Owner's Policy: Condition and Stipulation Section 14.

(C)    If this endorsement is attached to a TIRSA Owner's Extended Protection Policy: Condition Number 12.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

**DATED: February 28, 2017**

Countersigned by:

*[signature]*

Elliot S. Zaks
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701

                                                **FIRST AMERICAN TITLE INSURANCE COMPANY**

Waiver Of Arbitration Endorsement (Owner's or Loan Policy)                         117524
4/24/01

**FIRST AMERICAN TITLE INSURANCE COMPANY**

**STANDARD NEW YORK LOAN POLICY**
**(LOAN POLICY)**

Attached to Policy No. 5011336-0204941e

1.  Covered Risk Number 11 is deleted, and the following is substituted:

    11.  The lack of priority of the lien of the Insured Mortgage upon the Title

       (a) as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien arising under Article 2 of the New York the Lien Law for services, labor, or material arising from construction of an improvement or work related to the land when the improvement or work is either

          (i) contracted for or commenced on or before Date of Policy; or

          (ii) contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secure by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and

       (b) over the lien of any assessments for street improvement under construction or completed at Date of Policy.

2.  Exclusion Number 7 is deleted, and the following is substituted:

    7. Any lien on the Title for real estate taxes, assessments, water charges or sewer rents imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11 (b).

3.  Exclusions From Coverage is amended by adding a new Exclusion Number 8:

    8. Any consumer protection law including, without limitation, New York Banking Law Sections 6-l ("High-Cost Home Loans") and 6-m ("Subprime Home Loans"), relating to a mortgage on Land improved or to be improved by a structure or structures intended principally for occupancy by one-to-four families.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Standard New York Loan Policy (Loan Policy)                                                                                                                  117524
5/1/07

Exhibit B to Lease – 55 Wythe Avenue

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
NYSCEF DOC. NO. 3

INDEX NO. 514152/2021

RECEIVED NYSCEF: 06/11/2021

24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
Pg 55 of 133

Policy No.: 5011336-0204941e

DATED: February 28, 2017

Countersigned by:

FIRST AMERICAN TITLE INSURANCE COMPANY

Elliot S. Zaks
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701

Standard New York Loan Policy (Loan Policy)
5/1/07

117524

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
INDEX NO. 514152/2021
NYSCEF DOC. NO. 3
24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
RECEIVED NYSCEF: 06/11/2021
Pg 56 of 133

**FIRST AMERICAN TITLE INSURANCE COMPANY**

**CO-INSURANCE ENDORSEMENT**

Attached to Policy No. 5011336-0204941e

Attached to and made a part of Madison Title Agency LLC, as agent for First American Title Insurance Company ("Issuing Co-Insurer") Policy No. 5011336-0204941e ("Co-Insurance Policy"). Issuing Co-Insurer and any other co-insurers are collectively referred to as "Co-Insurers."

1.  Co-Insurer issues this endorsement as evidence of Co-Insurer's liability under Co-Insurance Policy and directs that this endorsement be attached to the Co-Insurance Policy adopting its Covered Risks, Exclusions, Conditions, Schedules and Endorsements, as follows:

Amount and proportion of insurance and Aggregate Amount of Insurance under the Co-Insurance Policy:

| Co-Insuring Companies | Name and Address | Policy Number | Amount of Insurance | Percentage of Liability |
|---|---|---|---|---|
| Issuing Co-Insurer | Madison Title Agency LLC, as agent for First American Title Insurance Company 1 First American Way Santa Ana, CA 92707 | 5011336-0204941e | $60,000,000.00 | 36.075% |
| Co-Insurer | Madison Title Agency, LLC, as agent for Old Republic National Title Insurance Company 400 Post Avenue, Suite 310 Westbury, NY 11590 | LX-11654514 | $53,160,000.00 | 31.9625% |
| Co-Insurer | Madison Title Agency, LLC, as agent for Stewart Title Insurance Company 300 East 42nd Street, 10th Floor New York, NY 10017 | M-8912-001263822 | $53,160,000.00 | 31.9625% |
| Aggregate Policy Amount | | | $166,320,000.00 | |

2.  Each Co-Insurer shall be liable to the Insured under the Co-Insurance Policy only for the total of the loss and costs multiplied by its Proportion of Liability.

3.  Any notice of claim and any other notice or statement in writing required to be given under the Co-Insurance Policy must be given to Co-Insurer at its address set forth above.

TIRSA Endorsement (Co-Insurance) (11/1/08)                                                117524

Policy No.: 5011336-0204941e

4.    Any endorsement to the Co-Insurance Policy issued after the date of this Co-Insurance Endorsement must be signed on behalf of the Co-Insurer by its authorized officer or agent.

5.    This Co-Insurance Endorsement is effective as of the Date of Policy of the Co-Insurance Policy. This Co-Insurance Endorsement may be executed in counterparts.

This endorsement is issued as part of the Co-Insurance Policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

DATED: _____
Madison Title Agency LLC, as agent for First American Title Insurance Company

By: _____

DATED: _____
Madison Title Agency, LLC, as agent for Old Republic National Title Insurance Company

By: _____

DATED: _____
Madison Title Agency, LLC, as agent for Stewart Title Insurance Company

By: _____

[Additional Co-Insurer signatures may be added if needed.]

**DATED: February 28, 2017**

Countersigned by:

*[signature]*

**FIRST AMERICAN TITLE INSURANCE COMPANY**

Elliot S. Zaks
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701

TIRSA Endorsement (Co-Insurance) (11/1/08)                                117524

**FIRST AMERICAN TITLE INSURANCE COMPANY**

**TIRSA ENDORSEMENT 9**
**(RESTRICTIONS, ENCROACHMENTS, MINERALS)**

Attached to Policy No. 5011336-0204941e

The Policy insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1. The existence, at Date of Policy, of any of the following:

    (a) Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

    (b) Unless expressly excepted in Schedule B:

        (1) Present violations on the land of any enforceable covenants, conditions or restrictions, and any existing improvements on the land which violate any building setback lines shown on a plat of subdivision recorded or filed in the public records.

        (2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which, in addition, (i) establishes an easement on the land; (ii) provides a lien for liquidated damages; (iii) provides for a private charge or assessment; (iv) provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

        (3) Any encroachment of existing improvements located on the land onto adjoining land, or any encroachment onto the land of existing improvements located on adjoining land.

        (4) Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

        (5) Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2. Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land by the insured, provided the violation results in:

    (a) invalidity, loss of priority, or unenforceability of the lien of the insured mortgage; or

    (b) loss of title to the estate or interest in the land if the insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.

3. Damage to existing improvements, including lawns, shrubbery or trees;

    (a) which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;

    (b) resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.

TIRSA Endorsement 9 (Restrictions, Encroachments, Minerals) (10/17/98) NY (5/1/07)                117524

Exhibit B to Lease – 55 Wythe Avenue

Policy No.: 5011336-0204941e

4.  Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule B.

5.  Any final court order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

Wherever in this endorsement the words "covenants conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraphs 1(b)(1) and 5, the words "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

**DATED: February 28, 2017**

Countersigned by:

*[signature]*                                          **FIRST AMERICAN TITLE INSURANCE COMPANY**

Elliot S. Zaks
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701

Exhibit B to Lease – 55 Wythe Avenue

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
INDEX NO. 514152/2021
NYSCEF DOC. NO. 3
24-01334-mg   Doc 1   Filed 03/27/24   Entered 03/27/24 17:08:21   Main Document
RECEIVED NYSCEF: 06/11/2021
Pg 60 of 133

**FIRST AMERICAN TITLE INSURANCE COMPANY**

**ACCESS ENDORSEMENT**
**(LOAN POLICY ONLY)**

Attached to Policy No. 5011336-0204941e

The Policy hereby insures the Insured against loss which the Insured shall sustain in the event that the described land does not abut upon a physically open public street known as Wythe Avenue, North 12th Street and North 13th Street.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

**DATED: February 28, 2017**

Countersigned by:

*[signature]*

Elliot S. Zaks
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701

**FIRST AMERICAN TITLE INSURANCE COMPANY**

TIRSA Endorsement (Access) (10/22/99)                                    117524

Exhibit B to Lease – 55 Wythe Avenue

**FIRST AMERICAN TITLE INSURANCE COMPANY**

**LAND SAME AS SURVEY ENDORSEMENT**

Attached to Policy No. 5011336-0204941e

The Company hereby assures the Insured that said Land is the same as that delineated on the plat of a survey made by Leonard J. Strandberg and Associates Consulting Engineers and Land Surveyors, P.C., dated August 20, 2013, and last updated September 20, 2016 as Job ID 13-35567E.

The Company hereby insures said Assured against loss which said Assured shall sustain in the event said assurances herein shall prove to be incorrect.

The total liability of the Company under said policy and any endorsement therein shall not exceed, in the aggregate, the face amount of said policy and costs which the Company is obligated under the Conditions thereof to pay.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

**DATED: February 28, 2017**


Countersigned by:


Elliot S. Zaks
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701

**FIRST AMERICAN TITLE INSURANCE COMPANY**


TIRSA Endorsement (Land Same As Survey) (5/1/07)                                        117524

Exhibit B to Lease – 55 Wythe Avenue

FILED: KINGS COUNTY CLERK 06/11/2021 01:16 PM
NYSCEF DOC. NO. 3

INDEX NO. 514152/2021

RECEIVED NYSCEF: 06/11/2021

24-01334-mg    Doc 1    Filed 03/27/24    Entered 03/27/24 17:08:21    Main Document
Pg 62 of 133

## FIRST AMERICAN TITLE INSURANCE COMPANY

### MORTGAGE TAX ENDORSEMENT

Attached to Policy No. 5011336-0204941e

The Policy insures the owner of the indebtedness secured by the insured mortgage(s) against loss or damage which may be sustained by reason that all mortgage recording taxes required to be paid on the insured mortgage(s) have not been paid,

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

**DATED: February 28, 2017**

Countersigned by:

*[signature]*

Elliot S. Zaks
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701

**FIRST AMERICAN TITLE INSURANCE COMPANY**

TIRSA Endorsement (Mortgage Tax) (12/27/00)

117524

Exhibit B to Lease – 55 Wythe Avenue

### FIRST AMERICAN TITLE INSURANCE COMPANY

**SINGLE TAX PARCEL ENDORSEMENT**
**SINGLE TAX LOT (LOAN POLICY ONLY)**

Attached to Policy No. 5011336-0204941e

The Policy insures against loss or damage which the insured may sustain by reason that the land described in Schedule A is not assessed for real estate tax purposes as a separate tax lot which includes no other land.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

**DATED: February 28, 2017**

Countersigned by:

*[signature]*

Elliot S. Zaks
Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701

**FIRST AMERICAN TITLE INSURANCE COMPANY**

TIRSA Endorsement (Tax Parcel Single Lot) (Loan Policy)(12/27/00)          117524

Exhibit B to Lease – 55 Wythe Avenue

# EXHIBIT C

## Memorandum of Lease

---

**WYTHE BERRY FEE OWNER,**

as Lessor

and

**WYTHE BERRY LLC,**

as Lessee

**MEMORANDUM OF LEASE**

---

Dated: February 28, 2017

Block:   2283
Lot:     1
County:  Kings County
Address:   55 Wythe Avenue, Brooklyn, NY
PREPARED BY AND UPON RECORDATION RETURN TO:

Madison Title Agency, LLC
1125 Ocean Avenue
Lakewood, NJ 08701
Attn: Mindy Lichtenstein

---

Exhibit C to Lease – 55 Wythe Avenue

## MEMORANDUM OF LEASE

This is a Memorandum of Lease for the Lease Agreement executed on the 28th day of February 2017 (the "**Lease**"), between **WYTHE BERRY FEE OWNER LLC**, a Delaware limited liability company, having its principle office at 199 Lee Avenue, #693, Brooklyn, New York 11211(the "**Lessor**") and **WYTHE BERRY LLC**, a New York limited liability company, having its principal office at 266 Broadway, Suite 301, Brooklyn, New York 11211 (the "**Lessee**").

1.  Lessor is the owner of certain real property described in <u>Exhibit A</u> attached hereto and by this reference incorporated herein, and the buildings and improvements located thereon (the "**Premises**").

2.  Lessor and Lessee, concurrently herewith, have entered into that certain Lease pursuant to which Lessor will lease to Lessee, and Lessee will lease from Lessor, the Premises, pursuant to the terms and conditions contained in the Lease.

3.  The terms and conditions of the Lease are incorporated herein by reference. This memorandum is prepared for the purpose of notification and in no way modifies the terms and conditions of the Lease. If there is any inconsistency between the terms and conditions of this memorandum and the terms and conditions of the Lease, the terms and conditions of the Lease shall control.

4.  The term of the Lease begins on the date hereof and expires on January 31, 2032 unless sooner terminated in accordance with the terms of the Lease.

[Signature page follows]

Exhibit C to Lease – 55 Wythe Avenue

**LESSOR**:

WYTHE BERRY FEE OWNER LLC,
a Delaware limited liability company


By:_____
    Name: Yoel Goldman
     Title: Authorized Signatory

WYTHE BERRY LLC,
a New York limited liability company


By:_____
    Name: Zelig Weiss
     Title: Authorized Signatory

Exhibit C to Lease – 55 Wythe Avenue

## EXHIBIT A

Premises

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, State of New York bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Wythe Avenue, with the southwesterly side of North 13th Street;

RUNNING THENCE southeasterly along the southwesterly side of North 13th Street, 250 feet;

THENCE southwesterly and at right angles to the last mentioned course, 200 feet, to the northeasterly side of North 12th Street;

THENCE northwesterly along the northeasterly side of North 12th Street, 250 feet to the southeasterly side of Wythe Avenue;

THENCE northeasterly along the southeasterly side of Wythe Avenue, 200 feet, more or less, to the point or place of BEGINNING.

NOTE: Being Block(s) 2283, Lot(s) 1, Tax Map of the Borough of Brooklyn, County of Kings.

Exhibit A - Memo of Lease

Exhibit C to Lease – 55 Wythe Avenue

Exhibit B

# EXPERT REPORT of
# Kyle K. TenHuisen, ASA

## FAIR RENTAL VALUE APPRAISAL OF CERTAIN PERSONAL PROPERTY ASSETS OF THE WILLIAM VALE HOTEL
## as of
## February 28, 2017

**Report Issued: March 20, 2024**

**Presented in:**

## In re Wythe Berry Fee Owner LLC

**CASE NO. 22-11340 (MG)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**





**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

## Table of Contents

I.    Introduction and Summary of Opinion ................................................................ 3
II.   Assignment Overview ......................................................................................... 5
      a.   Purpose of Appraisal ................................................................................ 5
      b.   Client ......................................................................................................... 5
      c.   Intended Use and Users of the Report ...................................................... 5
      d.   Competency of the Appraiser .................................................................... 5
      e.   Subject Personal Property ......................................................................... 7
      f.   Relevant Dates ........................................................................................ 11
      g.   Definitions ................................................................................................ 12
      h.   Scope of Work ......................................................................................... 13
III.  Fair Rental Value Analysis the Subject Personal Property ......................... 15
      a.   Preface .................................................................................................... 15
      b.   Appraisal Techniques .............................................................................. 15
      c.   Application of the Traditional Method of the Analytical Approach  17
IV.   Current and Residual Value Analysis of the Subject Personal Property .. 24
      a.   Preface .................................................................................................... 24
      b.   Premise of Value ..................................................................................... 24
      c.   Appraisal Techniques .............................................................................. 25
      d.   Cost Approach Methodology .................................................................... 26
      e.   Cost Approach Example – Current Value ................................................ 29
      f.   Cost Approach Example – Residual Value .............................................. 30
      g.   Reconciliation and Conclusion of Current Value and Residual
           Value ........................................................................................................ 32
V.    Certification ...................................................................................................... 33



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

# Exhibits

Exhibit A……………………………………………...List of Information Considered
Exhibit B………………..……...……………..…...Assumptions & Limiting Conditions
Exhibit C…………………………………………………………..Curriculum Vitae
Exhibit D……………...……………………….Personal Property Fair Rental Value
Exhibit E……………………………………………………………...Defined Term
Exhibit F…………………………………………..Personal Property Rate of Return
Exhibit G……………..………...……Personal Property Current and Residual Values
Exhibit H…………..……...…………………….Personal Property Detailed Values
Exhibit I.…………..……...…………………………….Inspection Photographs

2



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

# I.   Introduction and Summary of Opinion

1.   I was retained by Herrick Feinstein LLP ("Herrick Feinstein" or the "Counsel") on behalf of their client, Wythe Berry Fee Owner LLC ("Wythe Berry Fee Owner" or the "Company"), to conduct a retrospective appraisal of the Fair Rental Value ("FRV") of certain personal property assets (the "Subject Personal Property") owned Wythe Berry Fee Owner as of February 28, 2017 (the "Valuation Date"). Specifically, the Subject Personal Property includes certain furniture, fixtures, and equipment at The William Vale Hotel (the "WV Hotel"). The opinions and contents of this report should be used solely for the purpose of litigation related to the case cited on the cover page of this report.

2.   A description of the assignment overview is set forth in Section II and a detailed description of my procedures, methodologies, assumptions, and conclusions is contained in Section III. My retrospective appraisal report and analysis are subject to the Statement of Assumptions and Limiting Conditions set forth in Exhibit B. A list of the sources of information considered is presented in Exhibit A. My curriculum vitae is presented in Exhibit C.

3.   My analysis and report were conducted approximately seven years after the Valuation Date. As such, my analysis and report is considered a retrospective appraisal.

4.   At the request of Counsel, I have been asked to conduct my retrospective appraisal and report of the Subject Personal Property using the Fair Rental Value premise of value. In my analysis and report I have further defined the premise of Fair Rental Value as:

> *The price that a willing and informed owner would accept for renting an asset to an informed and willing renter in an arm's length transaction for a prescribed period of time. A lease agreement may specify a modified or different definition applicable to that agreement.[1]*

As part of the scope of my work, I was not provided any lease agreements specific to the Subject Personal Property.

5.   Based on my analysis and the foregoing report, I have concluded that the monthly Fair Rental Value of the Subject Personal Property is **$98,000**, as of the Valuation Date. The concluded value is based upon the analysis, assumptions, and information contained within this report along with my workpaper files. This summary of my opinion should not be separated from, nor considered independent of, the report of which it is a part.

6.   The analyses and opinions expressed in this report are my own. Related to this assignment, Stout Risius Ross, LLC ("Stout") is compensated at a rate of $500 per hour for time incurred by me. Other individuals from Stout have also provided assistance in this matter; their hourly rates range from $200 per hour to $450 per hour. My compensation is not based on the content of my opinions or the outcome of this or any other matter.

7.   This retrospective appraisal was prepared in conformance with the current Uniform Standards of Professional Appraisal Practice ("USPAP") of the Appraisal Foundation and The Principles of Appraisal Practice and Code of Ethics of the American Society

---

[1] Machinery and Technical Specialties Committee, Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets - Fourth Edition (Washington, DC: American Society of Appraisers, 2020), p. 535.



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

of Appraisers ("ASA") as of the date of this report.  My report is considered to be a Restricted Appraisal Report. As such, this report only contains a summary of the information and supporting rationale considered and relied upon to develop the opinions and conclusions set forth in the report.

8.  My opinions, detailed herein, are based on the information made available to me as summarized in this report. If additional information is made available for my review, I reserve the right to supplement my opinions at a later date.



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

---

## II.  Assignment Overview

### Purpose of the Appraisal

The purpose of this retrospective appraisal is to provide an opinion of the Fair Rental Value of the Subject Personal Property as of the Valuation Date.

### Client

The client for my services is Herrick Feinstein LLP., for the benefit of Wythe Berry Fee Owner LLC.

### Intended Use and Users of the Report

This report is intended to be used for litigation purposes in connection with *In re Wythe Berry Fee Owner LLC*, Case No. 22-11340 (MG) in the United States Bankruptcy Court Southern District of New York.

My report is to be used by Wythe Berry Fee Owner LLC, Herrick Feinstein LLP. and other advisors, the Court, and other parties to the legal proceedings only for the purpose stated above.

### Competency of the Appraiser

My retrospective appraisal of the Subject Personal Property has been performed in accordance with the relevant sections of the current USPAP of the Appraisal Foundation and the current Principles of Appraisal Practice and Code of Ethics of the ASA.

The Competency Rule of USPAP presents and assigns conditions for knowledge and experience. According to the Competency Rule, an appraiser must:

1)  be competent to perform the assignment;

2)  acquire the necessary competency to perform the assignment; or

3)  decline or withdraw from the assignment.

In all cases, the appraiser must perform competently when completing the assignment. The appraiser must determine, prior to accepting an assignment, that he or she is able to perform the assignment competently. Competency requires:

1)  the ability to properly identify the problem to be addressed;

2)  the knowledge and experience to complete the assignment competently; and

3)  recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.

For this assignment, I concluded that, for the reasons presented below, I am competent to perform the appraisal. I have the experience and ability to properly identify the problem to be addressed; possess the knowledge and experience to complete the assignment competently; and can recognize and comply with the laws and regulations that apply to me and to the assignment.

I am a Managing Director and Machinery & Equipment Valuation Practice Leader at Stout. My 15 years of appraisal experience includes valuation of tangible assets used in

5



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

the hospitality industry, specifically hotels, resorts, and restaurants. I have appraised various furniture, fixture, and equipment ("FF&E") for a wide range of purposes, including acquisitions, impairments, asset-based-lending, insurance, litigation, and other related matters. Specifically, I have experience appraising FF&E at luxury hotels, of which the Subject Personal Property is a part. Furthermore, I have experience appraising tangible assets for leasing purposes on behalf of banks, companies, and independent lenders.

I am an accredited senior appraiser in the Machinery and Technical Specialties Discipline ("MTS") through the American Society of Appraisers. I am also, a member of the Detroit-chapter of the American Society of Appraisers. Additionally, I am currently serving a three-year term as a member of the Tangible Assets Board of the International Valuation Standards Council ("IVSC").

In the course of performing and supervising appraisals for 15 years, I have become familiar with the generally accepted procedures and data sources used by appraisers of personal property. My experience appraising FF&E, specifically within the hospitality industry, has provided me with a credible knowledge base when providing opinions of value similar to this appraisal assignment. My appraisals have been reviewed and accepted by the Internal Revenue Service, all the Big 4 accounting firms, many second tier and regional accounting firms, tax review boards, tax tribunals, and other courts of law.

6



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

### Subject Personal Property

As stated in Section I, the Subject Personal Property is defined as certain personal property assets (mostly FF&E) owned by Wythe Berry Fee Owner and existing at the WV Hotel as of the Valuation Date. For reference, an image of the hotel in which the Subject Personal Property resides is presented in Figure 1.

**Figure 1**
**WV Hotel Image Layout[2]**



---

[2] As presented in the November 2023 Offering Memorandum by Eastdil Secured and A&G Real Estate Partners.

7



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

The WV Hotel is a luxury lifestyle hotel located at 111 N 12th St, Brooklyn, New York 11249. The hotel opened in 2016 with 183 uniquely designed guestrooms, each featuring a private balcony, 7,300 square feet of high-end indoor and outdoor function space, amenities such as an outdoor pool and a public garden, and three restaurants. The WV Hotel is complemented by nearly 80,000 square feet of commercial space. For purposes of my appraisal, I have defined the Subject Personal Property to exist in the following 13 categories/locations:

1. <u>Guest Room Furniture & Equipment</u>: 183 total guestrooms – 8 double rooms, 139 king rooms, 11 queen rooms, 24 suite rooms, 1 penthouse room.

2. <u>Back of House Areas</u>: Administrative offices, housekeeping and laundry, employee cafeteria, security room, storage rooms, and hallways.

3. <u>Lower Level Meeting Rooms</u>: Three meeting rooms in the lower level with a pre-function area.

4. <u>Lobby & Reception</u>: First floor reception area and lobby with seating.

5. <u>Fitness Center</u>: Workout facility.

6. <u>Lueca Restaurant & Kitchen</u>: Full-service restaurant and commercial kitchen with a bar and private dining room.

7. <u>Main Kitchen (Lower Level)</u>: Large commercial kitchen that services the entire hotel.

8. <u>Westlight Restaurant & Kitchen</u>: Top floor full-service restaurant and commercial kitchen with bar and outdoor seating.

9. <u>Storage Area (10th Floor)</u>: Warehouse space for supply storage.

10. <u>Vale Outdoor Park</u>: Outdoor area above retail space. Also referred to as Public Garden.

11. <u>Vale Outdoor Pool and Event</u>: Outdoor below grade pool with two bars and self-contained commercial kitchen.

12. <u>Warehouse</u>: Ground level storage area for supplies.

13. <u>Miscellaneous</u>: Various non-defined areas of the hotel.

**Listing of Subject Personal Property**

It is my understanding based on discussions with Counsel, Wythe Berry Fee Owner, and personnel at the WV Hotel, that an existing comprehensive list of the Subject Personal Property as of February 28, 2017, is not available. Thus, a listing of the Subject Personal Property as of the Valuation Date was developed as part of my scope of work.

The starting basis for the listing of the Subject Personal Property was a physical inspection and detailed inventory of the personal property assets at WV Hotel in January of 2024. From this initial listing, personal property assets were added and removed based upon document evidence and my determination of probable existence as of the Valuation Date based on discussions with parties knowledgeable about the Subject Personal Property, my physical inspection, and my knowledge of the life expectancy of similar assets. Current and original (2016-2017) inventory and purchase documents, fixed asset listings as of 2023, and discussions with the WV Hotel personnel were considered when

8



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

determining an accurate listing of the Subject Personal Property as of the Valuation Date. The concluded listing of the Subject Personal Property as of the Valuation Date is presented in Exhibit H.

In general, the contents of the WV Hotel have not materially changed since its original construction in 2016. The hotel has not undergone any major renovations or refurbishments. Minor replacements and upgrades have occurred between the Valuation Date and the date of Stout's physical inspection. For example, portions of furniture at the Westlight Restaurant were replaced, fitness center equipment was replaced, saunas and hot tubs were added, and linen inventory was replaced multiple times. Furthermore, it is our understanding that the commercial spaces have changed overtime as leasing tenants change, but it is my understanding that these areas contained insignificant amounts of personal property assets owned by the WV Hotel.

**Description of the Subject Personal Property**

For purposes of my appraisal, the Subject Personal Property is categorized in the following ten groups:

1. <u>Banquet Furniture</u>: Banquet furniture primarily includes chairs, collapsible tables, portable bars, and specialty tables.

2. <u>Electronics & Technology</u>: Electronics & technology primarily includes an AED, alarm clocks, IT hardware, key system assets, paper shredders, phones, radios, safes, sound systems and speakers, televisions, and a video security system.

3. <u>General Equipment</u>: General equipment primarily includes commercial washing and drying machines, a floor scrubber, a handicap lift, hotel related carts, ice machines, racking, a trash compactor, trash receptacles, and vacuums.

4. <u>Guestroom Furniture</u>: Guestroom furniture primarily includes armoires/wardrobes, bed sets, dressers, guestroom chairs, guestroom tables, hotel linen, lamps, nightstands, rugs, sofas, wall sconces, and window treatments.

5. <u>Hotel Artwork / Scenery</u>: Hotel artwork / scenery primarily includes pictures, potted plants, a rock sculpture, and wall art.

6. <u>Kitchen & Bar Equipment</u>: Kitchen & bar equipment primarily includes freezers, fryers, griddles, ovens, prep tables, racking, ranges, refrigerators, sinks, smallware, ventilation systems, and walk-in refrigeration units.

7. <u>Office Furniture</u>: Office furniture primarily includes cabinets, chairs, couches, conference tables, desks, filers, lighting fixtures, ottomans, and side tables.

8. <u>Restaurant Furniture</u>: Restaurant furniture primarily includes bar stools, buffets, cabanas, couches, dining chairs, dining tables, outdoor chaise lounge chairs, outdoor couches, portable bars, and side stations.

9. <u>Unique Hotel Assets</u>: Unique hotel assets includes a 1974 Airstream with fully fitted commercial kitchen, and hotel fitness equipment.

10. <u>Software</u>: Software includes hotel and operations software systems.

9



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

A majority of the Subject Personal Property is comprised of assets within the Guestroom Furniture and Kitchen & Bar Equipment groups. Figures 2 and 3 provide sample photographs of assets in these groups based on our physical inspection in January 2024. Please refer to Exhibit I for a complete collection of photographs from our physical inspection in January 2024.

**Figure 2**
**Guestroom 1914 – Double Bed**






**Figure 3**
**Main Kitchen – Lower Level**





10



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

As of the Valuation Date, most of the Subject Personal Property was less than one year old. Thus, we have assumed that the Subject Personal Property was in good to excellent condition as of the Valuation Date.

As of our physical inspection date in January 2024 the Subject Personal Property was generally in fair condition, meaning the assets were functioning as designed but appeared worn and approaching the end of their useful life. Below is additional commentary regarding the Subject Personal Properties condition as of the physical inspection in January 2024.

1. Banquet Furniture: Fair condition.

2. Electronics & Technology: Fair condition. Most televisions and computer equipment were at the end of their useful life.

3. General Equipment: Fair condition. One of the commercial washing machines was broken and in need of complete replacement.

4. Guestroom Furniture: Fair condition. Hard goods and soft goods appeared worn and at the end of their useful life.

5. Hotel Artwork / Scenery: Fair to good condition.

6. Kitchen & Bar Equipment: Fair to good condition. Some equipment was in good working order. Some original cooking appliances were broken or had been replaced. Others were in need of repair.

7. Office Furniture: Fair condition.

8. Restaurant Furniture: Fair condition. All the original outdoor furniture at the Westlight Restaurant no longer exists and was replaced in 2023.

9. Unique Hotel Assets: Fair condition. All original fitness equipment no longer exists and was replaced in 2021.

10. Software: No condition assessment was made.

**Relevant Dates**

As noted previously, the Valuation Date of my expert report, otherwise known as the effective date of the appraisal, is February 28, 2017.

Inspections of the Subject Personal Property located at the WV Hotel were performed by Kyle K. TenHuisen, ASA and Chris Fundich on January 10, 2024 and January 11, 2024. Reference Exhibit I for a collection of photographs from this inspection.

Further discussed in Section IV of this report, I determined of the current value of the Subject Personal Property as of February 28, 2017. Additionally, I determined the residual value of the Subject Personal Property as of February 28, 2025. Both of these value conclusions were used as inputs in ultimately determining the Fair Rental Value as of February 28, 2017.

The date of issuance of my expert report is March 20, 2024.

11



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

## Definitions

**Fair Rental Value**, as used in this report, is defined as:

> The price that a willing and informed owner would accept for renting an asset to an informed and willing renter in an arm's length transaction for a prescribed period of time. A lease agreement may specify a modified or different definition applicable to that agreement.[3]

**Fair Market Value**, as used in this report, is first defined as:

> The price at which property would exchange between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both having reasonable knowledge of the relevant facts.[4].

The above definition of Fair Market Value is the basis from which I establish the appropriate premises of value that are later defined and used in this report.

The following additional terms, as used in this report, are defined by the American Society of Appraisers, as follows:

- **Reproduction Cost New**: The cost of reproducing a new replica of a property on the basis of current prices with the same or closely similar materials, as of a specific date.

- **Replacement Cost New**: The current cost of a similar new property having the nearest equivalent utility as the property being appraised, as of specific date.

- **Highest and Best Use**: The most probable and legal use of a property (including machinery and equipment), which is physically possible, appropriately supported, financially feasible, and that results in the highest value.

- **Chronological Age**: The number of years that have elapsed since an item or property was originally built or placed in service for the first time.

- **Effective Age**: The apparent age of a property in comparison with a new property of like kind, that is, the age indicated by the actual condition of a property.

- **Remaining Useful Life**: The estimated period during which a property of a certain effective age is expected to actually be used before it is retired from service.

- **Original Cost**: The initial capitalized cost of an asset in the hands of its present owner.

- **Depreciation**: The actual loss in value or worth of a property from all causes including those resulting from physical deterioration, functional obsolescence,

---

[3] Machinery and Technical Specialties Committee, *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets - Fourth Edition* (Washington, DC: American Society of Appraisers, 2020), p. 535.
[4] Treas. Regs §20.2031-1(b) and §25.2512-1; Rev. Rul. 59-60, 1959-1 C.B. 237.

12



**In re Wythe Berry Fee
Owner LLC**

**Expert Report of
Kyle K. TenHuisen, ASA**

**March 20, 2024**

and economic obsolescence. Depreciation may be curable or incurable. The estimated loss in value of an asset.

■ **Physical Deterioration**: A form of depreciation where the loss in value or usefulness of a property is due to the using up or expiration of its useful life caused by wear and tear, deterioration, exposure to various elements, physical stresses, and similar factors. Physical deterioration may be curable (or partially curable), by replacement or rebuilding, to some percentage of its full physical life.

■ **Functional Obsolescence**: A form of depreciation in which the loss in value or usefulness of a property is caused by inefficiencies or inadequacies of the property itself, when compared to a more efficient or less costly replacement property that new technology and changes in design, materials, or process that result in inadequacy, overcapacity, excess construction, lack of functional utility, excess operating costs, etc. has developed. Symptoms suggesting the presence of functional obsolescence are excess operating cost, excess construction (excess capital cost), over-capacity, inadequacy, lack of utility, or similar conditions.

■ **Economic Obsolescence**: A form of depreciation or loss in value or usefulness of a property caused by factors external to the property. These may include such things as the economics of the industry; availability of financing; loss of material and/or labor sources; passage of new legislation; changes in ordinances; increased cost of raw materials, labor or utilities (without an offsetting increase in product price); reduced demand for the product; increased competition; inflation or high interest rates; or similar factors.

■ **Residual Value**: As it pertains to leasing, the value remaining after part of the asset's life has been consumed.

## Scope of Work

The scope of work associated with completion of this assignment includes the following:

■ discussions with Counsel regarding the purpose and definition of value for the retrospective appraisal;

■ a physical inspection of the personal property assets at the WV Hotel in Brooklyn, New York;

■ interviews and discussions with Wythe Berry Fee Owner and the WV Hotel personnel regarding the business environment in which the Subject Personal Property is used, as well as the existence, quantity, quality, condition, and utility of these assets;

■ review of documents provided by Counsel, Wythe Berry Fee Owner, and the WV Hotel personnel, specifically listed in Exhibit A;

■ composition of an accurate listing of the Subject Personal Property as of the Valuation Date;

■ research and review of publicly available information related to the Subject Personal Property, the WV Hotel, and other similar companies;

13



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

- analysis of the current value of the Subject Personal Property as of the Valuation Date;

- analysis of the of the residual value of the Subject Personal Property;

- review and analysis of market data;

- analysis of the expected useful life and required rate of return of the Subject Personal Property;

- determination of the Fair Rental Value of the Subject Personal Property; and

- preparation of this report, including outlining the data reviewed, the assumptions utilized, and my opinion of the Fair Rental Value of the Subject Personal Property as of the Valuation Date.



### III.   Fair Rental Value Analysis of the Subject Personal Property

### Preface

The following section covers the standard techniques, valuation procedures performed, and assumptions made to arrive at an opinion of the Fair Rental Value of the Subject Personal Property as of the Valuation Date. It should be clearly understood that the Fair Rental Value is a retrospective opinion of value, based upon the difference in time between the Valuation Date and when my analysis and report were conducted.

Significant inputs relied upon in the determination of Fair Rental Value such as the current value and residual value of the Subject Personal Property are separately addressed in Section IV of this report.

My analysis and report are subject to the Statement of Assumptions and Limiting Conditions set forth in Exhibit B of this report.

### Fair Rental Value Approaches

In principle, the concept of Fair Rental Value is to determine what a fair and equitable rental payment would be for the use of an asset (or group of assets) for a given period of time to enable the lessor to recover a reasonable return on their investment and provide a reasonable payment structure for the lessee[5].

According to the ASA's Fundamentals of Appraising Machinery and Technical Assets (Fourth Edition) there are two standard approaches to determine Fair Rental Value:

1.   Sales comparison approach

2.   Analytical approach

Each approach is described below.

The sales comparison approach attempts to identify identical or comparable assets in a direct or indirect method, making adjustments to comparables where necessary. In certain circumstances an appraiser can research the marketplace and identify rental rates for comparable assets with comparable terms.

The analytical approach attempts to quantify a market rental payment by analyzing and considering two main factors: 1.) loss in value of an asset(s) over time, 2.) rate of return that a lessor would require on the investment. The analytical approach is predicated on the concepts of present value and future value. Furthermore, according to the ASA, there are two generally accepted methods within the analytical approach:

■   Traditional Method

■   Opportunity Loss Method

The traditional method requires a determination of the lease term or rental term, a current value of the asset(s) at the beginning of the defined term, the projected residual value of

---

[5] Machinery and Technical Specialties Committee, *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets - Fourth Edition* (Washington, DC: American Society of Appraisers, 2020), pgs. 282-283.

15



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

the asset(s) at the end of the defined term, and the required rate of return. A generally accepted financial payment function is then used to calculate the Fair Rental Value.

The financial payment function is based on the following mathematical formula (assuming payments in arrears):

$$Payment = r \div ((1 + r)^N - 1) \times (pv \times (1 + r)^N - fv)$$

$r$: *periodic interest rate*
$N$: *total number of interest payments*
$pv$: *present value (current value at beginning of defined term)*
$fv$: *future value (residual value at the end of defined term)*

The ASA provides an example of the traditional method, as presented in Figure 4.

**Figure 4**
**Analytical Approach – Traditional Method Example**

| | |
|---|---|
| Current (i.e., present) value of equipment | $ 1,200,000 |
| Projected residual (i.e., future) value of equipment after 5 years | $ 590,490 |
| Lease term converted to months (i.e., number of periods) | 60 |
| Lessor's required rate of return converted to a monthly rate | 1% |
| Solving for monthly *fair rental value*, which equals | $19,463.11 |

The traditional method is more commonly applied while the opportunity loss method is less frequently applied in practice[6].

The opportunity method attempts to quantify a market rental payment by analyzing the market return of an alternative investment compared to an investment in the subject assets. Under this method it is necessary to determine what the opportunity loss would be for the defined term of the lease/rental. The opportunity loss method is based on the following three-step process:

1. Determine the value of the asset(s) today and project the residual value of the asset(s) at the end of the defined term.

2. Determine the future value (based on the current value of the asset(s) today) of an alternative investment at the end of the defined term.

3. Subtract the residual value of the asset(s) from the future value of an alternative investment. Take this difference and divide it by the number of payments during the defined term.

Additionally, the ASA provides a summary of the steps taken when utilizing the opportunity loss method. This is presented in Figure 5.

---

[6] Machinery and Technical Specialties Committee, *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets - Fourth Edition* (Washington, DC: American Society of Appraisers, 2020), pgs. 282-283.

16



In re Wythe Berry Fee
Owner LLC

Expert Report of
Kyle K. TenHuisen, ASA

March 20, 2024

**Figure 5**
**Analytical Approach – Opportunity Loss Method Summary**

| | |
|---|---|
| Minus | Future value of investment at safe market investment rate |
| | Projected future value of equipment |
| Divided by | Total amount the investor wants to recover through payments |
| | Number of payments |
| | Monthly *fair rental value* |

As is my general practice, I considered all approaches in determining the Fair Rental Value of the Subject Property. However, in this case, I ultimately did not conclude an indication of value using the sales comparison approach or the opportunity loss method under the analytical approach.

I determined that the sales comparison approach is not applicable to the Subject Personal Property. In my research I did not identify any publicly available rental rate data for sufficiently similar property. While hotel FF&E can and is leased in some circumstances, the information related to these transactions are typically not publicly available. For this reason, along with the unique composition of the Subject Personal Property, I have not applied the sales comparison approach in my determination of the Fair Rental Value.

Additionally, I did not apply the opportunity loss method of the analytical approach. In my opinion, this method does not provide an indication of Fair Rental Value that considers a market return based upon the characteristics and composition of the Subject Personal Property. This method is too broad in consideration and looks to alternative investment returns. For this reason, along with the fact that it is a generally less preferred method, I have not applied the opportunity loss method of the analytical approach in my determination of the Fair Rental Value.

Thus, I have concluded the only applicable approach is the traditional method of the analytical approach to determine the Fair Rental Value of the Subject Personal Property as of the Valuation Date. The following describes the specific application of this approach and resulting Fair Rental Value of the Subject Personal Property.

## Application of the Traditional Method of the Analytical Approach

The Fair Rental Value of the Subject Personal Property under the traditional method of the analytical approach, required the following determinations:

- Defined Term: the term of the lease/rental.

- Current Value: the value of the Subject Personal Property at the beginning of the defined term.

- Residual Value: the projected residual value of the Subject Personal Property at the end of the defined term.

- Rate of Return: the required rate of return for the Subject Personal Property over the defined term.

My analysis and determination of the four factors considered in the traditional method of the analytical approach are presented in the following pages of this section of the report.



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

### Defined Term

The first factor considered in my application of the traditional method of the analytical approach was the defined term of the lease/rental period. A reasonable defined term of a lease will never exceed the expected life or remaining life of the asset(s) subject to the lease agreement. Since the Subject Personal Property was less than one year old as of the Valuation Date, I researched and analyzed market information providing indications of the expected life of assets similar to the Subject Personal Property.

In my research I reviewed hotel renovation and refurbishment cycles, hotel soft goods replacement cycles, hotel FF&E useful lives, and discussions with market participants. On average these indicated an expected life of seven to ten years. Additionally, a majority of the Subject Personal Property was still in-service as of the date of my physical inspection (nearly 7 years from the Valuation Date).

Based on the foregoing, I determined that eight years was a reasonable defined term for the Subject Personal Property in the context of the Fair Rental Value analysis. A summary of my defined term research and conclusion is presented below in Table 1 and also in Exhibit E.1.

**Table 1**
**Defined Term Indications and Conclusion**

| | | | Years | |
|---|---|---|---|---|
| **Personal Property Defined Term Indications** | | Notes | Low | High |
| William Vale Hotel Sale-Leaseback Term | | [a] | 15 | 15 |
| | | | | |
| Stantec Engineering: Hotel Refurbishment Lifecycle | | [b] | 6 | 8 |
| HVS Asset & Hotel Management: Soft Goods Replacement Cycle | | [c] | 7 | 10 |
| Marshall Valuation Service: Hotel and Motel Furnishings and Equipment Life | | [d] | 8 | 12 |
| Lodging Magazine: Select-Service Hotels Renovation Cycle | | [e] | 7 | 10 |
| | | | | |
| | Average | [f] | 7 | 10 |
| | Median | [f] | 7 | 10 |
| | | | | |
| **Concluded Defined Term for Fair Rental Rate Analysis** | | | **8** | |

[a]  As provided by Counsel. Includes real property and personal property assets.
[b]  https://www.stantec.com/en/markets/hospitality/2023-hospitality-design-trends
[c]  https://www.costar.com/article/93041398/required-renovations-for-branded-hotels-ramp-up-but-theres-room-for-negotiation
[d]  Marshall & Swift Valuation Service (February 2017), Section 97, Page 20.
[e]  https://lodgingmagazine.com/renovation-equation-forces-play-select-service-refresh-cycle/
[f]  Excludes the William Vale Hotel Sale-Leaseback Term.

As a related matter, it is my understanding based on information provided by Counsel that the Subject Personal Property as of the Valuation Date was subject to a sale-leaseback agreement also containing the real property assets of the WV Hotel. It was represented to me by Counsel, that the term of the sale leaseback was 15-years. I have considered this fact, but ultimately disregarded its relevance since the sale-leaseback term far exceeds the expected life of the Subject Personal Property.

### Current Value & Residual Value

The next two factors considered in my application of the traditional method of the analytical approach were the "current value" and "residual value" of the Subject Personal Property. The current value and residual value represent the present value and future value concepts, respectively, in the Fair Rental Value analysis.

The current value is the value of the Subject Personal Property at the beginning of the defined term of the lease/rental, while the residual value represents the anticipated future



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

value of the Subject Personal Property at the end of the defined term. Within the leasing industry the residual value typically represents the amount that can be recovered by selling the asset(s) and the end of the lease term.

Current value and residual value are further defined in Section IV of this report. Additionally, the methodology employed, approaches to value, assumptions, and supporting analysis used in determining both the current value and residual value of the Subject Personal Property are discussed in detail in Section IV of this report.

Primarily based upon my analysis in Section IV, I have determined the current value of the Subject Personal Property to be approximately $6,640,000 as of February 28, 2017. Additionally, I have determined the residual value of the Subject Personal Property to be approximately $329,000 as of February 28, 2025.

The conclusions of current value and residual value of the Subject Personal Property by category/location is presented below in Table 2 and also in Exhibit G.1.

**Table 2**
**Conclusion of Current Value and Residual Value by Category/Location**

|  | Category/Location | Notes | Current Value (as of 2/28/2017) [a] | Residual Value (as of 2/28/2025) [b] |
|---|---|---|---|---|
| 1 | Guest Room Furniture & Equipment | $ | 2,649,610 | $ 16,220 |
| 2 | Back of House Areas | | 1,105,135 | 41,185 |
| 3 | Lower Level Meeting Rooms | | 37,150 | 1,520 |
| 4 | Lobby & Reception | | 72,350 | 2,865 |
| 5 | Fitness Center | | 75,700 | 310 |
| 6 | Lueca Restaurant & Kitchen | | 322,710 | 25,395 |
| 7 | Main Kitchen (Lower Level) | | 860,000 | 82,500 |
| 8 | Westlight Restaurant & Kitchen | | 491,150 | 78,645 |
| 9 | Storage Area (10th Floor) | | 65,250 | 4,000 |
| 10 | Vale Outdoor Park | | 264,200 | 13,070 |
| 11 | Vale Outdoor Pool and Event | | 284,260 | 19,200 |
| 12 | Warehouse | | 41,700 | 9,150 |
| 13 | Miscellaneous | | 371,200 | 35,150 |
| | | | | |
| 14 | **Total Value of Personal Property** | | **$ 6,640,415** | **$ 329,210** |
| | | | | |
| 15 | **Total Value of Personal Property (Rounded)** | | **$ 6,640,000** | **$ 329,000** |

Detailed information by asset is presented in Exhibit H.
[a] For the purposes of my analysis current value is further defined as Fair Market Value in Continued Use.
[b] For the purposes of my analysis residual value is further defined as Fair Market Value in Exchange.

Table 3 and Exhibit G.2 present an alternative summary table of the concluded current value and residual value of the Subject Personal Property by asset group.

19



In re Wythe Berry Fee
Owner LLC

Expert Report of
Kyle K. TenHuisen, ASA

March 20, 2024

**Table 3**
**Conclusion of Current Value and Residual Value by Asset Group**

| | Asset Group | Notes | Current Value (as of 2/28/2017) | Residual Value (as of 2/28/2025) |
|---|---|---|---|---|
| 1 | Banquet Furniture | | $          69,550 | $            3,540 |
| 2 | Electronics & Technology | | 857,040 | 25,120 |
| 3 | General Equipment | | 277,270 | 42,880 |
| 4 | Guestroom Furniture | | 2,163,720 | 0 |
| 5 | Hotel Artwork / Scenery | | 83,080 | 4,255 |
| 6 | Kitchen & Bar Equipment | | 1,735,750 | 214,090 |
| 7 | Office Furniture | | 89,555 | 4,335 |
| 8 | Restaurant Furniture | | 529,450 | 24,490 |
| 9 | Unique Hotel Assets | | 295,000 | 10,500 |
| 10 | Software | | 540,000 | 0 |
| 11 | **Total Value of Personal Property** | | **$      6,640,415** | **$      329,210** |
| 12 | **Total Value of Personal Property (Rounded)** | | **$      6,640,000** | **$      329,000** |

Detailed information by asset is presented in Exhibit H.

### Rate of Return

The final factor considered in my application of the traditional method of the analytical approach was the required rate of return for the Subject Personal Property over the defined term. While I considered a variety of sources and methods to estimate a reasonable rate of return, I found the 2018 Pepperdine University Private Capital Markets Report[7] to have the most relevant rate of return data for the purposes of my analysis:

The Private Capital Markets Report produced by Craig Everett, PhD of Pepperdine University's Grazidadio's School of Business Management is a result of Pepperdine's private cost of capital survey that was originally launched in 2007. The 2018 report, previously referenced, relied upon a survey that was deployed in January of 2017.

Starting on page 92 of the 2018 Private Capital Markets Report, the results of the survey specific to equipment leasing are analyzed and summarized. Specifically, Table 70 in the report provides annualized expected returns from leases booked during the past 12 months. The expected returns are provided based on lease size and asset type. A copy of this table is presented in Table 4. Highlighted are the relevant returns related to the lease size range that is comparable to the Subject Personal Property.

---

[7] Everett, Craig R.,"2018 Private Capital Markets Report" (2018). Pepperdine University Graziadio School of Business and Management.
http://digitalcommons.pepperdine.edu/gsbm_pcm_pcmr/11.



**In re Wythe Berry Fee
Owner LLC**

**Expert Report of
Kyle K. TenHuisen, ASA**

**March 20, 2024**

**Table 4**
2018 Pepperdine University Private Capital Markets Report
Annualized expected returns from leases booked during the past 12 months

| Lease size | Autos | Trucks | Computers | Machinery and equipment |
|---|---|---|---|---|
| less than $100K | 16.0% | 20.0% | 20.0% | 15.5% |
| $100K - $499K | 15.0% | 16.0% | 20.0% | 10.0% |
| $500K - $999K | 14.0% | 13.0% | 17.0% | 9.0% |
| $1M - $4.99M | 12.0% | 12.0% | 16.0% | 7.0% |
| $5M - $9.99M | 10.0% | 11.0% | 16.0% | 7.0% |
| $10M - $24.99M | 7.0% | 10.0% | 12.0% | 6.5% |
| $25M - $49.99M | 7.0% | 7.0% | 10.0% | 6.0% |
| $50M+ | 7.0% | 7.0% | 7.0% | 6.0% |

While the study does not explicitly identify an expected rate of return for FF&E leases, it provides a range of expected returns for personal property assets from leases that were booked around the Valuation Date. Based on the lease size of the Subject Personal Property ($6.64 million) the 2018 Private Capital Markets Report shows a rate of return range of 7% to 16%.

I also considered the 2023 Equipment Leasing and Finance Association's ("ELFA") Survey of Finance Activity. This survey provides an in-depth review and analysis of equipment (including FF&E) leasing and financing companies.

In table 10c of this report it provides the internal rate of return (labeled "W-Avg pre-tax yield") of the different types of leasing and finance organizations. The internal rate of return for independent (non-bank or captive) leasing and finance organizations was 11.07% in fiscal year 2022. Since this information is 5-years beyond our Valuation Date, a negative 252 basis point adjustment was made, based upon the change in prime rates between 2022 and 2017. After this adjustment the estimated internal rate of return was 8.55%. This was informative but ultimately not heavily relied upon when determining the rate of return for the Subject Personal Property.

Based upon the foregoing, and mostly relying on the data contained in the 2018 Private Capital Market Report, I have determined a reasonable rate of return for the Subject Personal Property over the course of the defined term to be 10%. It is my opinion that the rates of return in the 2018 Private Capital Markets Report associated with machinery and equipment, autos, and trucks are most similar to the Subject Personal Property.

A summary of my rate of return research and conclusion is presented below in Table 5 and also in Exhibit F.1.



In re Wythe Berry Fee
Owner LLC

Expert Report of
Kyle K. TenHuisen, ASA

March 20, 2024

**Table 5**
**Rate of Return Indications and Conclusion**

| Personal Property Rate of Return Indications | Notes | Rate of Return |
|---|---|---|
| **2018 Pepperdine - Private Capital Markets Report** | [a] | |
| *Annualized expected returns from leases booked during prior 12 months* | | |
|     Autos ($5M - $9.99M lease size) | | 10.00% |
|     Trucks ($5M - $9.99M lease size) | | 11.00% |
|     Computers ($5M - $9.99M lease size) | | 16.00% |
|     Machinery and Equipment ($5M - $9.99M lease size) | | 7.00% |
| | | |
| **2023 Equipment Leasing and Finance Assoication - Survey of Equipment Finance Activity** | [b] | |
| *Reported internal rate of return for equipment leasing and finance companies* | | |
|     FY2022 Independents (non-bank or captive) | | 11.07% |
|             *Adjustment (bps)* | [c] | *-252* |
| | | |
|     Estimated FY2017 Independents (non-bank or captive) | | 8.55% |
| | | |
| **Concluded Rate of Return for Fair Rental Rate Analysis** | | **10%** |

| | |
|---|---|
| [a] | Everett, Craig R.,"2018 Private Capital Markets Report" (2018). Pepperdine University Graziadio School of Business and Management. http://digitalcommons.pepperdine.edu/gsbm_pcm_pcmr/11, pg. 94. |
| [b] | Equipment Leasing and Finance Association, "ELFA 2023 Survey of Equipment Finance Activity Report", Table 10c. |
| [c] | Adjustment for difference in rate as of 2022 and 2017. Based upon change in prime rate: 5.5% vs 4.25%. |

**Conclusion of Fair Rental Value**

Utilizing the traditional method of the analytical approach, I relied upon the preceding defined term, current value, residual value, and rate of return to estimate the Fair Rental Value of the Subject Personal as of the Valuation Date. As a last step, the generally accepted financial payment function was used to determine the Fair Rental Value on a monthly basis.

Based on the foregoing and as presented in Table 6 (on the following page) and Exhibit D.1, I determined the Fair Rental Value of the Subject Personal Property as the Valuation Date, to be approximately:

**NINETY-EIGHT THOUSAND DOLLARS**

**$98,000**

As previously mentioned, my analysis and report were conducted approximately seven years after the Valuation Date. As such, my analysis and report is considered a retrospective appraisal.



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

**Table 6**
**Traditional Method of the Analytical Approach**
**Fair Rental Value Conclusion**

| Personal Property Fair Rental Rate Analysis | | |
|---|---|---|
| Current Value as of February 28, 2017 | | $6,640,000 |
| Residual Value as of February 28, 2025 | | $329,000 |
| Defined Term (months) | [a] | 96 |
| Rate of Return (monthly) | [b] | 0.83% |
| **Monthly Fair Rental Value of Subject Personal Property** | [c] | $98,268 |
| **Monthly Fair Rental Value of Subject Personal Property (Rounded)** | | **$98,000** |

[a]  8 years x 12 months.
[b]  10% / 12 months.

[c]  Monthly Fair Rental Value was determined utilizing the financial payment function (assuming payments in

23



## IV.  Current and Residual Value Analysis of the Subject Personal Property

### Preface

The following section covers the standard appraisal techniques, valuation procedures performed, and assumptions made to determine the following two value estimates of the Subject Personal Property:

- current value as of February 28, 2017

- residual value as of February 28, 2025

The current value and residual value conclusions are relied upon in my appraisal's ultimate determination of the Fair Rental Value of the Subject Personal Property as of the Valuation Date (Section III of the report). It should be clearly understood that the <u>current value is a retrospective opinion of value,</u> and the <u>residual value is a prospective opinion of value.</u> This is based upon the difference in time between the effective dates and when my analysis and report were conducted.

My analysis and report are subject to the Statement of Assumptions and Limiting Conditions set forth in Exhibit B of this report.

### Premise of Value

For purposes of conducting my analysis, the terms "current value" and "residual value" were further defined to establish the appropriate premise of value for use within the Fair Rental Value analysis.

Based upon my understanding, the Fair Market Value concept is predominantly relied upon when determining current value and residual value in the leasing/rental context.

**Fair Market Value**, as used in this report, is first defined as:

> The price at which property would exchange between a willing buyer and a willing seller[8], when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both having reasonable knowledge of the relevant facts.[9].

Appraisers typically separate the general Fair Market Value concept into two fundamental categories: "value in continued use" and "value in exchange".

Value in continued use is the worth of an asset used in an operating business. Value in exchange is the price at which an asset would sell on a piecemeal basis. Adopting one or the other of these value premises can have a marked effect on the valuation of an asset.

Fit for the purpose of the Fair Rental Value analysis, I have considered the current value of the Subject Personal Property under the Fair Market Value in Continued Use premise. Under this premise, I have assumed the Subject Personal Property will continue to be

---

[8] The buyer and seller discussed above refer to hypothetical parties, and therefore specific incentives or attributes of particular buyers and sellers may not be the same as the hypothetical buyer and seller from which Fair Market Value is determined.

[9] Treas. Regs §20.2031-1(b) and §25.2512-1; Rev. Rul. 59-60, 1959-1 C.B. 237.



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

used in the same locations and for the same purpose as in the past as of the Valuation Date. Though sometimes necessary, no economic analysis related to the business enterprise in which the Subject Personal Property operated was required to support my value conclusion.

Since the residual value typically represents the amount that can be recovered by selling the asset(s) and the end of the lease term, I have considered the residual value of the Subject Personal Property under the Fair Market Value in Exchange premise. Under this premise, I have assumed the Subject Personal Property will be sold to one or more buyers at alternate locations, for uses that may be similar or different than the current use. Furthermore, under the premise no consideration has been given to the expenses of conducting a sale, such as broker fees, storage or warehouse costs, accounting or legal fees, or any other expenses associated with the cost of selling the assets.

Based on the foregoing and for purposes of this report, current value is synonymous with Fair Value in Continued Use and residual value is synonymous with Fair Market Value in Exchange.

My analysis did not require a consideration of the highest and best use of the Subject Personal Property when establishing the appropriate premise of value.

## Appraisal Techniques

In order to determine the current value and residual value of the Subject Personal Property, I considered the three standard appraisal approaches to value:

1. Cost approach

2. Market approach

3. Income approach.

Each approach is described below.

Under the cost approach, Reproduction Cost New or Replacement Cost New ("RCN") of an asset (as of the effective date) normally sets the upper limit of value. RCN is estimated using either an indirect or direct approach. The indirect approach applies specific indices to the historical cost of an asset to estimate replacement cost as of the effective date. The direct approach involves using published sources, cost estimating techniques, and input from vendors and manufacturers.

Because the Subject Personal Property is not brand new, accrued depreciation (defined as loss in value) needs to be deducted to arrive at the indication of value, including physical deterioration, functional obsolescence, and economic obsolescence.

The market approach relies on the assumption that the value of the property to be appraised can be measured by the selling or asking prices of similar assets, either individually or collectively, in the used market. Under this approach, the best evidence of the value of the Subject Personal Property would be market sales of the same type of asset. Where there is insufficient sales data for a particular representative asset, the best evidence is the sales and asking prices of similar assets with adjustments made for any differences. Examples of possible adjustments include those for the age, condition, and capacity of the assets or the location, date, and type of sale (e.g., retail sale, auction sale, or asking price).



**In re Wythe Berry Fee
Owner LLC**

**Expert Report of
Kyle K. TenHuisen, ASA**

**March 20, 2024**

The income approach requires that the earning capacity of the Subject Personal Property be determined and that the expected capacity, whether derived from a past, current, or projected earnings stream, be capitalized at a rate sufficient to satisfy the investment requirements associated with ownership.

As is my general practice, I considered all three approaches to value. However, in this case, I ultimately did not conclude indications of value for the current value or residual value using the market or income approaches.

The income approach is not applicable to the Subject Personal Property because, in general, it is not possible to reliably allocate earning capacity when valuing individual assets that require a collection of assets/liabilities to generate income. I also did not explicitly apply the market approach due to the limited availability of comparable sale transactions. Thus, I relied only on the cost approach in estimating the current value and residual value of the Subject Personal Property. As part of my analysis, comparable market transactions were analyzed to support certain assumptions/inputs within my cost approach analysis.

## 1.  Cost Approach Methodology

To determine the current value and residual value of the Subject Personal Property under the cost approach, I first determined the RCN of the assets as of the effective dates. A number of techniques are available to estimate RCN. The most prevalent techniques are the detail method and the historic cost trending method. Other methods include engineering estimating techniques, such as the investment cost per unit of capacity (sometimes referred to as "modeling") method. Each method has strengths and weaknesses that must be considered when deciding which is most appropriate to use.

- ■ **Detail method**: Under this method (also known as the "direct method"), each cost component of each asset is "detailed." First, an inventory of the assets is created and then a current cost is assigned to each asset by estimating the direct and indirect costs incurred in acquiring and installing that item. Direct costs include the cost of the equipment, sales tax, freight, and installation labor and supplies. Indirect costs include costs such as design and engineering fees, permits, and debugging costs. The detail method generally provides the most accurate indication of RCN but can be difficult and very time consuming to carry out depending on the number of cost components of each asset.

- ■ **Historic cost trending method**: Under this method (also known as the "indirect method"), a cost index is applied to historical cost data to determine RCN. A cost index is a number used to measure change in prices and normally represents the percent variation from an arbitrary standard (usually 100) at some earlier point in time. The historic cost trending method is generally easier to use than other methods, but the reliability of the results depends heavily on the quality of the historical cost information used. When the historic cost and acquisition dates of the assets being appraised are reliable, the results are likely to be more accurate.

- ■ **Engineering estimating technique**: Under engineering estimating techniques, a total investment cost per unit is developed to estimate a collection of assets. This technique is commonly used to estimate the RCN of production related assets. I did not find this technique useful or applicable in estimating the RCN of the Subject Personal Property.



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

In valuing the Subject Personal Property, I utilized both the direct and indirect methods to estimate RCN. For each asset, only one of the two methods were applicable due to the availability of information.

In valuing the Subject Personal Property, I primarily used the detailed method or the direct method to estimate RCN. I chose this as the primary method because, there are multiple sources to obtain current pricing for hotel FF&E. Additionally, in most cases, asset-level original cost and acquisition dates were not available which prevented me from utilizing the indirect approach to estimate RCN for most of the Subject Personal Property.

In my application of the Cost Approach by the detail method, RCN estimates for each individual asset were obtained from either Nehmer and HVS Design's Hotel Cost Estimating Guide, current manufacturers, equipment vendor sites, other standard pricing media, or in a limited number of instances the WV Hotel personnel. In many cases adjustments were made to the current price/cost estimates to estimate the RCN as of the effective date (either February 28, 2017 or February 28, 2025). Additionally, indirect costs such as engineering, freight, taxes, and installation and debugging, were considered to account for the effort required to acquire an operational asset.

In my limited application of the Cost Approach by the historical cost trending method or indirect method, the basis for the historical cost and date information was the WV Hotel's fixed asset listings as of October 31, 2023; project quotes from the original construction of the hotel; and in a couple instances, estimates of the original cost from WV Hotel personnel. Next, the cost of each item was adjusted to an RCN, as of the effective date, using price indices. These price indices were derived from recognized sources such as the United States Department of Labor's Bureau of Labor Statistics and Marshall Valuation Services. A list of the price indices utilized are presented in Table 7.

**Table 7**
**List of Price Indices by Stout Asset Class**

| Stout Asset Class | Price Index Source | Producer Price Index |
|---|---|---|
| General Equipment | U.S. Dept. of Labor - Bureau of Labor Statistics | WPU114 |
| Furniture and Fixtures | U.S. Dept. of Labor - Bureau of Labor Statistics | PCU337---337--- |
| Office Equipment | U.S. Dept. of Labor - Bureau of Labor Statistics | PCU33994-33994- |
| Software | U.S. Dept. of Labor - Bureau of Labor Statistics | PCU511210511210502 |
| Production Equipment/Commercial Food Equipment | U.S. Dept. of Labor - Bureau of Labor Statistics | PCU3332413332413 |
| Hotel Furniture | Marshall Valuation Services | Equipment - Hotel |
| Audio Visual Equipment | U.S. Dept. of Labor - Bureau of Labor Statistics | PCU3343--3343-- |
| Computer Equipment | U.S. Dept. of Labor - Bureau of Labor Statistics | WPU115 |
| Restaurant Furniture & Equipment | Marshall Valuation Services | Equipment - Restaurant |
| Refrigeration Equipment | U.S. Dept. of Labor - Bureau of Labor Statistics | WPU11480331 |

The estimated RCNs were then reduced by the loss in value attributable to depreciation. Physical deterioration factors were derived from age-life methodology.  To determine physical deterioration, we considered the following information regarding the assets appraised: age of the asset as of the effective date, expected life, current and assumed physical condition as of the effective date, utilization, operating history, and maintenance/refurbishment history. This information was obtained in document review, the physical inspection, and/or through discussions with WV Hotel personnel knowledgeable about the Subject Personal Property.

A majority of the Subject Personal Property was placed into service when the WV Hotel opened in April of 2016.

27



In re Wythe Berry Fee
Owner LLC

Expert Report of
Kyle K. TenHuisen, ASA

March 20, 2024

When evaluating the normal useful life of the Subject Personal Property I considered information gathered from studies of actual retirement of similar assets (U.S. IRS Publication 946, ASA Normal Useful Life Study, etc.), market data (Marshall Valuation Services, Stantec, CoStar, etc.), and my past experience with assets used in the hospitality and retail industry.

Next, as part of the cost approach, I considered the last two forms of depreciation: functional and economic obsolescence. I evaluated the functional use and current technology for the Subject Personal Property. In my analysis I found no evidence of identifiable and/or quantifiable functional obsolescence related to the Subject Personal Property. I also considered economic obsolescence—that is, any economic or external factors that may impact the value of the assets. Similar to functional obsolescence, I found no evidence of applicable economic obsolescence related to the Subject Personal Property.

Specific to the determination of residual value, an adjustment (referred to as the "residual factor") was applied to consider that the Subject Personal Property would be sold on a piecemeal basis as of February 28, 2025. Residual factors were developed by asset group to account for the varying levels of salvage amounts in a piecemeal sale.

In developing the residual factor table, I first estimated a salvage value range by asset group. Salvage value is estimated by multiplying the asset group's RCN by the salvage percentage as provided in Section 97 of Marshall Valuation Service. This is presented in Table 8.

**Table 8**
**Salvage Value Range by Asset Group**

| Asset Group | RCN | Salvage Percentage | | | Salvage Value | | |
|---|---|---|---|---|---|---|---|
| | | Low | Midpoint | High | Low | Midpoint | High |
| Banquet Furniture | 109,250 | 0% | 5% | 10% | - | 5,463 | 10,925 |
| General Equipment | 430,320 | 0% | 5% | 10% | - | 21,516 | 43,032 |
| Guestroom Furniture | 3,404,150 | 0% | 5% | 10% | - | 170,208 | 340,415 |
| Hotel Artwork / Scenery | 134,185 | 0% | 5% | 10% | - | 6,709 | 13,419 |
| Kitchen & Bar Equipment | 2,739,900 | 0% | 7% | 14% | - | 191,793 | 383,586 |
| Office Furniture | 142,500 | 0% | 6% | 12% | - | 8,550 | 17,100 |
| Restaurant Furniture | 710,650 | 0% | 7% | 14% | - | 49,746 | 99,491 |
| Unique Hotel Assets | 380,000 | 0% | 5% | 10% | - | 19,000 | 38,000 |

Next, I calculated a range of residual factors based by asset group. This was done by dividing the salvage value by the indication of Fair Market Value in Continued Use. A summary of this is presented in Table 9.

**Table 9**
**Residual Factor Range by Asset Group**

| Asset Group | Salvage Value | | | Indication of Fair Market Value in Continued Use | Residual Factor Range | | |
|---|---|---|---|---|---|---|---|
| | Low | Midpoint | High | | Low | Midpoint | High |
| Banquet Furniture | - | 5,463 | 10,925 | 11,590 | 0% | 47% | 94% |
| General Equipment | - | 21,516 | 43,032 | 96,001 | 0% | 22% | 45% |
| Guestroom Furniture | - | 170,208 | 340,415 | 340,871 | 0% | 50% | 100% |
| Hotel Artwork / Scenery | - | 6,709 | 13,419 | 13,879 | 0% | 48% | 97% |
| Kitchen & Bar Equipment | - | 191,793 | 383,586 | 536,415 | 0% | 36% | 72% |
| Office Furniture | - | 8,550 | 17,100 | 14,812 | 0% | 58% | 115% |
| Restaurant Furniture | - | 49,746 | 99,491 | 98,724 | 0% | 50% | 101% |
| Unique Hotel Assets | - | 19,000 | 38,000 | 41,715 | 0% | 46% | 91% |

Finally, I concluded a residual factor by asset group based upon the ranges in Table 9, discussions with hotel FF&E liquidators, additional quantitative analysis, and my

28



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

experience appraising similar assets. Presented below in Table 10 are my concluded residual factors.

**Table 10**
**Residual Factor Range by Asset Group**

| Asset Group | Concluded Residual Factor | Note |
|---|---|---|
| Banquet Furniture | 30% | |
| Electronics & Technology | 45% | Separate analysis. |
| General Equipment | 45% | |
| Guestroom Furniture | 0% | Based upon discussions with hotel liquidators. |
| Hotel Artwork / Scenery | 30% | |
| Kitchen & Bar Equipment | 40% | |
| Office Furniture | 30% | |
| Restaurant Furniture | 25% | |
| Software | 0% | Cannot be sold peicemeal. |
| Unique Hotel Assets | 25% | |

Taking all of the above into account, the depreciation due to physical deterioration, functional obsolescence, economic obsolescence, and residual value adjustment were quantified and deducted from RCN to provide indications of the current value and residual value of the Subject Personal Property.

## 2. Cost Approach Example – Current Value

Following the steps described above, I estimated the current value as of February 28, 2017 of Stout No. 191, which is a quantity of 24 Sofa / Sette with a pullout bed located in all of the Suite guestrooms.

No historical cost and date information for Stout No. 191 was made available. Thus, I was unable to utilize the historical cost trending method. Under the detailed method, a unit RCN of $2,422.84 was obtained from Nehmer and HVS Design's Hotel Cost Estimating Guide 2023[10]. Next, the unit RCN was adjusted for the difference in cost between 2023 and 2017 (trend factor), quantity, and indirect costs such as freight and tax. This brought the concluded RCN to $48,039.

Next physical depreciation was estimated using the age/life methodology. The calculated percent good took the remaining useful life based on the chronological age and divided it by the normal useful life. This resulted in a percent good of 88.6%.

Replacement cost less physical depreciation ("RCNLD") was calculated next by multiplying the concluded RCN ($48,039) by the percent good (88.6%). This resulted in a RCNLD of $42,561.

No adjustment was made for functional or economic obsolescence. Thus, after all the steps of the Cost Approach were considered and applied to Stout No. 191, I arrived at an indication of the current value as of February 28, 2017 of $43,000. The steps and calculations described above are presented in detail in Table 11.

---

[10] Average cost of Sleeper Sofa (including fabric) within the Luxury hotel-type.

29



In re Wythe Berry Fee
Owner LLC

Expert Report of
Kyle K. TenHuisen, ASA

March 20, 2024

**Table 11**
**Stout No. 191 Cost Approach Example – Current Value**

| Stout No. 191 | SOFA / SETTE (W/ PULL OUT BED) | |
|---|---|---|
| Category/Location | | GUEST ROOM FURNITURE & EQUIPMENT |
| Asset Group | | GUESTROOM FURNITURE |
| Room | | GUEST ROOM - SUITE |
| Room Type | | BEDROOM #1 |
| Total Quantity | | 24 |
| Original Cost | | *unknown* |
| In Service Date | | 4/1/2016 |
| Valuation Date (effective date) | | 2/28/2017 |
| Unit RCN (Nehmer and HVS Design - Hotel Cost Estimating Guide 2023) | | $2,422.84 |
| Cost indices applied | Marshall Valuation Services - Hotel Equipment | |
| Cost Index | (2023) | 1944.6 |
| Cost Index | (2017) | 1410.8 |
| Trend Factor | (1410.8/1944.6) | 0.73 |
| Quantity Adjustment | | 24 |
| Indirect Cost Adjustment | | 1.13875 |
| Adjusted RCN (Concluded) | | $48,039.00 |
| Normal Useful Life (years) | 8 | |
| Age (years) | 0.9 | |
| Calculated Remaining Useful Life | 7.1 | |
| Calculated Percent Good | (7.1 ÷ 8) | 88.6% |
| RCN less physical depreciation ("RCNLD") | | $42,561 |
| Adjust for obsolescence (functional & economic) | | 0% |
| RCN less depreciation | | $42,561 |
| **Cost Approach Value Indication - Current Value** | | **$43,000** |

## 3.  Cost Approach Example – Residual Value

Next, I estimated the residual value of Stout No. 191 as of February 28, 2025.

I again utilized the detailed method and a unit RCN of $2,422.84. The unit RCN was adjusted for the expected difference in cost between 2023 and 2025 (trend factor), quantity, and indirect costs such as freight and tax. This brought the concluded RCN to $69,243.

Since the chronological age (8.9 years) of Stout No. 191 exceeds the normal useful life (8 years), the calculated physical deterioration would exceed 100%. As is common in the appraisal practice, I have employed a "floor" to the amount of physical deterioration that can be applied to certain asset types in the Cost Approach. For furniture type assets, this "floor" percentage is estimated to be 10%. For most personal property asset classes, a generally accepted "floor" percentage is between 5% to 25%.

Replacement cost less physical depreciation ("RCNLD") was calculated next by multiplying the concluded RCN ($48,039) by the concluded percent good (10%). This resulted in a RCNLD of $6,924.

No adjustment was made for functional or economic obsolescence. As a final step the residual factor of 0% was multiplied by the RCNLD.



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

Thus, after all the steps of the Cost Approach were considered and applied to Stout No. 191, I arrived at an indication of the residual value as of February 28, 2025 of $0. The steps and calculations described above are presented in detail in Table 12.

**Table 12**
**Stout No. 191 Cost Approach Example – Residual Value**

| Stout No. 191 | | SOFA / SETTE (W/ PULL OUT BED) |
|---|---|---|
| Category/Location | | GUEST ROOM FURNITURE & EQUIPMENT |
| Asset Group | | GUESTROOM FURNITURE |
| Room | | GUEST ROOM - SUITE |
| Room Type | | BEDROOM #1 |
| Total Quantity | | 24 |
| Original Cost | | *unknown* |
| In Service Date | | 4/1/2016 |
| Valuation Date (effective date) | | 2/28/2025 |
| Unit RCN (Nehmer and HVS Design - Hotel Cost Estimating Guide 2023) | | $2,422.84 |
| Cost indices applied | Marshall Valuation Services - Hotel Equipment | |
| Cost Index | (2023) | 1944.6 |
| Cost Index | (2025) | 2033.5 |
| Trend Factor | (1944.6/2033.5) | 1.05 |
| Quantity Adjustment | | 24 |
| Indirect Cost Adjustment | | 1.13875 |
| Adjusted RCN (Concluded) | | $69,243.17 |
| Normal Useful Life (years) | 8 | |
| Age (years) | 8.9 | |
| Calculated Remaining Useful Life | -0.9 | |
| Calculated Percent Good | (-0.9 ÷ 8) | -11.4% |
| Appraiser's "Floor" Percent Good (Concluded) | | 10.0% |
| RCN less physical depreciation ("RCNLD") | | $6,924 |
| Adjust for obsolescence (functional & economic) | | 0% |
| RCN less depreciation | | $6,924 |
| Residual Factor | | 0% |
| **Cost Approach Value Indication - Residual Value** | | **$0** |



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

**Reconciliation and Conclusion of Current Value and Residual Value**

Since only the cost approach was utilized in my analysis of the Subject Personal Property, I have placed all weight on the cost approach indication of value when concluding the current value and residual value.

Based on the foregoing and as presented in Exhibit G, I determined the current value of the Subject Personal Property as of February 28, 2017, to be:

**SIX MILLION SIX HUNDRED AND FORTY THOUSAND DOLLARS**

**$6,640,000**

Additionally, based on the foregoing and as presented in Exhibit G, I determined the residual value of the Subject Personal Property as of February 28, 2025, to be approximately:

**THREE HUNDRED TWENTY-NINE THOUSAND DOLLARS**

**$329,000**

As previously mentioned, the current value and residual value conclusions are relied upon in my appraisal's ultimate determination of the Fair Rental Value of the Subject Personal Property as of the Valuation Date (Section III of the report). It should be clearly understood that the <u>current value is a retrospective opinion of value,</u> and the <u>residual value is a prospective opinion of value</u>. This is based upon the difference in time between the effective dates and when my analysis and report were conducted.

In support of my current value and residual value conclusions an asset-by-asset schedule of value conclusions is presented in Exhibit H.



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

## V.  Certification

I certify, except as otherwise noted in this appraisal report, that to the best of my knowledge and belief:

- ■  The statements of fact contained in this report, upon which the analysis, opinions, and conclusions expressed herein are based, are true and accurate.

- ■  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, conclusions, and recommendations.

- ■  The data used in this report was obtained from sources believed to be reliable. All facts known to us that have bearing on the values presented in this report have been considered, and no facts of importance have been intentionally omitted herein.

- ■  I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

- ■  I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

- ■  My engagement in this assignment was not contingent upon the development or reporting predetermined results.

- ■  My compensation for completing this assignment is fee-based and is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- ■  My analyses, opinions, and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation and the Principles of Appraisal Practice and Code of Ethics of the American Society of Appraisers.

- ■  The American Society of Appraisers has a mandatory reaccreditation program for all of its Accredited Senior Appraisers. I am an Accredited Senior Appraiser and am in compliance with the requirements of that program.

- ■  I have performed services as an appraiser, regarding the property that is the subject of the work under review within the three-year period immediately preceding acceptance of this assignment.

- ■  Inspections of the Subject Personal Property located at the WV Hotel was performed by Kyle K. TenHuisen, ASA and Chris Fundich on January 10, 2024 and January 11, 2024. Reference Exhibit I for a collection of photographs from these inspections.

- ■  In addition to the undersigned, Chris Fundich provided significant professional assistance with the physical inspection of the Subject Personal Property and the current value and residual value analyses in the preparation of this report.



**In re Wythe Berry Fee Owner LLC**

**Expert Report of Kyle K. TenHuisen, ASA**

**March 20, 2024**

Kyle K. TenHuisen, ASA
Managing Director
Machinery & Equipment Valuation Practice Leader
Stout Risius Ross, LLC

# Exhibit A: List of Information Considered

**List of Information Considered in Appraisal**

- Ebay.com
- Usedprice.com
- U.S. Department of Labor – Bureau of Labor and Statistics
- U.S. IRS Publication 946
- American Society of Appraisers Normal Useful Life Study
- Machinery and Technical Specialties Committee, Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets - Fourth Edition (Washington, DC: American Society of Appraisers, 2020)
- Marshall Value Services
- Nehmer and HVS Design's Hotel Cost Estimating Guide
- IBISWorld Funiture Rental Industry Report 2018
- Everett, Craig R.,"2018 Private Capital Markets Report" (2018). Pepperdine University Graziadio School of Business and Management.
- Everett, Craig R.,"2023 Private Capital Markets Report" (2023). Pepperdine University Graziadio School of Business and Management.
- Equipment Leasing and Finance Association, "ELFA 2023 Survey of Equipment Finance Activity Report".
- Federal Reserve Economic Data
- Stantec Engineering Articles
- CoStar Articles
- Lodging Magazine Articles
- 2015-12-21 THE WILLIAM VALE HOTEL ROOF LEVEL BAR QUOTE.pdf
- 2016-1-11 THE WILLIAM VALE HOTEL-ROOF LEVEL QUOTE.pdf
- 2016-2-3 THE WILLIAM VALE HOTEL-CELLAR QUOTE.pdf
- 2016-2-3 THE WILLIAM VALE HOTEL-HOOD-ANSUL-REFRIGERATION INSTALL QUOTE.pdf
- 2016-2-3 THE WILLIAM VALE HOTEL-ROOF LEVEL-WITH HOODS.pdf
- Fixed Asset Listing for Food & Beverage as of October 31, 2023
- Fixed Asset Listing for WB Hotel, LLC as of October 31, 2023
- Completed Information Request List as of January 2024
- Initial Hotel Inventory Budget Lists
- Initial AirStream Quote
- Westlight Outdoor Furniture Invoice from 2023
- Photographs and videos provided by the William Vale Hotel personnel



# Exhibit B: Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions.

- This Restricted Appraisal Report as defined by Standard 8, "Personal Property Appraisal, Reporting" of the Uniform Standards of Professional Appraisal Practice presents only limited discussions of the data, reasoning, and analysis that were used in the appraisal process to develop my opinion of value. A copy of this report and the data, reasoning, and analysis supporting it will remain in my files for review upon request.

- My analysis and report were conducted approximately seven years after the Valuation Date making this a retrospective appraisal. As such, every effort has been made to only considered data subsequent to the Valuation Date that align with trends that would be reasonably considered by a hypothetical buyer and seller as of the Valuation Date. Due to the extensive time between the Valuation Date and effective date of my analysis and report, certain information as of the Valuation Date was not available. In those instances, we have examined certain data that is subsequent to the Valuation Date and made adjustments consistent with typical market participant assumptions where appropriate to inform what a hypothetical buyer and seller would have reasonably considered as of the Valuation Date. Based upon the availability and feasibility of information, every effort has been made to comply with the best practices of a retrospective appraisal.

- Stout Risius Ross, LLC is not required to give testimony in court, or be in attendance during any hearings or depositions, unless previous arrangements have been made.  We are committed to supporting the valuation report provided compensation arrangements for such additional services have been made.

- No opinion is intended to be expressed for matters that require legal or specialized expertise, investigation, or knowledge beyond that customarily employed by appraisers.  This report does not address issues of law, engineering, code conformance, insect or rodent infestation, or toxic contamination, discharge, or inter alia, unless specifically identified in the body of the report.

- At Counsel's request, the scope of this assignment was limited to the property stated in the body of the report.  No consideration was given to any other assets.

- We assume that all of the assets are in normal operating condition, unless noted otherwise in the body or the report.  Testing the status of individual pieces of equipment was beyond the scope of the appraisal.

- Due to the nature and scope of this appraisal, we inspected a sample of the Subject Personal Property located at the WV Hotel in January 2024. We physically inspected all accessible areas of the hotel but did not inspect the Subject Personal Property in every guestroom.

- As part of our scope of work we developed a listing of the Subject Personal Property as of the Valuation Date. This list was determined by our physical inspection and data provided by Counsel, Wythe Berry Fee Owner, and WV Hotel personnel. This analysis applies the extraordinary assumption that the data provided by in this regard is complete and accurate, as it could not be verified by physical inspection as of the Valuation Date.

- The opinions presented in this report are based upon my analysis of documents and other information made available to me to date. I respectfully reserve the right to modify those opinions and conclusions should additional information be provided. I additionally reserve the right to prepare demonstrative charts and other graphic materials as directed by Counsel for presentation at further litigation proceedings.

- No one that worked on this appraisal has any known financial interest in the assets or equity of the Company or the outcome of this valuation.  Further, our compensation is neither based nor contingent on the results of our analysis.

- My opinions are applicable for the stated purpose only and may not be appropriate for any other purpose. This report is solely for use in the cited dispute, for the purpose stated herein, and is not to be referred to or distributed, in whole or in part, without prior written consent.



# Exhibit B: Assumptions and Limiting Conditions

- I have been asked to conduct my retrospective appraisal and report to determine the Fair Rental Value of Subject Personal Property as of the Valuation Date. As part of my analysis, I have further determined the retrospective current value and prospective residual value of the Subject Personal Property.

- My opinion of the retrospective current value of the Subject Personal Property is based on the Fair Market Value in Continued Use premise.

- My opinion of the prospective residual value of the Subject Personal Property is based on the Fair Market Value in Exchange premise.

- This summary should not be separated from, nor considered independent of, the report of which it is a part.



# Exhibit C: Curriculum Vitae



**Detroit, MI USA**
Office: +1.248.432.1224
ktenhuisen@stout.com

## Education

B.S., Industrial Engineering
Kettering University

## Designations

Accredited Senior Appraiser (ASA)

## Practice Areas

Machinery & Equipment
Valuation Disputes

Kyle K. TenHuisen is a Managing Director in the Valuation Advisory group. His concentration is in machinery & equipment appraisal. Mr. TenHuisen has valuation consulting experience concerning domestic and foreign markets. He has performed tangible asset valuations both domestically and internationally, including various countries in Asia, Africa, Eastern and Central Europe, and Central and South America.

Mr. TenHuisen has provided valuation services to clients in numerous industries, including manufacturing (automotive, medical, commercial food, aluminum and steel production, metalworking, chemicals, textiles), energy (refineries, terminals, and pipeline), power and utilities (power plants, renewable, transmission, and storage), healthcare, transportation (rail and air), communications (voice and data), entertainment and hospitality, and retail.

His work spans across a variety of different purposes such as litigation, property and federal tax, insurance, financial reporting, financing, leasing, and consulting. He has served as an expert in various litigation proceedings in regard to the valuation of tangible assets.

Mr. TenHuisen leads the firm's Machinery & Equipment practice, with responsibilities including practice management, business development, senior level recruiting, and internal systems and group operations. He also currently serves on the Tangible Assets Board of the International Valuation Standards Council.

Prior to joining Stout, Mr. TenHuisen was a Business Operations Analyst for William Beaumont Hospitals. Preceding his work at Beaumont, he was a Manufacturing Engineer at Fleetwood Motor Homes, Inc.

**Professional Memberships**

- American Society of Appraisers
- International Valuation Standards Council



# Exhibit D: Personal Property Fair Rental Value

**The William Vale Hotel**
**Personal Property Fair Rental Rate Conclusion**                                                   **Exhibit D.1**

*In U.S. Dollars*

| Considerations | Notes | |
|---|---|---|
| Valuation Date | [a] | February 28, 2017 |
| Defined Term | [b] | 8 years |
| Rate of Return (annual) | [c] | 10% |

**Personal Property Fair Rental Rate Analysis**

| | | |
|---|---|---|
| Current Value as of February 28, 2017 | [d] | $6,640,000 |
| Residual Value as of February 28, 2025 | [e] | $329,000 |
| Defined Term (months) | [f] | 96 |
| Rate of Return (monthly) | [g] | 0.83% |
| **Monthly Fair Rental Value of Subject Personal Property** | [h] | $98,268 |
| **Monthly Fair Rental Value of Subject Personal Property (Rounded)** | | **$98,000** |

[a] As provided by Counsel.
[b] Stout's determination of the defined term for the personal property is based on the asset's expected useful life. Reference Exhibit E.
[c] Reference Exhibit F.
[d] Stout determined the current value of the William Vale Hotel's personal property assets as of February 28, 2017. Explained and presented further in this report (Section IV, Exhibit G, and Exhibit H).
[e] Stout determined the residual value of the William Vale Hotel's personal property assets as of February 28, 2025. Explained and presented further in this report (Section IV, Exhibit G, and Exhibit H).
[f] 8 years x 12 months.
[g] 10% / 12 months.
[h] Monthly Fair Rental Value was determined utilizing the financial payment function (assuming payments in arrears).



# Exhibit E: Defined Term

**The William Vale Hotel**
**Personal Property Defined Term**                                                      **Exhibit E.1**

| Personal Property Defined Term Indications | Notes | Years Low | High |
|---|---|---|---|
| William Vale Hotel Sale-Leaseback Term | [a] | 15 | 15 |
| | | | |
| Stantec Engineering: Hotel Refurbishment Lifecycle | [b] | 6 | 8 |
| HVS Asset & Hotel Management: Soft Goods Replacement Cycle | [c] | 7 | 10 |
| Marshall Valuation Service: Hotel and Motel Furnishings and Equipment Life | [d] | 8 | 12 |
| Lodging Magazine: Select-Service Hotels Renovation Cycle | [e] | 7 | 10 |
| | | | |
| Average | [f] | 7 | 10 |
| Median | [f] | 7 | 10 |
| | | | |
| **Concluded Defined Term for Fair Rental Rate Analysis** | | **8** | |

[a] As provided by Counsel. Includes real property and personal property assets.
[b] https://www.stantec.com/en/markets/hospitality/2023-hospitality-design-trends
[c] https://www.costar.com/article/93041398/required-renovations-for-branded-hotels-ramp-up-but-theres-room-for-negotiation
[d] Marshall & Swift Valuation Service (February 2017), Section 97, Page 20.
[e] https://lodgingmagazine.com/renovation-equation-forces-play-select-service-refresh-cycle/
[f] Excludes the William Vale Hotel Sale-Leaseback Term.



# Exhibit F: Personal Property Rate of Return

**The William Vale Hotel**
**Personal Property Rate of Return**                                    **Exhibit F.1**

| Personal Property Rate of Return Indications | Notes | Rate of Return |
|---|---|---|
| **2018 Pepperdine - Private Capital Markets Report** | [a] | |
| *Annualized expected returns from leases booked during prior 12 months* | | |
| Autos ($5M - $9.99M lease size) | | 10.00% |
| Trucks ($5M - $9.99M lease size) | | 11.00% |
| Computers ($5M - $9.99M lease size) | | 16.00% |
| Machinery and Equipment ($5M - $9.99M lease size) | | 7.00% |
| | | |
| **2023 Equipment Leasing and Finance Asooication - Survey of Equipment Finance Activity** | [b] | |
| *Reported internal rate of return for equipment leasing and finance companies* | | |
| FY2022 Independents (non-bank or captive) | | 11.07% |
| *Adjustment (bps)* [c] | | *-252* |
| | | |
| Estimated FY2017 Independents (non-bank or captive) | | 8.55% |
| | | |
| **Concluded Rate of Return for Fair Rental Rate Analysis** | | **10%** |

[a]  Everett, Craig R.,"2018 Private Capital Markets Report" (2018). Pepperdine University Graziadio School of Business and Management. http://digitalcommons.pepperdine.edu/gsbm_pcm_pcmr/11, pg. 94.

[b]  Equipment Leasing and Finance Association, "ELFA 2023 Survey of Equipment Finance Activity Report", Table 10c.

[c]  Adjustment for difference in rate as of 2022 and 2017. Based upon change in prime rate: 5.5% vs 4.25%.



# Exhibit G: Personal Property Current & Residual Values

**The William Vale Hotel**
**Personal Property Conclusion of Value - Category/Location**                    **Exhibit G.1**

*In U.S. Dollars*

| | Category/Location | Notes | Current Value (as of 2/28/2017) [a] | Residual Value (as of 2/28/2025) [b] |
|---|---|---|---|---|
| 1 | Guest Room Furniture & Equipment | | $ 2,649,610 | $ 16,220 |
| 2 | Back of House Areas | | 1,105,135 | 41,185 |
| 3 | Lower Level Meeting Rooms | | 37,150 | 1,520 |
| 4 | Lobby & Reception | | 72,350 | 2,865 |
| 5 | Fitness Center | | 75,700 | 310 |
| 6 | Lueca Restaurant & Kitchen | | 322,710 | 25,395 |
| 7 | Main Kitchen (Lower Level) | | 860,000 | 82,500 |
| 8 | Westlight Restaurant & Kitchen | | 491,150 | 78,645 |
| 9 | Storage Area (10th Floor) | | 65,250 | 4,000 |
| 10 | Vale Outdoor Park | | 264,200 | 13,070 |
| 11 | Vale Outdoor Pool and Event | | 284,260 | 19,200 |
| 12 | Warehouse | | 41,700 | 9,150 |
| 13 | Miscellaneous | | 371,200 | 35,150 |
| 14 | **Total Value of Personal Property** | | **$ 6,640,415** | **$ 329,210** |
| 15 | **Total Value of Personal Property (Rounded)** | | **$ 6,640,000** | **$ 329,000** |

Detailed information by asset is presented in Exhibit H.
[a] For the purposes of my analysis current value is further defined as Fair Market Value in Continued Use.
[b] For the purposes of my analysis residual value is further defined as Fair Market Value in Exchange.



# Exhibit G: Personal Property Current & Residual Values

**The William Vale Hotel**
**Personal Property Conclusion of Value - Asset Group**　　　　　　　　　　**Exhibit G.2**

*In U.S. Dollars*

| | Asset Group | Notes | Current Value (as of 2/28/2017) [a] | Residual Value (as of 2/28/2025) [b] |
|---|---|---|---|---|
| 1 | Banquet Furniture | | $ 69,550 | $ 3,540 |
| 2 | Electronics & Technology | | 857,040 | 25,120 |
| 3 | General Equipment | | 277,270 | 42,880 |
| 4 | Guestroom Furniture | | 2,163,720 | 0 |
| 5 | Hotel Artwork / Scenery | | 83,080 | 4,255 |
| 6 | Kitchen & Bar Equipment | | 1,735,750 | 214,090 |
| 7 | Office Furniture | | 89,555 | 4,335 |
| 8 | Restaurant Furniture | | 529,450 | 24,490 |
| 9 | Unique Hotel Assets | | 295,000 | 10,500 |
| 10 | Software | | 540,000 | 0 |
| 11 | **Total Value of Personal Property** | | **$ 6,640,415** | **$ 329,210** |
| 12 | **Total Value of Personal Property (Rounded)** | | **$ 6,640,000** | **$ 329,000** |

Detailed information by asset is presented in Exhibit H.

[a] For the purposes of my analysis current value is further defined as Fair Market Value in Continued Use.

[b] For the purposes of my analysis residual value is further defined as Fair Market Value in Exchange.



# Exhibit H: Personal Property Detailed Values

The William Vale Hotel
Personal Property Detailed Values
Exhibit H.1

*In U.S. Dollars*

| Stout No. | Category/Location | Asset Type | Room | Room Type | Room Type Qty | Asset Description | Qty | Total Asset Quantity | Current Value (as of 2/28/2017) | Residual Value (as of 2/28/2025) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HALLWAYS | 1 | RACKING (5' X 4 SHELVES) | 5 | 5 | 1,700 | 300 |
| 2 | BACK OF HOUSE AREAS | ELECTRONICS & TECHNOLOGY | BACK HOUSE | HALLWAYS | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 2 | 2 | 3,800 | 100 |
| 3 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HALLWAYS | 1 | RACKING (5' X 4 SHELVES) | 4 | 4 | 1,300 | 250 |
| 4 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HALLWAYS | 1 | GRATE LOCK-UPS (RACKING) (5' X 4 SHELVES) | 3 | 3 | 950 | 200 |
| 5 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HALLWAYS | 1 | WHEEL CHAIRS | 2 | 2 | 600 | 50 |
| 6 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | WASHING MACHINE | 2 | 2 | 43,000 | 8,000 |
| 7 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | WASHING MACHINE (BROKEN AS OF 2024 INSPECTION) | 1 | 1 | 21,000 | |
| 8 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | DRYER | 2 | 2 | 65,000 | 12,000 |
| 9 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | DRYER | 1 | 1 | 32,000 | 6,000 |
| 10 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | SOAP DISPENSER | 2 | 2 | 300 | 25 |
| 11 | BACK OF HOUSE AREAS | KITCHEN & BAR EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | SMALL STAINLESS STEEL SINK | 1 | 1 | 150 | 35 |
| 12 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | RACKING (5' X 4 SHELVES) | 2 | 2 | 650 | 150 |
| 13 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | DOLLY | 1 | 1 | 100 | 10 |
| 14 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | BOX FAN | 1 | 1 | 40 | 5 |
| 15 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | ROLLABLE WARDROBE HANGER | 2 | 2 | 150 | 10 |
| 16 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | DESK | 4 | 4 | 1,600 | 80 |
| 17 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | OFFICE CHAIR | 5 | 5 | 650 | 30 |
| 18 | BACK OF HOUSE AREAS | GUESTROOM FURNITURE | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | TABLE LAMP / FLOOR LAMP | 4 | 4 | 750 | |
| 19 | BACK OF HOUSE AREAS | GUESTROOM FURNITURE | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | MAKEUP MIRROR | 2 | 2 | 400 | |
| 20 | BACK OF HOUSE AREAS | ELECTRONICS & TECHNOLOGY | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | PAPER SHREDDER | 1 | 1 | 250 | 5 |
| 21 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | HORIZONTAL FILER | 1 | 1 | 350 | 20 |
| 22 | BACK OF HOUSE AREAS | GUESTROOM FURNITURE | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | BOOK SHELF | 1 | 1 | 150 | 10 |
| 23 | BACK OF HOUSE AREAS | GUESTROOM FURNITURE | BACK HOUSE | HOUSEKEEPING / LAUNDRY ROOM | 1 | WALL MIRROR | 1 | 1 | 200 | |
| 24 | BACK OF HOUSE AREAS | GUESTROOM FURNITURE | BACK HOUSE | EMPLOYEE CAFETERIA | 1 | PICNIC TABLE W/ BENCHES | 5 | 5 | 4,800 | 350 |
| 25 | BACK OF HOUSE AREAS | GUESTROOM FURNITURE | BACK HOUSE | EMPLOYEE CAFETERIA | 1 | WOOD CHAIRS | 11 | 11 | 650 | |
| 26 | BACK OF HOUSE AREAS | GUESTROOM FURNITURE | BACK HOUSE | EMPLOYEE CAFETERIA | 1 | COFFEE TABLE / SIDE TABLE / SOFA TABLE | 6 | 6 | 3,600 | |
| 27 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | EMPLOYEE CAFETERIA | 1 | BULLETIN BOARD | 1 | 1 | 35 | |
| 28 | BACK OF HOUSE AREAS | ELECTRONICS & TECHNOLOGY | BACK HOUSE | EMPLOYEE CAFETERIA | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 2 | 2 | 3,800 | 100 |
| 29 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | EMPLOYEE CAFETERIA | 1 | PLASTIC ROLLING CART | 1 | 1 | 100 | 10 |
| 30 | BACK OF HOUSE AREAS | KITCHEN & BAR EQUIPMENT | BACK HOUSE | EMPLOYEE CAFETERIA | 1 | MICROWAVE | 1 | 1 | 100 | 10 |
| 31 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | STORAGE ROOM (C43) | 1 | RACKING (4' X 4 SHELVES) | 8 | 8 | 2,600 | 500 |
| 32 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | STORAGE ROOM (C43) | 1 | RACKING (4' X 4 SHELVES) | 3 | 3 | 1,000 | 200 |
| 33 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | STORAGE ROOM (C43) | 1 | HORIZONTAL FILER | 1 | 1 | 350 | 20 |
| 34 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | STORAGE ROOM (C43) | 1 | PERSONAL HEATER | 1 | 1 | 80 | |
| 35 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | STORAGE ROOM (C43) | 1 | GRATE LOCK-UPS (RACKING) (5' X 4 SHELVES) | 1 | 1 | 300 | 60 |
| 36 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | SECURITY ROOM (OFFICE) | 1 | WALL CABINET (OVER DESK) | 10 | 10 | 4,000 | 200 |
| 37 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | SECURITY ROOM (OFFICE) | 1 | DESK | 4 | 4 | 1,600 | 80 |
| 38 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | SECURITY ROOM (OFFICE) | 1 | OFFICE CHAIR | 4 | 4 | 500 | 25 |
| 39 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | SECURITY ROOM (OFFICE) | 1 | HORIZONTAL FILER | 2 | 2 | 750 | 40 |
| 40 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | SECURITY ROOM (OFFICE) | 1 | MINI REFRIGERATOR | 1 | 1 | 150 | 10 |
| 41 | BACK OF HOUSE AREAS | ELECTRONICS & TECHNOLOGY | BACK HOUSE | SECURITY ROOM (OFFICE) | 1 | TELEPHONE HANDSET | 4 | 4 | 250 | 5 |
| 42 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | DESK | 11 | 11 | 4,400 | 200 |
| 43 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | GUEST ROOM SAFE | 2 | 2 | 400 | 5 |
| 44 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | PICTURES | 7 | 7 | 150 | 5 |
| 45 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | COFFEE MAKER | 1 | 1 | 100 | 5 |
| 46 | BACK OF HOUSE AREAS | ELECTRONICS & TECHNOLOGY | BACK HOUSE | OFFICES | 1 | PAPER SHREDDER | 1 | 1 | 250 | 5 |
| 47 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | BULLETIN BOARD | 5 | 5 | 150 | 10 |
| 48 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | WALL CABINET (OVER DESK) | 20 | 20 | 7,750 | 400 |
| 49 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | OFFICE CHAIR | 18 | 18 | 2,300 | 100 |
| 50 | BACK OF HOUSE AREAS | ELECTRONICS & TECHNOLOGY | BACK HOUSE | OFFICES | 1 | TELEPHONE HANDSET | 8 | 8 | 450 | 10 |
| 51 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | HORIZONTAL FILER | 3 | 3 | 1,100 | 60 |
| 52 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | COFFEE TABLE / SIDE TABLE / SOFA TABLE | 2 | 2 | 1,200 | 60 |
| 53 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | WALL MIRROR | 2 | 2 | 450 | 20 |
| 54 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | SOFA / SETTE | 1 | 1 | 1,800 | 90 |
| 55 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | MINI REFRIGERATOR | 1 | 1 | 150 | 10 |
| 56 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | ARMOIRE / WARDROBE | 1 | 1 | 800 | 40 |
| 57 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | STANDING DESK | 1 | 1 | 150 | 5 |
| 58 | BACK OF HOUSE AREAS | OFFICE FURNITURE | BACK HOUSE | OFFICES | 1 | PERSONAL HEATER | 1 | 1 | 80 | |
| 59 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | BACK HOUSE | HALLWAYS | 1 | 3 X 3 LOCKERS | 10 | 10 | 4,000 | 300 |
| 60 | BACK OF HOUSE AREAS | BANQUET FURNITURE | BACK HOUSE | BANQUET FURNITURE COUNT | 1 | BANQUET CHAIRS | 338 | 338 | 29,000 | 1,500 |
| 61 | BACK OF HOUSE AREAS | BANQUET FURNITURE | BACK HOUSE | BANQUET FURNITURE COUNT | 1 | CEREMONY CHAIRS | 205 | 205 | 17,500 | 900 |
| 62 | BACK OF HOUSE AREAS | BANQUET FURNITURE | BACK HOUSE | BANQUET FURNITURE COUNT | 1 | 6 FOOT TABLES | 22 | 22 | 5,250 | 250 |
| 63 | BACK OF HOUSE AREAS | BANQUET FURNITURE | BACK HOUSE | BANQUET FURNITURE COUNT | 1 | ROUND TABLES | 31 | 31 | 7,750 | 400 |
| 64 | BACK OF HOUSE AREAS | BANQUET FURNITURE | BACK HOUSE | BANQUET FURNITURE COUNT | 1 | FULL HIGH TOPS SETS | 12 | 12 | 1,300 | 70 |
| 65 | BACK OF HOUSE AREAS | BANQUET FURNITURE | BACK HOUSE | BANQUET FURNITURE COUNT | 1 | ROLLING WEDDING CAKE TABLES | 3 | 3 | 600 | 30 |
| 66 | BACK OF HOUSE AREAS | BANQUET FURNITURE | BACK HOUSE | BANQUET FURNITURE COUNT | 1 | SKINNY 6 FOOT TABLES | 10 | 10 | 1,500 | 70 |
| 67 | BACK OF HOUSE AREAS | BANQUET FURNITURE | BACK HOUSE | BANQUET FURNITURE COUNT | 1 | 8 FOOT TABLE | 1 | 1 | 400 | 20 |
| 68 | BACK OF HOUSE AREAS | BANQUET FURNITURE | BACK HOUSE | BANQUET FURNITURE COUNT | 1 | VERMONT BARS | 4 | 4 | 6,250 | 300 |
| 69 | BACK OF HOUSE AREAS | ELECTRONICS & TECHNOLOGY | HOTEL | PREMISES | 1 | PORTABLE RADIOS | 39 | 39 | 7,750 | 250 |
| 70 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | HOUSEKEEPER CARTS | 21 | 21 | 8,750 | 700 |
| 71 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | HOUSEKEEPERS VACUUM | 8 | 8 | 1,900 | 150 |
| 72 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | HOUSEMAN-HALLWAY VACUUM | 2 | 2 | 500 | 40 |
| 73 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | LOBBY-VACUUM | 1 | 1 | 350 | 20 |
| 74 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | UPHOLSTERY SHAMPOOER | 1 | 1 | 550 | 45 |
| 75 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | HOOVER UPRIGHT SHAMPOER | 1 | 1 | 100 | 10 |



# Exhibit H: Personal Property Detailed Values

The William Vale Hotel
**Personal Property Detailed Values**                                                                                     **Exhibit H.1 (continued)**
*In U.S. Dollars*

| Stout No. | Category/Location | Asset Type | Room | Room Type | Room Type Qty | Asset Description | Qty | Total Asset Quantity | Current Value (as of 2/28/2017) | Residual Value (as of 2/28/2025) |
|---|---|---|---|---|---|---|---|---|---|---|
| 76 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | AIR MOVER (BLOWER) | 2 | 2 | 400 | 35 |
| 77 | BACK OF HOUSE AREAS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | LAUNDRY CARTS | 8 | 8 | 950 | 80 |
| 78 | BACK OF HOUSE AREAS | ELECTRONICS & TECHNOLOGY | VARIOUS | VARIOUS | 1 | IT HARDWARE | 1 | 1 | 200,000 | 4,800 |
| 79 | BACK OF HOUSE AREAS | ELECTRONICS & TECHNOLOGY | VARIOUS | VARIOUS | 1 | PHONE & VOICEMAIL SYSTEM | 1 | 1 | 49,000 | 1,300 |
| 80 | FITNESS CENTER | ELECTRONICS & TECHNOLOGY | 4TH ROOM FITNESS CENTER | FITNESS | 1 | SOUND SYSTEM | 1 | 1 | 5,250 | 150 |
| 81 | FITNESS CENTER | UNIQUE HOTEL ASSETS | 4TH ROOM FITNESS CENTER | FITNESS | 1 | LOT OF FITNESS EQUIPMENT (REPLACED WITH NEW EQUIPMENT IN 2021) | 1 | 1 | 65,000 | |
| 82 | FITNESS CENTER | KITCHEN & BAR EQUIPMENT | 4TH ROOM FITNESS CENTER | FITNESS | 1 | MINI REFRIGERATOR | 2 | 2 | 400 | 10 |
| 83 | FITNESS CENTER | ELECTRONICS & TECHNOLOGY | 4TH ROOM FITNESS CENTER | FITNESS | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 1 | 1 | 1,900 | 50 |
| 84 | FITNESS CENTER | ELECTRONICS & TECHNOLOGY | 4TH ROOM FITNESS CENTER | FITNESS | 1 | AED | 1 | 1 | 1,500 | 40 |
| 85 | FITNESS CENTER | GUESTROOM FURNITURE | 4TH ROOM FITNESS CENTER | FITNESS | 1 | TOWEL CABINET | 1 | 1 | 900 | |
| 86 | FITNESS CENTER | GUESTROOM FURNITURE | 4TH ROOM FITNESS CENTER | FITNESS | 1 | TRASH CAN | 2 | 2 | 750 | 60 |
| 87 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | BEDSET (BOX SPRING, MATTRESS, FRAME, HEADBOARD, BED SKIRT, BEDSPREAD, AND PILLOWS) | 2 | 16 | 14,500 | |
| 88 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | NIGHT STANDS | 1 | 8 | 5,500 | |
| 89 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | ARMOIRE / WARDROBE | 1 | 8 | 6,500 | |
| 90 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | OTTOMAN | 1 | 8 | 8,250 | |
| 91 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | SOFA / SETTE | 1 | 8 | 14,000 | |
| 92 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | WALL MIRROR | 1 | 8 | 1,800 | |
| 93 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | TABLE LAMP / FLOOR LAMP | 1 | 8 | 1,500 | |
| 94 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | WALL SCONCE | 3 | 24 | 4,000 | |
| 95 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | AREA RUG | 1 | 8 | 5,750 | |
| 96 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | ALARM CLOCK RADIO | 1 | 8 | 700 | 50 |
| 97 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | GUEST ROOM SAFE | 1 | 8 | 1,500 | 100 |
| 98 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | LUGGAGE STAND | 1 | 8 | 750 | |
| 99 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 1 | 8 | 15,500 | 400 |
| 100 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | TELEPHONE HANDSET | 1 | 8 | 450 | 10 |
| 101 | GUEST ROOM FURNITURE & EQUIPMENT | HOTEL ARTWORK / SCENERY | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | PICTURES | 4 | 32 | 650 | 30 |
| 102 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | COFFEE MAKER | 1 | 8 | 1,000 | |
| 103 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | MINI REFRIGERATOR | 1 | 8 | 1,400 | |
| 104 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | IRONING BOARD W/IRON | 1 | 8 | 600 | |
| 105 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | WINDOW TREATMENTS, PER WINDOW (SHEER, BLACKOUT CURTAIN, HARDWARE, INSTALLED) | 1 | 8 | 6,500 | |
| 106 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | KNIC-KNACS (PILLOWS, SMALL FAKE PLANTERS, ETC) | 1 | 8 | 700 | |
| 107 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | SHELF (UNDER TV) | 1 | 8 | 1,500 | |
| 108 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BEDROOM #1 | 8 | WALL CABINET (UNDER TV) | 1 | 8 | 1,500 | |
| 109 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BATHROOM #1 | 8 | WALL MIRROR | 1 | 8 | 1,800 | |
| 110 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BATHROOM #1 | 8 | HAIR DRYER | 1 | 8 | 1,100 | |
| 111 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BATHROOM #1 | 8 | SHELF (BATHROOM) | 1 | 8 | 700 | |
| 112 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BALCONY | 8 | PATIO CHAIR | 2 | 16 | 3,600 | |
| 113 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BALCONY | 8 | PATIO TABLE ROUND (42" DIAM) | 1 | 8 | 4,000 | |
| 114 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BALCONY | 8 | PATIO SIDE TABLE (18" DIAM) | 1 | 8 | 950 | |
| 115 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - DOUBLE | BALCONY | 8 | CHAISE LOUNGE CHAIR | 2 | 16 | 10,500 | |
| 116 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | BEDSET (BOX SPRING, MATTRESS, FRAME, HEADBOARD, BED SKIRT, BEDSPREAD, AND PILLOWS) | 1 | 139 | 125,000 | |
| 117 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | NIGHT STANDS | 2 | 278 | 190,000 | |
| 118 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | ARMOIRE / WARDROBE | 1 | 139 | 110,000 | |
| 119 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | SOFA / SETTE | 1 | 139 | 245,000 | |
| 120 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | WALL MIRROR | 1 | 139 | 31,000 | |
| 121 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | TABLE LAMP / FLOOR LAMP | 2 | 278 | 52,500 | |
| 122 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | WALL SCONCE | 3 | 417 | 70,000 | |
| 123 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | AREA RUG | 1 | 139 | 100,000 | |
| 124 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - KING | BEDROOM #1 | 139 | ALARM CLOCK RADIO | 1 | 139 | 12,000 | 900 |
| 125 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - KING | BEDROOM #1 | 139 | GUEST ROOM SAFE | 1 | 139 | 25,000 | 1,900 |
| 126 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | LUGGAGE STAND | 1 | 139 | 13,500 | |
| 127 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - KING | BEDROOM #1 | 139 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 1 | 139 | 270,000 | 7,000 |
| 128 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - KING | BEDROOM #1 | 139 | TELEPHONE HANDSET | 1 | 139 | 8,000 | 200 |
| 129 | GUEST ROOM FURNITURE & EQUIPMENT | HOTEL ARTWORK / SCENERY | GUEST ROOM - KING | BEDROOM #1 | 139 | PICTURES | 4 | 556 | 11,000 | 550 |
| 130 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | COFFEE MAKER | 1 | 139 | 17,000 | |
| 131 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | MINI REFRIGERATOR | 1 | 139 | 24,000 | |
| 132 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | IRONING BOARD W/IRON | 1 | 139 | 10,000 | |
| 133 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | WINDOW TREATMENTS, PER WINDOW (SHEER, BLACKOUT CURTAIN, HARDWARE, INSTALLED) | 1 | 139 | 115,000 | |
| 134 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | KNIC-KNACS (PILLOWS, SMALL FAKE PLANTERS, ETC) | 1 | 139 | 12,500 | |
| 135 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | SHELF (UNDER TV) | 1 | 139 | 25,000 | |
| 136 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BEDROOM #1 | 139 | WALL CABINET (UNDER TV) | 1 | 139 | 25,000 | |
| 137 | GUEST ROOM FURNITURE & EQUIPMENT | HOTEL ARTWORK / SCENERY | GUEST ROOM - KING | BATHROOM #1 | 139 | PICTURES | 1 | 139 | 2,300 | 150 |
| 138 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BATHROOM #1 | 139 | HAIR DRYER | 1 | 139 | 18,500 | |
| 139 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BATHROOM #1 | 139 | SHELF (BATHROOM) | 1 | 139 | 12,000 | |
| 140 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BALCONY | 139 | PATIO CHAIR | 2 | 278 | 62,500 | |
| 141 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - KING | BALCONY | 139 | PATIO TABLE ROUND (42" DIAM) | 1 | 139 | 70,000 | |
| 142 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | BEDSET (BOX SPRING, MATTRESS, FRAME, HEADBOARD, BED SKIRT, BEDSPREAD, AND PILLOWS) | 1 | 11 | 10,000 | |
| 143 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | NIGHT STANDS | 1 | 11 | 7,500 | |
| 144 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | ARMOIRE / WARDROBE | 1 | 11 | 8,750 | |
| 145 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | OTTOMAN | 1 | 11 | 11,500 | |



# Exhibit H: Personal Property Detailed Values

**The William Vale Hotel**
**Personal Property Detailed Values**                                                                                                    **Exhibit H.1 (continued)**
*In U.S. Dollars*

| Stout No. | Category/Location | Asset Type | Room | Room Type | Room Type Qty | Asset Description | Qty | Total Asset Quantity | Current Value (as of 2/28/2017) | Residual Value (as of 2/28/2025) |
|---|---|---|---|---|---|---|---|---|---|---|
| 146 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | SOFA / SETTE | 1 | 11 | 19,500 | |
| 147 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | WALL MIRROR | 1 | 11 | 2,400 | |
| 148 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | TABLE LAMP / FLOOR LAMP | 1 | 11 | 2,000 | |
| 149 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | WALL SCONCE | 3 | 33 | 5,500 | |
| 150 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | AREA RUG | 1 | 11 | 7,750 | |
| 151 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | ALARM CLOCK RADIO | 1 | 11 | 950 | 70 |
| 152 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | GUEST ROOM SAFE | 1 | 11 | 2,000 | 150 |
| 153 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | LUGGAGE STAND | 1 | 11 | 1,100 | |
| 154 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 1 | 11 | 21,000 | 550 |
| 155 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | TELEPHONE HANDSET | 1 | 11 | 650 | 15 |
| 156 | GUEST ROOM FURNITURE & EQUIPMENT | HOTEL ARTWORK / SCENERY | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | PICTURES | 3 | 33 | 650 | 30 |
| 157 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | COFFEE MAKER | 1 | 11 | 1,400 | |
| 158 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | MINI REFRIGERATOR | 1 | 11 | 1,900 | |
| 159 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | IRONING BOARD W/IRON | 1 | 11 | 800 | |
| 160 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | WINDOW TREATMENTS, PER WINDOW (SHEER, BLACKOUT CURTAIN, HARDWARE, INSTALLED) | 1 | 11 | 9,000 | |
| 161 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | KNICKNACKS (PILLOWS, SMALL FAKE PLANTERS, ETC) | 1 | 11 | 1,000 | |
| 162 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | SHELF (UNDER TV) | 1 | 11 | 2,000 | |
| 163 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BEDROOM #1 | 11 | WALL CABINET (UNDER TV) | 1 | 11 | 2,000 | |
| 164 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BATHROOM #1 | 11 | WALL MIRROR | 1 | 11 | 2,400 | |
| 165 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BATHROOM #1 | 11 | HAIR DRYER | 1 | 11 | 1,500 | |
| 166 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BATHROOM #1 | 11 | SHELF (BATHROOM) | 1 | 11 | 950 | |
| 167 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BALCONY | 11 | PATIO CHAIR | 2 | 22 | 5,000 | |
| 168 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - QUEEN | BALCONY | 11 | PATIO TABLE ROUND (42" DIAM) | 1 | 11 | 5,500 | |
| 169 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | BEDSET (BOX SPRING, MATTRESS, FRAME, HEADBOARD, BED SKIRT, BEDSPREAD, AND PILLOWS) | 1 | 24 | 22,000 | |
| 170 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | NIGHT STANDS | 2 | 48 | 33,000 | |
| 171 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | ARMOIRE / WARDROBE (DOUBLE) | 1 | 24 | 32,000 | |
| 172 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | DRESSER | 1 | 24 | 85,000 | |
| 173 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | LOUNGE CHAIR | 1 | 24 | 38,000 | |
| 174 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | WALL MIRROR | 1 | 24 | 5,250 | |
| 175 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | TABLE LAMP / FLOOR LAMP | 3 | 72 | 13,500 | |
| 176 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | WALL SCONCE | 3 | 72 | 12,000 | |
| 177 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | AREA RUG | 1 | 24 | 17,000 | |
| 178 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - SUITE | BEDROOM #1 | 24 | ALARM CLOCK RADIO | 1 | 24 | 2,100 | 150 |
| 179 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - SUITE | BEDROOM #1 | 24 | GUEST ROOM SAFE | 1 | 24 | 4,400 | 300 |
| 180 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | LUGGAGE STAND | 1 | 24 | 2,300 | |
| 181 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - SUITE | BEDROOM #1 | 24 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 2 | 48 | 92,500 | 2,400 |
| 182 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - SUITE | BEDROOM #1 | 24 | TELEPHONE HANDSET | 2 | 48 | 2,800 | 70 |
| 183 | GUEST ROOM FURNITURE & EQUIPMENT | HOTEL ARTWORK / SCENERY | GUEST ROOM - SUITE | BEDROOM #1 | 24 | PICTURES | 6 | 144 | 2,800 | 150 |
| 184 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | COFFEE MAKER | 1 | 24 | 3,000 | |
| 185 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | MINI REFRIGERATOR | 1 | 24 | 4,200 | |
| 186 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | IRONING BOARD W/IRON | 1 | 24 | 1,800 | |
| 187 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | WINDOW TREATMENTS, PER WINDOW (SHEER, BLACKOUT CURTAIN, HARDWARE, INSTALLED) | 3 | 72 | 60,000 | |
| 188 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | KNICKNACKS (PILLOWS, SMALL FAKE PLANTERS, ETC) | 2 | 48 | 4,200 | |
| 189 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOM - SUITE | BEDROOM #1 | 24 | SOUND BAR | 2 | 48 | 9,750 | 700 |
| 190 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | SHELF (UNDER TV) | 1 | 24 | 4,400 | |
| 191 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | SOFA / SETTE (W/ PULL OUT BED) | 1 | 24 | 43,000 | |
| 192 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BEDROOM #1 | 24 | COFFEE TABLE / SIDE TABLE / SOFA TABLE | 1 | 24 | 14,000 | |
| 193 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BATHROOM #1 | 24 | WALL MIRROR | 1 | 24 | 5,250 | |
| 194 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BATHROOM #1 | 24 | MAKEUP MIRROR | 1 | 24 | 5,000 | |
| 195 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BATHROOM #1 | 24 | WINDOW TREATMENTS, PER WINDOW (SHEER, BLACKOUT CURTAIN, HARDWARE, INSTALLED) | 1 | 24 | 20,000 | |
| 196 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BALCONY | 24 | PATIO CHAIR | 2 | 48 | 11,000 | |
| 197 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BALCONY | 24 | PATIO TABLE ROUND (42" DIAM) | 1 | 24 | 12,000 | |
| 198 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BALCONY | 24 | PATIO SIDE TABLE (18" DIAM) | 1 | 24 | 8,000 | |
| 199 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BALCONY | 24 | CHAISE LOUNGE CHAIR | 2 | 48 | 32,000 | |
| 200 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOM - SUITE | BATHROOM #1 | 24 | 3 SHELF UNIT | 1 | 24 | 2,800 | |
| 201 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | BEDSET (BOX SPRING, MATTRESS, FRAME, HEADBOARD, BED SKIRT, BEDSPREAD, AND PILLOWS) | 1 | 1 | 900 | |
| 202 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | NIGHT STANDS | 2 | 2 | 1,400 | |
| 203 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | ARMOIRE / WARDROBE | 1 | 1 | 800 | |
| 204 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | UPHOLSTERED BENCH | 1 | 1 | 750 | |
| 205 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | WALL MIRROR | 1 | 1 | 200 | |
| 206 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | TABLE LAMP / FLOOR LAMP | 2 | 2 | 350 | 5 |
| 207 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | ALARM CLOCK RADIO | 1 | 1 | 90 | 5 |
| 208 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | GUEST ROOM SAFE | 1 | 1 | 200 | 15 |
| 209 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | LUGGAGE STAND | 1 | 1 | 100 | |
| 210 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 1 | 1 | 1,900 | 50 |
| 211 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | TELEPHONE HANDSET | 1 | 1 | 60 | |
| 212 | GUEST ROOM FURNITURE & EQUIPMENT | HOTEL ARTWORK / SCENERY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | PICTURES | 1 | 1 | 20 | |
| 213 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | COFFEE MAKER | 1 | 1 | 100 | |
| 214 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | MINI REFRIGERATOR | 1 | 1 | 200 | |
| 215 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | IRONING BOARD W/IRON | 1 | 1 | 70 | |
| 216 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | WINDOW TREATMENTS, PER WINDOW (SHEER, BLACKOUT CURTAIN, HARDWARE, INSTALLED) | 1 | 1 | 850 | |
| 217 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | SOUND BAR | 1 | 1 | 200 | 15 |
| 218 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | SHELF (UNDER TV) | 1 | 1 | 200 | |
| 219 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #1 | 1 | KNICKNACKS (PILLOWS, SMALL FAKE PLANTERS, ETC) | 1 | 1 | 90 | |
| 220 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BATHROOM #1 | 1 | WALL MIRROR | 2 | 2 | 450 | |
| 221 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BATHROOM #1 | 1 | HAIR DRYER | 1 | 1 | 150 | |



# Exhibit H: Personal Property Detailed Values

The William Vale Hotel
**Personal Property Detailed Values**

**Exhibit H.1 (continued)**

*In U.S. Dollars*

| Stout No. | Category/Location | Asset Type | Room | Room Type | Room Type Qty | Asset Description | Qty | Total Asset Quantity | Current Value (as of 2/28/2017) | Residual Value (as of 2/28/2025) |
|---|---|---|---|---|---|---|---|---|---|---|
| 222 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BATHROOM #1 | 1 | MAKEUP MIRROR | 1 | 1 | 200 | |
| 223 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BATHROOM #1 | 1 | 3 SHELF UNIT | 1 | 1 | 100 | |
| 224 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | BEDSET (BOX SPRING, MATTRESS, FRAME, HEADBOARD, BED SKIRT, BEDSPREAD, AND PILLOWS) | 1 | 1 | 900 | |
| 225 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | NIGHT STANDS | 2 | 2 | 1,400 | |
| 226 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | ARMOIRE / WARDROBE | 1 | 1 | 800 | |
| 227 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | UPHOLSTERED BENCH | 1 | 1 | 750 | |
| 228 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | WALL MIRROR | 1 | 1 | 200 | |
| 229 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | TABLE LAMP / FLOOR LAMP | 2 | 2 | 350 | |
| 230 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | ALARM CLOCK RADIO | 1 | 1 | 90 | 5 |
| 231 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | GUEST ROOM SAFE | 1 | 1 | 200 | 15 |
| 232 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | LUGGAGE STAND | 1 | 1 | 100 | |
| 233 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 1 | 1 | 1,900 | 50 |
| 234 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | TELEPHONE HANDSET | 1 | 1 | 60 | |
| 235 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | COFFEE MAKER | 1 | 1 | 100 | |
| 236 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | MINI REFRIGERATOR | 1 | 1 | 150 | |
| 237 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | IRONING BOARD W/IRON | 1 | 1 | 70 | |
| 238 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | WINDOW TREATMENTS, PER WINDOW (SHEER, BLACKOUT CURTAIN, HARDWARE, INSTALLED) | 1 | 1 | 850 | |
| 239 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BEDROOM #2 | 1 | GLASS DESK | 1 | 1 | 300 | |
| 240 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BATHROOM #2 | 1 | WALL MIRROR | 1 | 1 | 200 | |
| 241 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BATHROOM #2 | 1 | WALL SCONCE | 2 | 2 | 350 | |
| 242 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BATHROOM #2 | 1 | HAIR DRYER | 1 | 1 | 150 | |
| 243 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | SECTIONAL SOFA | 1 | 1 | 3,200 | |
| 244 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | LOUNGE CHAIR | 3 | 3 | 4,800 | |
| 245 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | OTTOMAN | 1 | 1 | 1,000 | |
| 246 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | ENTERTAINMENT CENTER | 1 | 1 | 2,000 | |
| 247 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | COFFEE TABLE / SIDE TABLE / SOFA TABLE | 3 | 3 | 1,800 | |
| 248 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | WALL SCONCE | 1 | 1 | 150 | |
| 249 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | CHANDELIER LIGHT | 1 | 1 | 3,000 | |
| 250 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 1 | 1 | 1,900 | 50 |
| 251 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | BOSE STEREO | 1 | 1 | 250 | 20 |
| 252 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | TELEPHONE HANDSET | 1 | 1 | 60 | |
| 253 | GUEST ROOM FURNITURE & EQUIPMENT | HOTEL ARTWORK / SCENERY | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | PICTURES | 3 | 3 | 60 | 5 |
| 254 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | AREA RUG | 1 | 1 | 700 | |
| 255 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | WINDOW TREATMENTS, PER WINDOW (SHEER, BLACKOUT CURTAIN, HARDWARE, INSTALLED) | 3 | 3 | 2,500 | |
| 256 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | KNIC-KNACS (PILLOWS, SMALL FAKE PLANTERS, ETC) | 2 | 2 | 200 | |
| 257 | GUEST ROOM FURNITURE & EQUIPMENT | HOTEL ARTWORK / SCENERY | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | ARTWORK (ROCK SCULPTURE) | 1 | 1 | 2,300 | 100 |
| 258 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | DECORATIVE SHELF | 1 | 1 | 200 | |
| 259 | GUEST ROOM FURNITURE & EQUIPMENT | ELECTRONICS & TECHNOLOGY | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | SPEAKERS | 1 | 1 | 200 | 15 |
| 260 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | DINING CHAIRS | 6 | 6 | 500 | |
| 261 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | DINING TABLE | 1 | 1 | 5,250 | |
| 262 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | OUTDOOR SECTIONAL COUCH | 2 | 2 | 5,750 | |
| 263 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | OUTDOOR LAMPS | 3 | 3 | 1,800 | |
| 264 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | PATIO CHAIR | 4 | 4 | 900 | |
| 265 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | PATIO TABLE ROUND (42" DIAM) | 4 | 4 | 2,000 | |
| 266 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | PATIO SIDE TABLE (18" DIAM) | 3 | 3 | 350 | |
| 267 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | CHAISE LOUNGE CHAIR | 1 | 1 | 650 | |
| 268 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | OUTDOOR DINING TABLE | 1 | 1 | 2,500 | |
| 269 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | DINING CHAIRS | 10 | 10 | 800 | |
| 270 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | OUTDOOR CABINET STORAGE | 1 | 1 | 1,200 | |
| 271 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | BALCONY | 1 | KNIC-KNACS (PILLOWS, SMALL FAKE PLANTERS, ETC) | 1 | 1 | 90 | |
| 273 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | GUEST ROOMS - VGR PENTHOUSE | LIVING ROOM | 1 | STORAGE CABINET | 1 | 1 | 1,200 | |
| 273 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | HOTEL | PREMISES | 1 | WAREHOUSE LINEN INVENTORY (LINENS INVENTORY COMPLETELY REPLACED SINCE 2017) | 1 | 1 | 15,000 | |
| 274 | GUEST ROOM FURNITURE & EQUIPMENT | GUESTROOM FURNITURE | HOTEL | PREMISES | 1 | IN - CIRCULATION LINEN INVENTORY (LINENS INVENTORY COMPLETELY REPLACED SINCE 2017) | 1 | 1 | 60,000 | |
| 275 | LOBBY & RECEPTION | ELECTRONICS & TECHNOLOGY | LOBBY | LOBBY | 1 | SOUND SYSTEM | 1 | 1 | 19,000 | 600 |
| 276 | LOBBY & RECEPTION | ELECTRONICS & TECHNOLOGY | LOBBY | LOBBY | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 2 | 2 | 3,800 | 100 |
| 277 | LOBBY & RECEPTION | OFFICE FURNITURE | LOBBY | LOBBY | 1 | CHAISE LOUNGE CHAIR | 1 | 1 | 650 | 30 |
| 278 | LOBBY & RECEPTION | OFFICE FURNITURE | LOBBY | LOBBY | 1 | SIDE CHAIR, LEATHER | 10 | 10 | 6,500 | 300 |
| 279 | LOBBY & RECEPTION | OFFICE FURNITURE | LOBBY | LOBBY | 1 | OTTOMAN | 3 | 3 | 3,200 | 150 |
| 280 | LOBBY & RECEPTION | OFFICE FURNITURE | LOBBY | LOBBY | 1 | COUCH | 3 | 3 | 5,250 | 250 |
| 281 | LOBBY & RECEPTION | OFFICE FURNITURE | LOBBY | LOBBY | 1 | DISPLAY CABINET, GLASS | 1 | 1 | 1,100 | 50 |
| 282 | LOBBY & RECEPTION | OFFICE FURNITURE | LOBBY | LOBBY | 1 | TABLE LAMP / FLOOR LAMP | 4 | 4 | 750 | 35 |
| 283 | LOBBY & RECEPTION | OFFICE FURNITURE | LOBBY | LOBBY | 1 | COFFEE TABLE / SIDE TABLE / SOFA TABLE | 13 | 13 | 7,500 | 350 |
| 284 | LOBBY & RECEPTION | OFFICE FURNITURE | LOBBY | LOBBY | 1 | DESK, GLASS, 84" | 2 | 2 | 750 | 40 |
| 285 | LOBBY & RECEPTION | OFFICE FURNITURE | LOBBY | LOBBY | 1 | CREDENZA | 1 | 1 | 550 | 30 |
| 286 | LOBBY & RECEPTION | HOTEL ARTWORK / SCENERY | LOBBY | LOBBY | 1 | POTTED PLANTS | 3 | 3 | 4,000 | 200 |
| 287 | LOBBY & RECEPTION | OFFICE FURNITURE | RECEPTION | RECEPTION | 1 | UPHOLSTERED BENCH | 2 | 2 | 1,500 | 70 |
| 288 | LOBBY & RECEPTION | HOTEL ARTWORK / SCENERY | RECEPTION | RECEPTION | 1 | POTTED PLANTS | 2 | 2 | 2,600 | 150 |
| 289 | LOBBY & RECEPTION | GENERAL EQUIPMENT | RECEPTION | RECEPTION | 1 | TRASH CAN | 1 | 1 | 300 | 30 |
| 290 | LOBBY & RECEPTION | ELECTRONICS & TECHNOLOGY | RECEPTION | RECEPTION | 1 | PHONE | 2 | 2 | 100 | 5 |
| 291 | LOBBY & RECEPTION | ELECTRONICS & TECHNOLOGY | RECEPTION | RECEPTION | 1 | ELECTRONIC KEY SYSTEM W/ (4) KEY STATIONS | 1 | 1 | 6,250 | 150 |



# Exhibit H: Personal Property Detailed Values

The William Vale Hotel
**Personal Property Detailed Values**

*In U.S. Dollars*

| Stout No. | Category/Location | Asset Type | Room | Room Type | Room Type Qty | Asset Description | Qty | Total Asset Quantity | Current Value (as of 2/28/2017) | Residual Value (as of 2/28/2025) |
|---|---|---|---|---|---|---|---|---|---|---|
| 292 | LOBBY & RECEPTION | OFFICE FURNITURE | RESERVATION BACK OFFICE | OFFICES | 1 | DESK | 5 | 5 | 2,000 | 100 |
| 293 | LOBBY & RECEPTION | OFFICE FURNITURE | RESERVATION BACK OFFICE | OFFICES | 1 | COFFEE MAKER | 1 | 1 | 150 | 10 |
| 294 | LOBBY & RECEPTION | ELECTRONICS & TECHNOLOGY | RESERVATION BACK OFFICE | OFFICES | 1 | PHONE | 5 | 5 | 300 | 10 |
| 295 | LOBBY & RECEPTION | ELECTRONICS & TECHNOLOGY | RESERVATION BACK OFFICE | OFFICES | 1 | VIDEO SECURITY SYSTEM | 1 | 1 | 4,800 | 150 |
| 296 | LOBBY & RECEPTION | ELECTRONICS & TECHNOLOGY | RESERVATION BACK OFFICE | OFFICES | 1 | SECURITY SAFE | 1 | 1 | 200 | 15 |
| 297 | LOBBY & RECEPTION | OFFICE FURNITURE | RESERVATION BACK OFFICE | OFFICES | 1 | LOCKED P.O. BOX - 24 SLOT | 1 | 1 | 600 | 30 |
| 298 | LOBBY & RECEPTION | OFFICE FURNITURE | RESERVATION BACK OFFICE | OFFICES | 1 | CABINET, TALL | 1 | 1 | 450 | 20 |
| 299 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | GRAND ROOM | 1 | CONFERENCE TABLES 6' | 3 | 3 | 1,700 | 90 |
| 300 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | GRAND ROOM | 1 | CONFERENCE CHAIRS | 16 | 16 | 3,600 | 200 |
| 301 | LOWER LEVEL MEETING ROOMS | ELECTRONICS & TECHNOLOGY | MEETING AREAS | GRAND ROOM | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 1 | 1 | 1,900 | 50 |
| 302 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | GRAND ROOM | 1 | SHELF (UNDER TV) | 1 | 1 | 200 | 10 |
| 303 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | GRAND ROOM | 1 | HANGING LIGHT FIXTURES | 4 | 4 | 650 | 30 |
| 304 | LOWER LEVEL MEETING ROOMS | ELECTRONICS & TECHNOLOGY | MEETING AREAS | GRAND ROOM | 1 | PHONE - INTERCOM | 1 | 1 | 350 | 10 |
| 305 | LOWER LEVEL MEETING ROOMS | GENERAL EQUIPMENT | MEETING AREAS | GRAND ROOM | 1 | TRASH RECEPTACLE | 1 | 1 | 350 | 30 |
| 306 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | BERRY ROOM | 1 | CONFERENCE TABLES 6' | 2 | 2 | 1,200 | 60 |
| 307 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | BERRY ROOM | 1 | CONFERENCE CHAIRS | 14 | 14 | 3,200 | 150 |
| 308 | LOWER LEVEL MEETING ROOMS | ELECTRONICS & TECHNOLOGY | MEETING AREAS | BERRY ROOM | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 1 | 1 | 1,900 | 50 |
| 309 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | BERRY ROOM | 1 | SHELF (UNDER TV) | 1 | 1 | 200 | 10 |
| 310 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | BERRY ROOM | 1 | HANGING LIGHT FIXTURES | 3 | 3 | 450 | 25 |
| 311 | LOWER LEVEL MEETING ROOMS | ELECTRONICS & TECHNOLOGY | MEETING AREAS | BERRY ROOM | 1 | PHONE - INTERCOM | 1 | 1 | 350 | 10 |
| 312 | LOWER LEVEL MEETING ROOMS | GENERAL EQUIPMENT | MEETING AREAS | BERRY ROOM | 1 | TRASH RECEPTACLE | 1 | 1 | 350 | 30 |
| 313 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | FRANKLIN EAST/WEST | 1 | HANGING LIGHT FIXTURES | 8 | 8 | 1,300 | 60 |
| 314 | LOWER LEVEL MEETING ROOMS | ELECTRONICS & TECHNOLOGY | MEETING AREAS | FRANKLIN EAST/WEST | 1 | TELEVISION, INCLUDING INSTALLATION & PROGRAMMING | 2 | 2 | 3,800 | 100 |
| 315 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | FRANKLIN EAST/WEST | 1 | SHELF (UNDER TV) | 2 | 2 | 400 | 20 |
| 316 | LOWER LEVEL MEETING ROOMS | GENERAL EQUIPMENT | MEETING AREAS | FRANKLIN EAST/WEST | 1 | TRASH RECEPTACLE | 2 | 2 | 700 | 60 |
| 317 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | PREFUNCTION AREA | 1 | HEXAGON COUCH | 1 | 1 | 1,600 | 80 |
| 318 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | PREFUNCTION AREA | 1 | OTTOMAN | 6 | 6 | 6,250 | 300 |
| 319 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | PREFUNCTION AREA | 1 | COFFEE TABLE / SIDE TABLE / SOFA TABLE | 4 | 4 | 2,300 | 100 |
| 320 | LOWER LEVEL MEETING ROOMS | OFFICE FURNITURE | MEETING AREAS | PREFUNCTION AREA | 1 | HANGING LIGHT FIXTURES | 6 | 6 | 950 | 45 |
| 321 | LOWER LEVEL MEETING ROOMS | GUESTROOM FURNITURE | MEETING AREAS | BATHROOMS | 2 | WALL MIRROR | 4 | 8 | 1,800 | |
| 322 | LOWER LEVEL MEETING ROOMS | GUESTROOM FURNITURE | MEETING AREAS | BATHROOMS | 2 | SMALL SHELF | 3 | 6 | 450 | |
| 323 | LOWER LEVEL MEETING ROOMS | GUESTROOM FURNITURE | MEETING AREAS | BATHROOMS | 2 | COFFEE TABLE / SIDE TABLE / SOFA TABLE | 1 | 2 | 1,200 | |
| 324 | LUECA RESTAURANT & KITCHEN | ELECTRONICS & TECHNOLOGY | LUECA | RESTAURANT | 1 | SOUND SYSTEM | 1 | 1 | 10,500 | 350 |
| 325 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | COFFEE TABLE / SIDE TABLE / SOFA TABLE | 4 | 4 | 2,300 | 100 |
| 326 | LUECA RESTAURANT & KITCHEN | HOTEL ARTWORK / SCENERY | LUECA | RESTAURANT | 1 | POTTED PLANTS | 4 | 4 | 5,250 | 300 |
| 327 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | LARGE DOUBLE DOOR CABINET, 60"X80" | 1 | 1 | 3,600 | 150 |
| 328 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | TABLE LAMP / FLOOR LAMP | 4 | 4 | 750 | 35 |
| 329 | LUECA RESTAURANT & KITCHEN | HOTEL ARTWORK / SCENERY | LUECA | RESTAURANT | 1 | WALL ART | 8 | 8 | 1,500 | 80 |
| 330 | LUECA RESTAURANT & KITCHEN | HOTEL ARTWORK / SCENERY | LUECA | RESTAURANT | 1 | PICTURES | 11 | 11 | 200 | 10 |
| 331 | LUECA RESTAURANT & KITCHEN | ELECTRONICS & TECHNOLOGY | LUECA | RESTAURANT | 1 | PHONE | 1 | 1 | 60 | |
| 332 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | TABLE, BAR TOP, 60"X24" | 3 | 3 | 2,600 | 100 |
| 333 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | BAR STOOLS | 12 | 12 | 6,500 | 300 |
| 334 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | TABLE, 30"X24" | 27 | 27 | 14,000 | 600 |
| 335 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | TABLE, 36"X36" | 14 | 14 | 7,250 | 300 |
| 336 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | CHAIRS | 76 | 76 | 6,500 | 300 |
| 337 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | COUCHES, CUSTOM SEATING | 21 | 21 | 37,000 | 1,700 |
| 338 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | SHELVING W/ DÉCOR | 5 | 5 | 9,000 | 400 |
| 339 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | UPHOLSTERED BENCH | 1 | 1 | 750 | 30 |
| 340 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | HI-CHAIRS | 4 | 4 | 350 | 15 |
| 341 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | RESTAURANT | 1 | TABLE, BUFFET, MARBLE TOP, 60" | 4 | 4 | 22,000 | 950 |
| 342 | LUECA RESTAURANT & KITCHEN | ELECTRONICS & TECHNOLOGY | LUECA | RESTAURANT | 1 | SOUND SYSTEM | 1 | 1 | 10,500 | 350 |
| 343 | LUECA RESTAURANT & KITCHEN | KITCHEN & BAR EQUIPMENT | LUECA | BAR | 1 | BAR EQUIPMENT C/O: GLASS RACK, SINKS, ICE BINS, SPEED RAIL/RACK, BEER TAP, UNDERCOUNTER COOLERS | 1 | 1 | 19,000 | 1,800 |
| 344 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | PRIVATE ROOM | 1 | TABLES, 36"X84", MARBLE TOP | 4 | 4 | 7,250 | 300 |
| 345 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | PRIVATE ROOM | 1 | BUFFET | 1 | 1 | 5,500 | 250 |
| 346 | LUECA RESTAURANT & KITCHEN | RESTAURANT FURNITURE | LUECA | PRIVATE ROOM | 1 | CHAIRS | 24 | 24 | 2,100 | 90 |
| 347-364 | LUECA RESTAURANT & KITCHEN | KITCHEN & BAR EQUIPMENT | LUECA | KITCHEN | 1 | KITCHEN EQUIPMENT C/O: RANGE, FRENCH TOP; RANGE, 4-BURNER; FLAT TOP & OVEN, 36" WIDE; FRYER, 2-BASKET; CONVECTION OVEN; CONVECTION OVEN (BROKEN AS OF 2024 INSPECTION); SINK STATION, SS; SINK STATION, CORNER, SS; SINK STATION, 3-SINK, SS, 96"; PREP TABLE, 72" W/ SHELVES; PREP TABLE, 93" W. BUILT IN COOLER DRAWERS AND REFRIGERATOR; PIZZA OVEN, WOOD FIRE; TABLE, BUTCHER BLOCK, 24"X24"; CHARCOAL ROTISSERIE; MINI REFRIGERATOR; WALK-IN FREEZER, 6'X3'X6'; KITCHEN VENTILATION SYSTEM, OVERHEAD, ~20LF; REFRIGERATOR, SINGLE DOOR | 1 | 1 | 146,250 | 16,885 |
| 365 | LUECA RESTAURANT & KITCHEN | ELECTRONICS & TECHNOLOGY | LUECA | KITCHEN | 1 | TIME CLOCK | 1 | 1 | 2,000 | 50 |



# Exhibit H: Personal Property Detailed Values

The William Vale Hotel
Personal Property Detailed Values

Exhibit H.1 (continued)

*In U.S. Dollars*

| Stout No. | Category/Location | Asset Type | Room | Room Type | Room Type Qty | Asset Description | Qty | Total Asset Quantity | Current Value (as of 2/28/2017) | Residual Value (as of 2/28/2025) |
|---|---|---|---|---|---|---|---|---|---|---|
| 366 | MAIN KITCHEN (LOWER LEVEL) | KITCHEN & BAR EQUIPMENT | LOWER LEVEL | MAIN KITCHEN | 1 | KITCHEN EQUIPMENT C/O: KITCHEN VENTILATION SYSTEM; WATER FILTERS; VARIOUS ICE MAKERS W/ BINS; PLANETARY MIXERS; BATCH FREEZER; VARIOUS SS SHELVING UNITS; VARIOUS SS WORK TABLES; REACH-IN UNDERCOUNTER REFRIGERATOR; CONVECTION OVENS; VARIOUS SS RACKS; WALK IN WINE COOLER; L-SHAPED WORK TABLE; WALK-IN COOLER 8'X13'X8'; BLAST CHILLER; WALK-IN COOLER 6'X13'X8'; CONDENSER RACK; WALK-IN COOLER 10'X13'X8; TILTING SKILLETS, GAS; DOUGH SHELTER; COMBI OVENS; HAND SINKS; MEAT GRINDER; GRATER, ELECTRIC; GAS CHEESEMELTERS; HD RANGES (32"), 6 OPEN BURNERS; HD RANGE (36"), 6 OPEN BURNERS; FRYERS; COUNTERTOP GRIDDLE; HD RANGE (48"), GRIDDLE; REMOTE REFRIGERATOR WORK TABLES; DRAFT BEER SYSTEM; ROLL-IN REFRIGERATOR; DISH CARTS; CONVEYOR MOVERS; WALK-IN COOLER, BEVERAGE 9'X7'X7'; SOILED DISHTABLE; WASTE COLLECTORS; DISHWASHERS; MOBILE HEATED CABINETS; BAKERS TABLE; BACK BAR COOLER; HD RANGE (48"), 8 OPEN BURNERS; HD RANGE, 24" CHARBROILER; HD RANGE, 48" GRIDDLE; PASTA EXTRUDER; THREE COMPARTMENT SINK; BEVERAGE COUNTER; REACH-IN REFRIGERATOR; CARTS; | 1 | 1 | 860,000 | 82,500 |
| 367 | MISCELLANEOUS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | BELLMAN'S CARTS | 4 | 4 | 2,200 | 150 |
| 368 | MISCELLANEOUS | GENERAL EQUIPMENT | HOTEL | PREMISES | 1 | ICE MACHINES | 5 | 5 | 29,000 | 3,000 |
| 369 | MISCELLANEOUS | KITCHEN & BAR EQUIPMENT | HOTEL | PREMISES | 1 | SMALLWARES INVENTORY | 1 | 1 | 340,000 | 32,000 |
| 370 | STORAGE AREA (10TH FLOOR) | GENERAL EQUIPMENT | 10TH FLOOR STORAGE | STORAGE | 1 | LOT OF EQUIPMENT AND SMALL TOOLS C/O: FLOOR SCRUBBER, POWER WASHER, SNOW THROWER, POWER TOOLS, HANDHELD TOOLS | 1 | 1 | 7,250 | 600 |
| 371 | STORAGE AREA (10TH FLOOR) | RESTAURANT FURNITURE | STORAGE | STORAGE | 1 | SATELLITE DESK | 6 | 6 | 45,000 | 2,600 |
| 372 | STORAGE AREA (10TH FLOOR) | RESTAURANT FURNITURE | STORAGE | STORAGE | 1 | SIDE STATIONS | 3 | 3 | 13,000 | 800 |
| 373 | VALE OUTDOOR PARK | UNIQUE HOTEL ASSETS | VALE PARK | OUTDOOR AREA | 1 | 1974 AIRSTREAM W/ COMMERCIAL KITCHEN UPFIT | 1 | 1 | 230,000 | 10,500 |
| 374 | VALE OUTDOOR PARK | KITCHEN & BAR EQUIPMENT | VALE PARK | OUTDOOR AREA | 1 | ICE CREAM MACHINES | 2 | 2 | 21,000 | 2,000 |
| 375 | VALE OUTDOOR PARK | RESTAURANT FURNITURE | VALE PARK | OUTDOOR AREA | 1 | OUTDOOR CHAIRS (IN STORAGE AS OF 2024 INSPECTION) | 25 | 25 | 11,500 | 500 |
| 376 | VALE OUTDOOR PARK | RESTAURANT FURNITURE | VALE PARK | OUTDOOR AREA | 1 | OUTDOOR SIDE TABLES (IN STORAGE AS OF 2024 INSPECTION) | 14 | 14 | 1,700 | 70 |
| 377 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | SINK STATION, 3-SINK, SS, 96" | 1 | 1 | 1,600 | 400 |
| 378 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | GLASS WASHER | 1 | 1 | 7,000 | 650 |
| 379 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | GLASS RACK, 3-SHELF, UNDERCOUNTER | 3 | 3 | 550 | 50 |
| 380 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | FLAT TOP & OVEN, 36" WIDE | 1 | 1 | 5,500 | 500 |
| 381 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | CHARBROILER, 24", TABLE TOP | 1 | 1 | 1,200 | 100 |
| 382 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | PREP TABLE, 6-DRAWER, REFRIGERATED, 72" | 1 | 1 | 5,750 | 550 |
| 383 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | FRYER, 2-BASKET | 2 | 2 | 1,900 | 200 |
| 384 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | PREP TABLE, 72" W/ SHELVES | 3 | 3 | 3,400 | 850 |
| 385 | VALE OUTDOOR POOL AND EVENT | ELECTRONICS & TECHNOLOGY | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | PHONE | 1 | 1 | | |
| 386 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | SINK STATION, SS | 1 | 1 | 800 | 200 |
| 387 | VALE OUTDOOR POOL AND EVENT | KITCHEN & BAR EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR KITCHEN | 1 | REFRIGERATOR, SINGLE DOOR | 3 | 3 | 7,750 | 750 |
| 388 | VALE OUTDOOR POOL AND EVENT | HOTEL ARTWORK / SCENERY | 4TH FLOOR VALE POOL/EVENTS AREA | EVENTS AREA | 1 | PLANTERS | 17 | 17 | 23,000 | 1,100 |
| 389 | VALE OUTDOOR POOL AND EVENT | ELECTRONICS & TECHNOLOGY | 4TH FLOOR VALE POOL/EVENTS AREA | EVENTS AREA | 1 | SOUND SYSTEM | 1 | 1 | 19,500 | 500 |
| 390 | VALE OUTDOOR POOL AND EVENT | RESTAURANT FURNITURE | 4TH FLOOR VALE POOL/EVENTS AREA | EVENTS AREA | 1 | OUTDOOR BAR | 1 | 1 | 19,500 | 3,000 |
| 391 | VALE OUTDOOR POOL AND EVENT | RESTAURANT FURNITURE | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR POOL | 1 | OUTDOOR BAR | 1 | 1 | 19,500 | 3,000 |
| 392 | VALE OUTDOOR POOL AND EVENT | GENERAL EQUIPMENT | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR POOL | 1 | HANDICAP LIFT | 1 | 1 | 5,000 | 400 |
| 393 | VALE OUTDOOR POOL AND EVENT | RESTAURANT FURNITURE | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR POOL | 1 | CABANAS, LARGE | 5 | 5 | 46,000 | 1,900 |
| 394 | VALE OUTDOOR POOL AND EVENT | RESTAURANT FURNITURE | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR POOL | 1 | CABANAS, SMALL | 5 | 5 | 23,000 | 950 |
| 395 | VALE OUTDOOR POOL AND EVENT | RESTAURANT FURNITURE | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR POOL | 1 | OUTDOOR COUCH (PARTIALLY IN STORAGE AS OF 2024 INSPECTION) | 14 | 14 | 13,500 | 550 |
| 396 | VALE OUTDOOR POOL AND EVENT | RESTAURANT FURNITURE | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR POOL | 1 | OUTDOOR CHAISE LOUNGE (IN STORAGE AS OF 2024 INSPECTION) | 44 | 44 | 50,000 | 2,100 |
| 397 | VALE OUTDOOR POOL AND EVENT | RESTAURANT FURNITURE | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR POOL | 1 | OUTDOOR UMBRELLA WITH BASE (IN STORAGE AS OF 2024 INSPECTION) | 15 | 15 | 8,750 | 350 |
| 398 | VALE OUTDOOR POOL AND EVENT | HOTEL ARTWORK / SCENERY | 4TH FLOOR VALE POOL/EVENTS AREA | OUTDOOR POOL | 1 | PLANTERS | 15 | 15 | 21,000 | 1,100 |
| 399 | WAREHOUSE | GENERAL EQUIPMENT | WAREHOUSE | WAREHOUSE | 1 | RACKING (8' X 5 SHELVES) | 20 | 20 | 21,000 | 4,000 |
| 400 | WAREHOUSE | GUESTROOM FURNITURE | WAREHOUSE | WAREHOUSE | 7 | COFFEE MAKER | 7 | 7 | 850 | |
| 401 | WAREHOUSE | GENERAL EQUIPMENT | WAREHOUSE | WAREHOUSE | 1 | LADDER | 1 | 1 | 100 | 10 |
| 402 | WAREHOUSE | OFFICE FURNITURE | WAREHOUSE | WAREHOUSE | 5 | OFFICE CHAIR | 5 | 5 | 650 | 30 |
| 403 | WAREHOUSE | OFFICE FURNITURE | WAREHOUSE | WAREHOUSE | 2 | DESK | 2 | 2 | 800 | 40 |
| 404 | WAREHOUSE | GENERAL EQUIPMENT | WAREHOUSE | WAREHOUSE | 1 | HORIZONTAL FILER | 1 | 1 | 350 | 20 |
| 405 | WAREHOUSE | GENERAL EQUIPMENT | WAREHOUSE | WAREHOUSE | 1 | PERSONAL HEATER | 1 | 1 | 80 | |
| 406 | WAREHOUSE | OFFICE FURNITURE | WAREHOUSE | WAREHOUSE | 2 | WALL CABINET (OVER DESK) | 2 | 2 | 800 | 40 |
| 407 | WAREHOUSE | GENERAL EQUIPMENT | WAREHOUSE | WAREHOUSE | 1 | TRASH COMPACTOR | 1 | 1 | 17,000 | 5,000 |
| 408 | WAREHOUSE | GENERAL EQUIPMENT | WAREHOUSE | WAREHOUSE | 1 | SMALL WIRE RACK | 1 | 1 | 70 | 10 |



# Exhibit H: Personal Property Detailed Values

The William Vale Hotel
**Personal Property Detailed Values**

*In U.S. Dollars*

**Exhibit H.1 (continued)**

| Stout No. | Category/Location | Asset Type | Room | Room Type | Room Type Qty | Asset Description | Qty | Total Asset Quantity | Current Value (as of 2/28/2017) | Residual Value (as of 2/28/2025) |
|---|---|---|---|---|---|---|---|---|---|---|
| 409 | WESTLIGHT RESTAURANT & KITCHEN | KITCHEN & BAR EQUIPMENT | ROOF LEVEL | WESTLIGHT | 1 | KITCHEN EQUIPMENT C/O: GLASS RACKS; WASTE CABINETS; ICE BINS; VARIOUS SS RACKS; DRY WASTE UNITS; REACH-IN UNDERCOUNTER FREEZER; BEER TOWER HEAD; BACK BAR COOLERS; DISHWASHERS; CLEAN DISHTABLE; VARIOUS SS SHELVING UNITS; WATER FILTER; SOILED DISHTABLE;  REFRIGERATED WINE CABINETS; PASTA COOKER; HD RANGE (24") CHARBROILER; HD RANGE (36") 2 FRENCH HOT TOPS; COMBI OVEN, HD RANGE (36") PLANCHA; GAS CHEESEMELTER; FRYER; KITCHEN VENTILATION SYSTEM; SELF CONTAINED REFRIGERATED WORK TABLE; L SHAPED DOUBLE OVERSHELF TABLE MOUNTED; L SHAPED DISH CABINET; WORKTOP FREEZER; L-SHAPED WORK TABLE; REACH-IN UNDERCOUNTER REFRIGERATORS; NUGGET ICE MAKER; REACH-IN REFRIGERATOR; SINGLE DOOR;  WORK COUNTER; 144" X 30"; ICE CUBER; FREEZER; REACH-IN DISPLAY; DRAFT BEER SYSTEM; WALK IN COOLER 9'X9'X8' | 1 | 1 | 290,000 | 72,500 |
| 410 | WESTLIGHT RESTAURANT & KITCHEN | ELECTRONICS & TECHNOLOGY | ROOF LEVEL | WESTLIGHT | 1 | SOUND SYSTEM | 1 | 1 | 10,500 | 350 |
| 411 | WESTLIGHT RESTAURANT & KITCHEN | ELECTRONICS & TECHNOLOGY | WESTLIGHT | RESTAURANT | 1 | PHONE | 1 | 1 | 60 | |
| 412 | WESTLIGHT RESTAURANT & KITCHEN | OFFICE FURNITURE | WESTLIGHT | BACK OFFICE | 1 | DESK | 2 | 2 | 800 | 40 |
| 413 | WESTLIGHT RESTAURANT & KITCHEN | OFFICE FURNITURE | WESTLIGHT | BACK OFFICE | 1 | CHAIRS | 1 | 1 | 90 | 5 |
| 414 | WESTLIGHT RESTAURANT & KITCHEN | KITCHEN & BAR EQUIPMENT | WESTLIGHT | BAR | 1 | BAR EQUIPMENT C/O: GLASS RACK, SINKS, ICE BINS, SPEED RAIL/RACK, BEER TAP, UNDERCOUNTER COOLERS | 1 | 1 | 19,000 | 1,800 |
| 415 | WESTLIGHT RESTAURANT & KITCHEN | RESTAURANT FURNITURE | WESTLIGHT | BAR | 1 | SHELVING, CUSTOM, OVERHEAD | 1 | 1 | 3,800 | 150 |
| 416 | WESTLIGHT RESTAURANT & KITCHEN | RESTAURANT FURNITURE | WESTLIGHT | RESTAURANT | 1 | TABLE, BAR TOP, 60"X24" | 10 | 10 | 9,000 | 400 |
| 417 | WESTLIGHT RESTAURANT & KITCHEN | RESTAURANT FURNITURE | WESTLIGHT | RESTAURANT | 1 | BAR STOOLS | 23 | 23 | 12,500 | 550 |
| 418 | WESTLIGHT RESTAURANT & KITCHEN | HOTEL ARTWORK / SCENERY | WESTLIGHT | RESTAURANT | 1 | POTTED PLANTS | 4 | 4 | 5,250 | 300 |
| 419 | WESTLIGHT RESTAURANT & KITCHEN | RESTAURANT FURNITURE | WESTLIGHT | RESTAURANT | 1 | TABLE, 30"X24" | 24 | 24 | 12,500 | 550 |
| 420 | WESTLIGHT RESTAURANT & KITCHEN | RESTAURANT FURNITURE | WESTLIGHT | RESTAURANT | 1 | CHAIRS | 36 | 36 | 3,000 | 150 |
| 421 | WESTLIGHT RESTAURANT & KITCHEN | RESTAURANT FURNITURE | WESTLIGHT | RESTAURANT | 1 | OTTOMAN | 6 | 6 | 6,250 | 300 |
| 422 | WESTLIGHT RESTAURANT & KITCHEN | RESTAURANT FURNITURE | WESTLIGHT | RESTAURANT | 1 | COUCHES | 12 | 12 | 21,000 | 950 |
| 423 | WESTLIGHT RESTAURANT & KITCHEN | KITCHEN & BAR EQUIPMENT | WESTLIGHT | RESTAURANT | 1 | WAITER CART | 2 | 2 | 4,400 | 300 |
| 424 | WESTLIGHT RESTAURANT & KITCHEN | ELECTRONICS & TECHNOLOGY | WESTLIGHT | RESTAURANT | 1 | SOUND SYSTEM | 1 | 1 | 10,500 | 300 |
| 425 | WESTLIGHT RESTAURANT & KITCHEN | RESTAURANT FURNITURE | WESTLIGHT | RESTAURANT | 1 | LOT OF OUTDOOR FURNITURE AND FIXTURES (COMPLETELY REPLACED IN 2023) | | 1 | 82,500 | |
| 426 | BACK OF HOUSE AREAS | SOFTWARE | VARIOUS | VARIOUS | 1 | SOFTWARE SYSTEMS | 1 | 1 | 540,000 | |

Subject Personal Property Total  $    6,640,415    $     329,210



# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                                  **Exhibit I.1**

| The William Vale Hotel | |
|---|---|
| Category / Location | Guest Room Furniture & Equipment |
| Description | King Room - 1515 |
| Inspection Date | 1/10/2024 |








# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                    **Exhibit I.2**

| The William Vale Hotel | |
|---|---|
| Category / Location | Guest Room Furniture & Equipment |
| Description | Queen Room - 1623 |
| Inspection Date | 1/10/2024 |







# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                    **Exhibit I.3**

| The William Vale Hotel | |
|---|---|
| Category / Location | Guest Room Furniture & Equipment |
| Description | Suite Room - 2020 |
| Inspection Date | 1/10/2024 |







# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                                    **Exhibit I.4**

| The William Vale Hotel | |
|---|---|
| Category / Location | Guest Room Furniture & Equipment |
| Description | Double Room - 1914 |
| Inspection Date | 1/10/2024 |









# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                                   **Exhibit I.5**

| The William Vale Hotel | |
|---|---|
| Category / Location | Back of House Areas |
| Inspection Date | 1/10/2024 |

 

 



# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                    **Exhibit I.6**

| The William Vale Hotel | |
|---|---|
| Category / Location | Lower Level Meeting Rooms |
| Inspection Date | 1/10/2024 |







# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                    **Exhibit I.7**

| The William Vale Hotel | |
|---|---|
| Category / Location | Lobby & Reception |
| Inspection Date | 1/10/2024 |

 





# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                              **Exhibit I.8**

| The William Vale Hotel | |
|---|---|
| Category / Location | Fitness Center |
| Inspection Date | 1/10/2024 |







# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                    **Exhibit I.9**

| The William Vale Hotel | |
|---|---|
| Category / Location | Lueca Restaurant & Kitchen |
| Inspection Date | 1/10/2024 |







# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                    **Exhibit I.10**

| The William Vale Hotel | |
|---|---|
| Category / Location | Main Kitchen (Lower Level) |
| Inspection Date | 1/10/2024 |









# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                              **Exhibit I.11**

| The William Vale Hotel | |
|---|---|
| Category / Location | Westlight Restaurant & Kitchen |
| Inspection Date | 1/10/2024 |








# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                                    **Exhibit I.12**

| The William Vale Hotel | |
|---|---|
| Category / Location | Vale Outdoor Park |
| Inspection Date | 1/10/2024 |







# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                    **Exhibit I.13**

| The William Vale Hotel | |
|---|---|
| Category / Location | Vale Outdoor Pool and Event |
| Inspection Date | 1/10/2024 |







# Exhibit I: Inspection Photographs

**Representative Sample Inspection Photos**                    **Exhibit I.14**

| The William Vale Hotel | |
|---|---|
| Category / Location | Warehouse |
| Inspection Date | 1/10/2024 |

 

 

